UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

PATRICK TRACY,
*on behalf of himself and all other*
*employees similarly situated,*

Plaintiffs,

v.

NVR, INC.,

Defendant.

Civil Action No.

04-CV-06541 DGL (P)

PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT

DOLIN, THOMAS & SOLOMON LLP
*Attorneys for Plaintiffs*
693 East Avenue
Rochester, New York 14607
(585) 272-0540

Of Counsel:  J. Nelson Thomas
Annette Gifford
Cristina A. Bahr

## TABLE OF CONTENTS

*Page*

PRELIMINARY STATEMENT.................................................................................. 1

FACTS.................................................................................................................. 2

ARGUMENT......................................................................................................... 3

I.      *Standard for Summary Judgment* .................................................................. 3

II.     *The Defendant Carries a Heavy Burden to Prove That Patrick Tracy Was Properly Classified as Exempt*.................................................................................................... 4

III.    *Patrick Tracy Was Non-Exempt Based on the Unambiguous Outside Sales Exemption Regulation* ............................................................................................................... 5

        A.  Outside Sales Employees Only Include Those Who Make Sales at the Customer's Place of Business or Home on a Customary and Regular Basis................................. 5

        B.  Pat Tracy Did Not Customarily and Regularly Make Sales at His Customer's Place of Business ................................................................................................ 9

IV.     *Various Opinion Letters From the Wage and Hour Division Do Not Make Mr. Tracy an Exempt Employee*................................................................................................ 10

        A.  Opinion Letters Are an Impermissible Attempt to Alter Unambiguous Regulation............................................................................. 10

        B.  Patrick Tracy's Employment Is Not Consistent with That Described in the Opinion Letters ...................................................................................................... 13

CONCLUSION..................................................................................................... 14

APPENDIX (Opinion Letters)

## <u>TABLE OF AUTHORITIES</u>

### <u>CASES</u>

*Page*

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986) ............................................. 3

*Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960) .............................................. 4

*Auer v. Robbins*, 519 U.S. 905, 911 (1997) ........................................................... 10

*Billingslea v. Brayson Homes, 2006 WL 562198 (Mar. 7, 2006, N.D. Georgia)* ........................... 11

*Billingslea v. Brayson Homes, 2007 WL 2118990 (Jul. 20, 2006, N.D. Georgia)* ......................... 12

*Brennan v. Modern Chevrolet Co.*, 363 F.Supp. 327, 330-31 (N.D.Tex.1973) ............................. 6

*Casas v. Conseco Finance Corp.*, 2002 WL 507059, *10 (D. Minn.) ..................................... 8

*Christensen v. Harris County*, 529 U.S. 576, 588 (2000) .............................................. 10

*Donovan v. Frezzo Bros., Inc.*, 678 F.2d 1166 (3d Cir. 1982) ........................................ 4

*Falleson v. Paul T. Freund Corp.*, 2007 WL 4232783 (W.D.N.Y. 2007) ................................. 4, 8

*Frankel v. Bally, Inc.*, 987 F.2d 86, 88 (2d Cir. 1993) ............................................. 3

*Idaho Sheet Metal Works, Inc. v. Wirtz*, 383 U.S. 190, 206 (1966) ................................... 4

*IntraComm, Inc. v. Bajaj*, 492 F.3d 285, 292 (4th Cir. 2007) ........................................ 7

*Jackson v. Go-Tane Services, Inc.*, 56 Fed.Appx. 267, 272, n. 8 (7th Cir.2003) ...................... 8

*Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896, 900 (3d Cir. 1991) ............................... 4, 8

*Rubery v. Buth-Na-Bodhaige, Inc.*, 470 F. Supp.2d 273, 278 (W.D.N.Y. 2007) (Larimer, J.) ........... 4, 9

*Secretary of Labor v. Daylight Dairy Prods., Inc.*, 779 F.2d 784, 787 (1st Cir.1985) ................ 8

*Todaro v. Township of Union*, 40 F. Supp.2d 226, 228 (D.N.J. 1999) ................................. 4

*Wage & Hour Div. Op. Ltr., Oct. 26, 2006, 2006 WL 3406603* .......................................... 8

*Wage & Hour Div. Op. Ltr., December 21, 2006, 2006 WL 3930478* ...................................... 8

*Wage & Hour Div. Op. Ltr., January 25, 2007, 2007 WL 506575* ....................................... 10, 13

ii

*Wage & Hour Div. Op. Ltr., January 25, 2007, 2007 WL 506574*...........................................10

*Wage & Hour Div. Op. Ltr., January 25, 2007, 2007 WL 506577*....................................7, 11

*Wage & Hour Div. Op. Ltr., January 31, 1964, 1964 DOLWH LEXIS 156*.............…................12

## REGULATIONS & STATUTES

29 C.F.R. § 541.502 .................................................................................... ...5, 11

29 C.F.R. § 541.701 .................................................................................... 8, 13

Federal Rule of Civil Procedure 56 ............................................................. 3

Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees, 69 Fed. Reg. 22122-01 (April 23, 2004) ................................ 6

## PRELIMINARY STATEMENT

Patrick Tracy is entitled to summary judgment in his favor on the issue of liability because the defendant did not pay him overtime as required under the Fair Labor Standards Act ("FLSA").[1] Mr. Tracy was employed by Ryan Homes ("Ryan Homes," or the "company" or "NVR" or "defendant") from approximately January 2000 until August 2005 as a Sales and Marketing Representative ("SMR") and he was not paid overtime when he worked over 40 hours in a week.

There are only a few limited exemptions to the FLSA, and the employer bears the heavy burden to prove that the employee's actual job duties fit within one of those exemptions.

To be exempt under the FLSA's outside sales exemption, an employee must "customarily and regularly" be making sales at his customers' places of business or homes.  If the employee is making sales in other locations, particularly any fixed site from which sales are made on behalf of the employer, the employee remains non-exempt.

Mr. Tracy's job is a paradigmatic example of an inside, not outside, sales employee. Under Ryan Homes' business model, customers came to him. He did not go and sell to customers at their homes or places of business.  He *never* travelled to non-Ryan Homes sites to make sales; he *never* made sales at customers' homes; he *never* made sales at customers' places of business.  The only place where he performed his sales work with customers was on Ryan Homes' fixed sales sites.  Therefore, Mr. Tracy does not qualify for the outside sales exemption and is entitled to summary judgment in his favor.

---

[1]     Named Plaintiff Patrick Tracy ("plaintiff") commenced this action personally, and on behalf of all employees similarly situated.  With this motion, Patrick Tracy moves for summary judgment as a matter of law, with respect to himself only.

## FACTS

As an SMR, Mr. Tracy would never go to customer's homes to sell houses. *See* Affirmation of Patrick Tracy, sworn to on December 11, 2007 (Plaintiff's Appendix to Statement of Material Facts Not in Dispute, Exhibit A ("Tracy Aff.")), ¶ 19. Instead, the customers would come to Mr. Tracy at a Ryan Homes sales site where the company had stationed him. *See* Tracy Aff. ¶¶ 8, 11, 17, 22.  Ryan Homes stationed Mr. Tracy at these sites for long stretches of time. *See* Tracy Aff. ¶ 65.  These sales sites, or home communities, were generally large tracts of land which Ryan Homes was having developed into a subdivision. *See* Tracy Aff. ¶ 7.  Ryan Homes, though, would not build a house on the site until a purchaser had agreed to buy one and had picked out which design and features he wanted. *See* Tracy Aff. ¶ 7.  These facts cannot be disputed by the defendant.  (As set forth in Plaintiff's Motion to Have its Requests for Admission Deemed Admitted, Docket No. [265],  the defendant was not able to dispute these facts when served on it and those facts must now be admitted for the purposes of this litigation.)

Therefore, when the customers came to Mr. Tracy to inquire about buying a house, Mr. Tracy did not have an available house to show them. *See* Tracy Aff. ¶ 14.  Instead, he would greet the customer, show them around a model home, and see if on that visit, or a later visit, he could finalize the sale with the customer. *See* Tracy Aff. ¶¶ 30, 31, 35, 36.

All of his sales activity was done exclusively from a Ryan Homes sales site. *See* Tracy Aff. ¶ 11.  Ryan Homes deliberately designed the sales site to be "one-stop shopping" for the customer. *See* Tracy Aff. ¶¶ 26, 27.  It did not want the SMR to ever have to leave the sales site as part of the sales process. *See* Tracy Aff. ¶ 46.  Therefore, it made sure that *everything* needed to make a sale was at the sales site location—the property itself was there, as well as

the sample features of the model home and all of the necessary paperwork for the purchase agreement. *See* Tracy Aff. ¶ 26. Thus, unlike a traditional real estate agent, Mr. Tracy did not travel throughout the day visiting various homes throughout the area to make sales, nor was he going to and from customers' homes as part of the sales process. *See* Tracy Aff. ¶¶ 6, 9, 10, 11, 12.

Mr. Tracy rarely had to leave the model home on the sales site. *See* Tracy Aff. ¶¶ 45, 57, 58. Occasionally a customer would want to visit a lot once they had decided on a purchase, but Mr. Tracy would not always accompany him, and when he did, he visited the lot only briefly. *See* Tracy Aff. ¶¶ 50, 57. Ryan Homes dictated this approach because it required that Mr. Tracy never leave the model for more than 15 minutes without a manager's permission to avoid missing a customer. *See* Tracy Aff. ¶ 46. Such site visits occurred approximately two times a month. *See* Tracy Aff. ¶¶ 57, 59.

Further, for many weeks of employment Mr. Tracy never visited a lot. *See* Tracy Aff. ¶ 61. Ryan Homes had Tracy "pre-sell" houses, meaning that he worked from a model in a sold-out community and sold houses for a yet undeveloped sales site, or sold on land before there was any development and any lots to visit. *See* Tracy Aff. ¶ 62.

## ARGUMENT

### I.    STANDARD FOR SUMMARY JUDGMENT.

Summary judgment is appropriate when "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Frankel v. Bally, Inc.*, 987 F.2d 86, 88 (2d Cir. 1993). As set forth below, Patrick Tracy is entitled to summary judgment.

## II.   THE DEFENDANT CARRIES A HEAVY BURDEN TO PROVE THAT PATRICK TRACY WAS PROPERLY CLASSIFIED AS EXEMPT.

The outside sales exemption is a statutory exemption. Therefore, the employer carries the burden of proving that the employee was properly classified as exempt. "The burden of proving these exemptions is upon the employer." *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960); *Idaho Sheet Metal Works, Inc. v. Wirtz*, 383 U.S. 190, 206 (1966).

Further, the FLSA exemptions are strictly construed against the employer. Both the Circuit Courts and the Supreme Court have repeatedly held that "exemptions from the Act's requirements are to be 'narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within their terms and spirit.'" *Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896, 900 (3d Cir. 1991) (*citing Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960)); *Idaho Sheet Metal Works, Inc. v. Wirtz*, 383 U.S. 190, 206 (1966); *Donovan v. Frezzo Bros., Inc.*, 678 F.2d 1166 (3d Cir. 1982); *Todaro v. Township of Union*, 40 F. Supp.2d 226, 228 (D.N.J. 1999). *See also Falleson v. Paul T. Freund Corp.*, No. 03-CV-6277L, 2007 WL 4232783, * 3 (W.D.N.Y. 2007) (Larimer, J.); *Rubery v. Buth-Na-Bodhaige, Inc.*, 470 F.Supp.2d 273, 276 (W.D.N.Y. 2007)(Larimer, J).

In this case, there is no dispute that the defendant is an enterprise engaged in interstate commerce with annual sales volume in excess of $500,000. *See* Tracy Aff. ¶ 4. Defendant did not pay Mr. Tracy overtime for those weeks he worked over 40 hours. *See* Tracy Aff. ¶ 90. Therefore, plaintiff has carried his burden of proof. Because the defendant cannot carry its heavy burden of proving an exemption applies, plaintiff is entitled to judgment in his favor.

III.   **PATRICK TRACY WAS NON-EXEMPT BASED ON THE UNAMBIGUOUS OUTSIDE SALES EXEMPTION REGULATION.**

    A.   *Outside Sales Employees Only Include Those Who Make Sales at the Customer's Place of Business or Home on a Customary and Regular Basis.*

To qualify as an "outside sales" employee under the FLSA, an employee must "make[] sales at the customer's place of business or...at the customer's home." 29 C.F.R. § 541.502. Sales made at places other than the "customer's place of business" or the "customer's home" therefore will not count towards the exemption.

Because of this rule, "**any** fixed site...used by a salesperson [for sales] is considered one of the employer's places of business, even though the employer is not in any formal sense the owner or tenant of the property," and thus "any" such fixed site is *per se* excluded as a place of outside sales. 29 C.F.R. § 541.502 (emphasis added). If a sales employee travels from "city to city" and spends on occasion no more than one to two weeks at a trade show or hotel sample room, then that limited transitory time at these specific locations will not count as the employer's place of business. *Id.*

In essence, the outside sales regulations describe an employee whose job it is to regularly travel among his various customers to make sales; outside sales employees do not work from any fixed site, nor do customers come to see them. Because in these cases the employer cannot effectively monitor the employee's working hours, has no control over the site from which the sales occur, and is generally not setting the employee's schedule, it is not hard to see why true outside sales employees are allowed one of the narrow exemptions to the FLSA. Generally speaking, a truly exempt outside sales employee can carry out sales work even if the employer's sales location is closed. U.S. Dep't of Labor, Report and Recommendations on Proposed Revisions of Regulations, Part 541, at 80 (June 30, 1949).

("An outside salesman['s]...exempt work (selling) may be carried on even when the office or plant is closed.").

Consistent with the unique realities of an outside sales person, the Department has repeatedly acknowledged that the requirements for truly exempt "outside" work are quite limited. Any sales employee who is making sales at places other than the customer's place of business or home cannot meet the statutory requirement to be an outside sales employee. Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees, 69 Fed. Reg. 22122-01 (April 23, 2004) ("The Department emphasizes...[it] does not have the statutory authority to exempt inside sales employees from the FLSA...under the outside sales exception.")

Therefore, the determination of an "outside" sales employee hinges entirely on whether he spends his time travelling to his customers to make sales. An "outside" sales employee is not created because the salesman happens to walk "outside" at a fixed sales site— after all, he is not going to his customer's place of business to make sales. For example in *Brennan v. Modern Chevrolet Co.*, the Department of Labor successfully sued an employer because the employer did not pay overtime to salespersons who made sales on the employer's large outdoor car lot. The car dealer argued that its car salesmen were outside salesmen, based on the fact that its salesmen regularly traveled from the dealer's inside showroom to the outside car lot and thus became "outside sales persons." 363 F.Supp. 327, 330-31 (N.D.Tex.1973). The court rejected this argument holding, "the employees...were not engaged in their activities away from the place of business of their employer, but in fact were employed to work on the premises of the employer at their showrooms and car lots." *Id*. The court noted, "the regulations provide that to qualify for the exemption of outside salesmen

- 6 -

the employee must be customarily and regularly engaged away from his employer's place or places of business." The court expressly noted that "the regulation is *unambiguous on what constitutes an outside salesman*" and that it required the employee to be going to the customer to make sales, not simply moving around even significant distances at the employer's location, or going outside at the employer's location. *Id*. (emphasis added). *See also IntraComm, Inc. v. Bajaj*, 492 F.3d 285, 292 (4th Cir. 2007) (finding plaintiff was not exempt as an outside sale person where "he only went on four sales calls during his ten months of employment, and primarily worked" ...at the employer's headquarters); U.S. Dep't of Labor, *Wage & Hour Op. Letter, dated January 25, 2007*, 2007 WL 506577 (finding employees who travel and transport customers from an office to a location where timeshare resorts are for sale are non-exempt because both the office and resort locations qualify as the employer's place of business).

These holdings are only logical. Whether employees are outside salesmen turns on something much more fundamental: whether they are travelling to different customers, as opposed to the customers coming to them. An employee does not become exempt just because he walks from his sales desk to pick up an order catalogue across the room. Nor does he become exempt if he leaves the same sales desk and walks down a long hall to the warehouse to look at merchandise. And he does not become exempt when he leaves the building in which he works and walks down the street to show a customer merchandise in the lot—even if that lot is some distance from his "inside" sales desk. In none of these cases is the salesperson acting as a true outside salesman by going to different locations to make sales at the customer's place of business or home.

Nor can occasional sales visits to customers meet the exemption under the regulation. Instead, the sales employee must "customarily and regularly" make sales at the customer's

place of business or home.  Thus, even if a sales person's job "includes" making outside sales, or if he occasionally makes such sales, he retains the exemption.  The regulations are clear that such work must be performed "recurrently" during each week – tasks performed less than once or twice a week simply do not meet the standard for "customary and regular" work.  29 CFR § 541.701.

Courts have drawn general boundaries regarding what is customary and regular, based on the percentage of time an employee performs those exempt tasks.  For example, courts have held that a sales employee who spends 80-90% of his time at the sales site cannot be "customarily and regularly" engaging in outside sales. *Casas v. Conseco Finance Corp.*, 2002 WL 507059, *10 (D. Minn.).[2] This Court has reached a similar conclusion in a case involving the same defense counsel as in this case, holding that if a jury concluded an employee spent 75%-80% of her time at the employer's place of business, the plaintiff can prevail on her claim that she does not meet the outside sales exemption. *Falleson v. Paul T. Freund Corp.*, No. 03-CV-6277L, 2007 WL 4232783 (W.D.N.Y. Nov. 28, 2007) (Larimer, J.).  Other courts have held that 76% and 67% of time falls short of the requirement that the employee be engaged in certain work "customarily and regularly."  *See e.g.*, *Secretary of Labor v. Daylight Dairy Prods., Inc.*, 779 F.2d 784, 787 (1st Cir.1985) (76% "falls short of 'regular and customary'"); *Jackson v. Go-Tane Services, Inc.*, 56 Fed.Appx. 267, 272, n. 8 (7th Cir.2003) (67% "falls short of 'regular and customary'").  This Court itself has held that if an employee spends less than

---

[2]    This is consistent with the Department of Labor's repeated guidance that an employee who spends 5 to 10% of his time on a task does not even meet the regulation's lower reduced threshold that his job "include" certain tasks.  *See* U.S. Dep't of Labor, *Wage & Hour Op. Letter, dated December 21, 2006*, 2006 WL 3930478; U.S. Dep't of Labor, *Wage & Hour Op. Letter, dated October 26, 2006*, 2006 WL 3406603.  Thus, if 5 to 10% of the time does not satisfy the threshold of an employee's duties as "including" certain tasks, 5-10% of any employees' time certainly cannot satisfy the customarily and regularly threshold.

80% of his time performing a task it is at least an issue of fact as to whether the employee engaged in such work "customarily and regularly." *Rubery v. Buth-Na-Bodhaige, Inc.*, 470 F. Supp.2d 273, 278 (W.D.N.Y. 2007) (Larimer, J.).

Therefore, under the unambiguous terms of the regulation, a salesperson will only be exempt as an outside salesperson if he is customarily and regularly travelling around to various customers' places of business to make his sales. In contrast, if he is making sales at any other fixed site (even a large one, or one "outside") he is a non-exempt employee.

**B.    *Pat Tracy Did Not Customarily and Regularly Make Sales at His Customer's Place of Business.***

As a SMR at Ryan Homes, Mr. Tracy never made sales at the homes or offices of Ryan Homes' customers. *See* Tracy Aff. ¶¶ 19, 20. Like a typical inside salesperson, the customers came to Ryan Homes' sales site and Mr. Tracy sold from there. *See* Tracy Aff. ¶ 22. In all the years Mr. Tracy worked for Ryan Homes, he *never* sold from anywhere but a Ryan Homes' sales site—and he certainly never did so customarily and regularly. *See* Tracy Aff. ¶¶ 18, 21. Thus, Ryan Homes employed the exact opposite of an outside sales business model. Ryan Homes never wanted Mr. Tracy to leave the sales site to sell to customers at their home or business, as an outside sales employer would. *See* Tracy Aff. ¶ 21. In fact, Ryan Homes told Mr. Tracy not to make such outside sales approaches—so much so that he was never supposed to leave the sales site for more than 15 minutes without permission. *See* Tracy Aff. ¶¶ 46, 47, 48. Ryan Homes also made sure that any sales efforts could all occur at the "one stop shop" of the sales site, not the customer's home. *See* Tracy Aff. ¶ 27.

Thus, when Mr. Tracy's duties are measured by the standards set out in the regulations, it is clear he was not in exempt outside sales. It is undeniable that Ryan Homes' plot of undeveloped land, with lots upon which homes are to be built, is not the *customer's*

home, or place of business.  Nor are the sales sites hotel sample rooms or trade shows.  They are Ryan Homes' sales sites from which SMRs sell for the company.  Not once did Mr. Tracy travel to customers' places of business to make sales.  *See* Tracy Aff. ¶ 20.  Because he only sold to customers who left their homes and businesses and came to Ryan Homes' sales site, Mr. Tracy's job simply does not match the narrow and unambiguous outside sales exemption.

## IV.  VARIOUS OPINION LETTERS FROM THE WAGE AND HOUR DIVISION DO NOT MAKE MR. TRACY AN EXEMPT EMPLOYEE.

Defendant has indicated that its defense relies primarily on two recent Wage and Hour Opinion letters issued by the Wage and Hour Division of the Department of Labor (the "Division").  *See* U.S. Dep't of Labor, *Wage & Hour Op. Letter*, dated January 25, 2007, 2007 WL 506575; U.S. Dep't of Labor, *Wage & Hour Op. Letter*, dated January 25, 2007, 2007 WL 506574 (a third letter was also issued that day as well, discussed *infra* on pp. 11).  Although facially congruent with defendant's legal argument, any scrutiny of those letters demonstrates why they cannot, as a legal matter, be relied on in this case.  Further, the circumstances of Mr. Tracy's employment is different from that covered by the letters.

### A.  *Opinion Letters Are an Impermissible Attempt to Alter Unambiguous Regulations*

First, the Division's recent opinion letters may only be considered, *if* the regulation they interpret is ambiguous.  Even then, they are not controlling, but only carry weight if they have the power to persuade the Court.  Thus when the regulation is unambiguous, the agency cannot "interpret" that regulation to mean something else.  *See Christensen v. Harris County*, 529 U.S. 576, 588 (2000) (courts should not give consideration to the DOL's interpretation of the regulation unless "the language of the regulation is ambiguous") citing *Auer v. Robbins*, 519 U.S. 905, 911 (1997) (holding that DOL interpretations of its own

regulation can only govern if the regulation is ambiguous and is not plainly erroneous and inconsistent with the regulation). Here, the regulation is anything but ambiguous: sales must be made "at the customer's place of business or...at a customer's home." 29 C.F.R. § 541.502. Yet, the opinion letters *do not even address* this unambiguous requirement of the regulation. To hold that model sales-persons were exempt without even applying the unambiguous requirements of the regulation that sales be made at the customer's home or place of business results in the opinion letters deserving no consideration at all.

And as if ignoring unambiguous requirements were not enough to make the opinion letters unreliable, they go further and misconstrue two additional unambiguous requirements. First, the opinion letters narrowly construe what constitutes the employer's place of business, limiting it only to the land the model home was on, as opposed to the entire sales site. The regulations, though, impose a clear definition that the employer's place of business means "any fixed site," not just a site that will ensure that the employees are considered exempt. *See* 29 CFR § 541.502.

Second, the opinion letters read into the otherwise unambiguous regulations a requirement that the employer maintain a continuing interest in the sales site. U.S. Dep't of Labor, *Wage & Hour Op. Letter, dated January 25, 2007*, 2007 WL 506577. Besides not being a regulatory requirement, and also contradicting the regulations which provide for only two exceptions (trade shows and hotel sample rooms – not model home sales sites), the definition of an outside salesperson simply does not turn on how long his sales site may remain in the employer's control. Taken to its logical conclusion, anytime an inside salesperson's location was up for sale, the employee would automatically become exempt. [3]

---

[3]     Plaintiff's position is in accord with Billingslea v. Brayson Homes, No. Civ.A. 104CV00962JEC, 2006 WL 562198 (Mar. 7, 2006, N.D. Georgia) (Billingslea I), citing *Wage*

Further, all three of these erroneous opinions have to be valid for the opinion letters' conclusion to be valid; if any one of them is incorrect, their conclusions are without foundation.

Finally, the recent opinion letters are not consistent with the tenor and purpose of the statute and regulation as relates to outside sales. The regulation is designed to deal with employees who are traveling frequently to a number of customers' locations to make sales. The regulations make clear that the purpose is not to cover sales employees whose customers come to visit them. These "inside" sales employees simply do not have jobs that justify exclusion from the FLSA: the employer has control and knowledge of the hours of these employees' work and is often setting general schedules for the employees—unlike the outside sales employee who is moving around from customer to customer at his own initiative far from any fixed site of the employer. Ultimately, the opinion letters are a conclusion in search of a principled rationale.

Put into context, the results of these opinion letters is not surprising. These opinion letters resulted from a concerted effort by defendant's former counsel, Tammy McCutchen, to obtain an opinion letter in her then-client's favor. *See* Affirmation of J. Nelson Thomas, sworn to, December 12, 2007 ("Thomas Aff."). Despite the Division's rule that parties in

---

*and Hour Div. Op. Ltr.*, January 31, 1964, available at 1964 DOLWH LEXIS 156, holding the model home sales persons at issue to be non-exempt and decided before the recent model home salesperson letters. However, when the Department of Labor issued its recent model home opinion letters, the court reversed its earlier decision, cursorily giving deference to the new opinion letters. Billingslea v. Brayson Homes, No. Civ.A. 104CV00962JEC, 2007 WL 2118990 (Jul. 20, 2006, N.D. Georgia) (Billingslea II). This change in the holding is both surprising and in error. Because the court had previously found the Department of Labor's regulation to be unambiguous, the issuance of new opinion letters which erred again in attempting to change the regulation by "interpretation," still remained as impermissible as was when the court's first decision was issued. The fact that a department does not follow its own regulations does not become any more acceptable because it happens repeatedly or recently.

"private pending litigation" are forbidden to seek guidance from the Division on that litigation, Ms. McCutchen, through her connections as a former Division administrator, petitioned for (and managed to achieve) from her successor, opinion letters which were facially favorable for her client. *See* U.S. Dep't of Labor, *Wage & Hour Op. Letter, dated January 25, 2007*, 2007 WL 506575. Having friends in the Division, however, does not save the defendant, because the opinion letters take a position contrary to the unambiguous regulations applicable in this case and can therefore be given no weight.

> **B.**    *Patrick Tracy's Employment Is Not Consistent with That Described in the Opinion Letters*

Even if the recent model home opinion letters were adopted in this case, they would not preclude summary judgment for Mr. Tracy. The opinion letters are founded on a model home salesperson frequently leaving the model home to visit lots within the sales site, supposedly converting an inside salesperson into one that was "customarily and regularly" engaging in outside sales. However, those facts do not fit what Mr. Tracy did.

First, Mr. Tracy left the model to visit the lots perhaps two times a month. As noted above, for a duty to be "customary and regular" it needs to at least be done repeatedly throughout each week. 29 C.F.R. § 541.701. Mr. Tracy did not do so here, and he certainly never came close to clearing the 10-20% time threshold for customary and regular work on a motion for summary judgment. *See* Tracy Aff. ¶ 60.

Second, there were many work weeks in which it is undisputed that Mr. Tracy did not ever leave the model because he was "pre-selling." *See* Tracy Aff. ¶¶ 61, 62. Over these months there were simply no lots to visit because the sales site had not even begun being cleared. *See* Tracy Aff. ¶ 63. Therefore, certainly in these weeks in which Mr. Tracy had no

place to visit, he was not an outside sales employee even under the facts in the opinion letters.

Just as the opinion letters themselves are not congruent with regulations, they are also not congruent with the facts of this case. Therefore this Court should not consider them.

**CONCLUSION**

For the foregoing reasons, plaintiff respectfully requests that this Court grant summary judgment in favor of Patrick Tracy.

Dated:  December 12, 2007

**DOLIN, THOMAS & SOLOMON LLP**

By: /s/  J. Nelson Thomas
    J. Nelson Thomas, Esq.
    Annette M. Gifford, Esq.
    Cristina A. Bahr, Esq.
    *Attorneys for Plaintiff*
    693 East Avenue
    Rochester, New York 14607
    Telephone: 585.272.0540
    nthomas@theemploymentattorneys.com
    agifford@theemploymentattorneys.com
    cbahr@theemploymentattorneys.com

# APPENDIX

Westlaw.

2006 WL 3930478 (DOL WAGE-HOUR)

Wage and Hour Division

United States Department of Labor

Opinion LetterFair Labor Standards Act (FLSA)

December 21, 2006

*** [FNa1]

This is in response to your letter requesting an opinion regarding whether copy editors and senior copy editors qualify as "administrative" employees under section 13(a)(1) of the Fair Labor Standards Act (FLSA) and 29 C.F.R. Part 541, [FN1] and, therefore, are exempt from the minimum wage and overtime pay requirements of the FLSA. It is our opinion that the copy editors and senior copy editors are not exempt administrative employees.

Your company is a direct marketing firm that focuses on the sale of books and promoting sales through several book clubs. The copy editors and senior copy editors review materials used for marketing and promoting books to book club members; they do not review the content of the books themselves. Your correspondence describes the two positions using virtually identical terms, with the exception of the required experience. The copy editor position requires two years of copy editing experience; the senior copy editor position requires four years of this experience. In addition, with respect to "work autonomy," the copy editor position is rated at three (on a scale of one to five, with one representing the least autonomy), and the senior copy editor position is rated at four on the same scale. Although both positions report to the supervisor of copy editing, the senior copy editor's work apparently is monitored less closely than the work of the copy editor. Each position requires a

bachelor's degree in either English or Journalism.

Employees in each of the two positions read club marketing promotional materials prepared by copywriters and make any necessary corrections for structure, grammar, comprehension, spelling, clarity, and accuracy. They correct the keying of test versions, check for adherence to legal requirements for trademarks and copyrights, and ensure compliance with postal rules and scanning standards. The copy editors and senior copy editors also review the accuracy of publication titles, authors' names, code numbers, and prices, and ensure that the company's requirements for style and procedures are met. They organize work priority to meet deadlines according to promotion schedules. They make decisions on workflow and communicate these decisions to club copywriters.

If a particular job is late, the copy editors and senior copy editors are responsible for making a judgment call concerning the level of review and whether to release the materials to prepress. They identify and implement streamlining ideas. On occasion, they head special projects assigned by management. They attend professional seminars and classes, as may be needed, to keep their skills current. They act as liaison with the legal department on legal compliance issues and with the operations department to assure all postal and scanning standards are correct. They attend departmental and book club status meetings.

Section 13(a)(1) of the FLSA exempts from its minimum wage and overtime pay provisions "any employee employed in a bona fide . . . administrative . . . capacity." The exemption is determined not by occupational title or job classification, but rather by the duties and salary of the individual employee involved. *See* 29 C.F.R. § 541.2. The regulatory provisions relevant to your inquiry are contained in 29 C.F.R. §§ 541.200-.203. As provided in the regulations, the administrative exemption in section 13(a)(1) of the FLSA applies to "any employee":
    (1) Compensated on a salary or fee basis at a rate of not less than $455 per week . . .

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 3930478 (DOL WAGE-HOUR)

exclusive of board, lodging or other facilities;
(2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of th employer or the employer's customers; and
(3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.
29 C.F.R. § 541.200(a).

We understand that the copy editors and senior copy editors receive at least $455 per week on a salary basis. Therefore, the first requirement for the exemption is satisfied.

The primary duty of the copy editors and senior copy editors is "office or non-manual work." We do not believe their primary duty, however, is "directly related to the management or general business operations of the employer or the employer's customers." As explained in the preamble to the 2004 revisions to the Department's Part 541 regulations, this exemption is limited to those employees whose duties relate to the administrative, as distinguished from the production, functions of a business. Thus, the exemption applies to employees whose work involves servicing the business itself. *See Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees*, 69 Fed. Reg. 22,121, 22,141 (Apr. 23, 2004).

Although the "production versus staff" dichotomy in the test is instructive, it is not dispositive of exempt status. In *Bothell v. Phase Metrics, Inc.*, 299 F.3d 1120 (9th Cir. 2002), for example, the Ninth Circuit found the dichotomy "useful only to the extent that it helps clarify the phrase 'work directly related to the management policies or general business operations.'" *Id.* at 1126 (citation omitted). The court further stated:
> This approach is sometimes appropriate because, as we have said, the dichotomy is but one analytical tool, to be used only to the extent that it clarifies the analysis. Only when work falls 'squarely on the production side of the line,' has the administration/production dichotomy been determinative.
*Id.* at 1127 (citation omitted).

As noted in the preamble to the final rule, the Department has adopted the Ninth Circuit's

approach in *Phase Metrics* that the "production versus staff" dichotomy is but one analytical tool that is determinative only if the work falls squarely on the production side of the line. *See* 69 Fed. Reg. at 22,141. The primary duty of the copy editors and senior copy editors described in your request does seem to fall squarely on the production side of the line for their employer, a direct marketing firm, and, thus, the employees are non-exempt.

As indicated above, these employees read and make any necessary corrections to club marketing promotional materials for structure, grammar, comprehension, spelling, clarity, and accuracy. They correct the keying of test versions and check for adherence to legal requirements for trademarks and copyrights and postal and scanning standards. They also review the accuracy of publication titles, authors' names, code numbers, and prices and ensure that the company's requirements for style and procedures are met. All of these processes appear to be technical steps involved in the production of the employer's marketing materials.

The copy editors and senior copy editors attend professional seminars and classes, as needed, to keep their skills current. They also attend departmental and book club status meetings. These activities do not appear to be administrative duties related to the management or general business operations of the employer. Although attending club status meetings might be viewed as an activity related to the general business operations of the employer's customers, *i.e.*, the book clubs, you provide no information that suggests how the employees' particular duties during this activity may affect the management or general business operations of the clubs themselves in significant matters. *See* 29 C.F.R. § 541.201(c). Consequently, the copy editors and senior copy editors do not appear to meet the second prong of the administrative exemption.

The third prong in the test for the administrative exemption requires that the employee's primary duty must include the exercise of discretion and independent judgment with respect to matters of significance. "The exercise of discretion and independent judgment implies that the employee has authority to make an independent choice, free from immediate direction or supervision." 29 C.F.R. § 541.202(c). As further clarified in 29

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

C.F.R. § 541.202(e), "[t]he exercise of discretion and independent judgment must be more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources." Many of the duties described above (checking materials for grammar, spelling, clarity, etc.) involve the use of skill rather than the exercise of discretion and independent judgment. *See* Wage and Hour Opinion Letter FLSA2006-14NA(June 29, 2006) (employee who reviewed government contract bid proposals, client reports and government reports for grammar, accuracy, completeness, and "plain English" did not exercise discretion and independent judgment). In this case, the employees also organize work priorities to meet production deadlines set by management. We believe this activity does not demonstrate the exercise of discretion with respect to matters of significance because of the nature of the decision itself and the fact that management has already set the production deadline for these employees. Similarly, although they make decisions on workflow within their areas and communicate these decisions to club copywriters, the discretion exercised is fairly narrow because of the deadlines set by others. In this regard, it is not sufficient that an employee makes decisions regarding "when and where to do different tasks, as well as the manner in which to perform them." *Clark* v. *J.M. Benson Co.*, 789 F.2d 282, 287 (4th Cir. 1986). Rather, the regulations emphasize both the nature and the level of importance of an employee's decisions as they relate to managing the employer's business operations. *See* 29 C.F.R. § 541.202(b); Wage and Hour Opinion Letters FLSA2006-27 (July 24, 2006) and FLSA2005-21 (August 19, 2005).

On occasion, when a particular job is late, the employees make a judgment call regarding the level of higher review needed and on releasing the material to prepress. Although this activity does suggest discretion and independent judgment, the arrangement seems akin to management policies in which members of the staff are delegated some special authority for unusual or emergency circumstances. This function, however, does not appear to be a routine or normal part of the employees' primary duty.

The copy editors and senior copy editors identify and implement streamlining ideas. On occasion, they head special projects assigned by management.

Whether these functions are part of the employees' primary duty and require discretion and independent judgment on matters of significance depends on the individual circumstances. It does not appear that these employees have broad discretion outside their specialized areas of responsibility to implement policy changes or to carry out special assignments on matters of significant impact to the company. Moreover, these functions do not appear to be essential to the performance of the employees' primary duty.

For the reasons stated above, we do not believe the primary duty of the copy editors and senior copy editors is directly related to the management or general business operations of the employer or the employer's customers or includes the exercise of discretion and independent judgment with respect to matters of significance. It is our opinion that these employees do not qualify for the administrative exemption and must, therefore, be paid in accordance with the minimum wage and overtime pay provisions of the FLSA.

This opinion is based exclusively on the facts and circumstances described in your request and is given based on your representation, express or implied, that you have provided a full and fair description of all the facts and circumstances that would be pertinent to our consideration of the question presented. Existence of any other factual or historical background not contained in your letter might require a conclusion different from the one expressed herein. You have represented that this opinion is not sought by a party to pending private litigation concerning the issue addressed herein. You have also represented that this opinion is not sought in connection with an investigation or litigation between a client or firm and the Wage and Hour Division or the Department of Labor.

We trust that the above information is responsive to your inquiry.

Sincerely,
Paul DeCamp
Administrator

FNa1. **Note: The actual name(s) was removed to preserve privacy in accordance with 5 U.S.C. §**

2006 WL 3930478 (DOL WAGE-HOUR)

**552(b)(7).**

FN1. Unless otherwise noted, any statutes, regulations, opinion letters, or other interpretive material cited in this letter can be found at www.wagehour.dol.gov.

2006 WL 3930478 (DOL WAGE-HOUR)
END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

2006 WL 3406603 (DOL WAGE-HOUR)

2006 WL 3406603 (DOL WAGE-HOUR)

Wage and Hour Division

United States Department of Labor

Opinion LetterFair Labor Standards Act (FLSA)

October 26, 2006

*** [FNa1]

This is in response to your request for an opinion concerning whether the position of Information Technology (IT) Support Specialist qualifies for exemption under section 13(a)(1) of the Fair Labor Standards Act (FLSA). Based on the information presented, it is our opinion that the IT Support Specialist position does not qualify for the administrative or the computer employee exemption.

Section 13(a)(1) of the FLSA provides a complete minimum wage and overtime pay exemption for any employee employed in a bona fide executive, administrative, or professional capacity, as those terms are defined in 29 C.F.R. Part 541. [FN1] An employee may qualify for exemption if all of the pertinent tests relating to duties and salary are met.

You state that the employer is in the process of creating the new position of IT Support Specialist within the Information Technology Department. In a discussion with a member of the Wage and Hour Division staff, you indicated that the amount and manner of compensation for the IT Support Specialist position would depend, in part, on whether the position is exempt or nonexempt under the new Part 541 regulations. [FN2] The employer in this case plans to have shifts of IT Support Specialists working or on-call 24 hours a day. The job description you provided states that the IT Support Specialist (renamed from Help Desk Support Specialist) is responsible for the diagnosis of computer-related problems as requested by employees, physicians, and contractors of the employer. The IT Support Specialist conducts problem analysis and research, troubleshoots, and resolves complex problems either in person or by using remote control software. He or she ensures timely closeout of trouble tickets.

The duties and the amount of time, in general, that an IT Support Specialist would spend on such duties are described below:

55%-Analyzes, troubleshoots, and resolves complex problems with business applications, networking, and hardware. Accurately documents all work in appropriate problem tracking software. Prioritizes tasks based on service level agreement criteria with limited supervision.

20%-Installs, configures, and tests upgraded and new business computers and applications based upon user-defined requirements. Assists users in identifying hardware/software needs and provides advice regarding current options, policies, and procedures. Creates and troubleshoots network accounts and other business application user accounts as documented in the employee lifecycle process.

10%-Participates in the design, testing, and deployment of client configurations throughout the organization. This process requires detailed knowledge of Microsoft operating systems and compatible business applications. Leverages application packaging software technology for deployment of business applications to client systems.

5%-Participates in the analysis and selection of new technology required for expanding computing needs throughout the organization. Works with competing vendors to determine the best selection based on price, technical functionality, durability, manufacturer support, manufacturer vision, and position in the healthcare industry.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 3406603 (DOL WAGE-HOUR)

Page 2

5%-Documents technical processes and troubleshooting guidelines. Documents end-user frequently asked questions about computer systems or programs and publishes on Intranet as guidelines for the entire organization.

5%-Monitors automated alerts generated by systems management tools and makes decisions on the most effective resolution.

The IT Support Specialist position requires a high school diploma or GED, although an associate degree is preferred. This position requires walking throughout the institution and/or ancillary buildings to perform the duties, and traveling to off-site facilities. Physical demands of the position include standing, sitting, walking, bending, lifting, and moving computer items as needed.

Below is a discussion of the administrative exemption and computer employee exemption under the revised final rule. Each discussion is followed by an analysis of whether the IT Support Specialist qualifies for the particular exemption.

**Administrative Exemption**

The term "employee employed in a bona fide administrative capacity" means "any employee":
> (1) Compensated on a salary or fee basis at a rate of not less than $455 per week . . .;
> (2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and
> (3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

29 C.F.R. § 541.200(a).
> The phrase "directly related to the management or general business operations" refers to the type of work performed by the employee. To meet this requirement, an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment.

29 C.F.R. § 541.201(a).
> Work directly related to management or general business operations includes, but is not limited to, work in functional areas such as tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations; government relations; computer network, internet and database administration; legal and regulatory compliance; and similar activities.

29 C.F.R. § 541.201(b).
> An employee may qualify for the administrative exemption if the employee's primary duty is the performance of work directly related to the management or general business operations of the employer's customers. Thus, for example, employees acting as advisers or consultants to their employer's clients or customers (as tax experts or financial consultants, for example) may be exempt.

29 C.F.R. § 541.201(c).
> To qualify for the administrative exemption, an employee's primary duty must include the exercise of discretion and independent judgment with respect to matters of significance. In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered. The term "matters of significance" refers to the level of importance or consequence of the work performed.

29 C.F.R. § 541.202(a).
> The phrase "discretion and independent judgment" must be applied in the light of all the facts involved in the particular employment situation in which the question arises. Factors to consider when determining whether an employee exercises discretion and independent judgment with respect to matters of significance include, but are not limited to: whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.

29 C.F.R. § 541.202(b). As the preamble to the final rule explained, federal courts generally conclude that employees who meet at least two or three of the indicators mentioned in 29 C.F.R. § 541.202(b) are exercising discretion and independent judgment, although a case-by-case analysis is required. *See* 69 Fed. Reg. at 22,143.

"The exercise of discretion and independent judgment implies that the employee has the authority to make an independent choice, free from immediate direction or supervision." 29 C.F.R. § 541.202(c). As indicated in 29 C.F.R. § 541.202(e), "[t]he exercise of discretion and independent judgment must be more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources." Section 541.202(f) further clarifies that "[a]n employee does not exercise discretion and independent judgment with respect to matters of significance merely because the employer will experience financial losses if the employee fails to perform the job properly." For example, "an employee who operates very expensive equipment does not exercise discretion and independent judgment with respect to matters of significance merely because improper performance of the employee's duties may cause serious financial loss to the employer." *Id.* The fact that work may be

unusually complex or highly specialized along technical lines, or that significant consequences or losses may result from improper performance of an employee's duties, do not automatically qualify the work as being significant to the management or general business operations of an employer. Indeed, a job may even be viewed by an employer as "indispensable" and still not meet the requirement that its primary duty must be "directly related to the management or general business operations." *See Clark v. J.M. Benson Co.,* 789 F.2d 282, 287 (4th Cir. 1986) (regulations emphasize nature of work, not its ultimate consequence). *See also* 29 C.F.R. § 541.202(f). Thus, although the upkeep of a computer system may be viewed as essential to an employer's business operations, the nature of the individual employee's particular work, and not the possible results or consequences of its performance, is the focus of the analysis for determining an employee's exempt status. To qualify as an exempt administrative employee, therefore, the work performed must itself relate to significant matters in the management or general business operations of the employer. In addition, performing highly skilled technical work in troubleshooting computer problems does not, by itself, demonstrate the exercise of discretion and independent judgment with respect to matters of significance. As stated in 29 C.F.R. § 541.202(e), "[t]he exercise of discretion and independent judgment must be more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources."

The primary duty of the IT Support Specialist you describe consists of installing, configuring, testing, and troubleshooting computer applications, networks, and hardware. Maintaining a computer system and testing by various systematic routines to see that a particular piece of computer equipment or computer application is working properly according to the specifications designed by others are examples of work that lacks the requisite exercise of discretion and independent judgment within the meaning of the administrative exemption. Employees performing such activities are using skills and procedures or techniques acquired by special training or experience. Their duties do not involve, with respect to matters of significance, the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered as

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

required by 29 C.F.R. § 541.202(a). *See* Wage and Hour Opinion Letter August 19, 1999 (copy enclosed). Such work does not involve formulating management policies or operating practices, committing the employer in matters that have significant financial impact, negotiating and binding the company on significant matters, planning business objectives, or other indicators of exercising discretion and independent judgment with respect to matters of significance discussed in 29 C.F.R. § 541.202(b). Although minor aspects of the work (described as five to ten percent) include participating in the design of client configurations and analyzing and selecting new technology, your description of the tasks performed and the decisions made by an IT Support Specialist does not demonstrate that their *primary* duty includes the exercise of discretion and independent judgment with respect to matters of significance to management or general business operations of the employer. Therefore, based on our review of the information you provided, it is our opinion that the IT Support Specialist position does not qualify for the administrative exemption under section 13(a)(1) of the FLSA. *See Martin v. Ind. Mich. Power Co.,* 381 F.3d 574, 581-84 (6th Cir. 2004) (IT Support Specialist responsible for installing and upgrading hardware and software, configuring desktop computers, and testing and troubleshooting equipment is not exempt as administrative employee under pre-2004 regulations because such work is not directly related to management policies or general business operations and is not of substantial importance to management or operation of the business); *Turner v. Human Genome Scis., Inc.,* 292 F. Supp. 2d 738, 745, 747 (D. Md. 2003) (although employees responsible for troubleshooting and correcting hardware and software problems and network connectivity issues utilized "knowledge and skill to solve computer problems, their primary duties did not involve discretion or independent judgment as required" under pre-2004 administrative exemption); *Burke v. County of Monroe,* 225 F. Supp. 2d 306, 320 (W.D.N.Y. 2002) (employees whose work included installing and operating computer networks, analyzing hardware and software problems, testing, and problem solving did "highly-skilled work," but these were "routine duties without the requirement of discretion and independent judgment" under pre-2004 administrative exemption).

**Computer Employee Exemption**

Computer systems analysts, computer programmers, software engineers, and other similarly skilled workers in the computer field who meet certain tests regarding their job duties are eligible for exemption from both minimum wage and overtime pay as professionals under FLSA sections 13(a)(1) and 13(a)(17). *See* 29 C.F.R. § 541.400(a). To qualify for the computer employee exemption, the employee must be compensated on either a salary or fee basis at a rate of not less than $455 per week or, in the case of an employee who is compensated on an hourly basis, not less than $27.63 an hour. *See* 29 C.F.R. § 541.400(b). In addition, "the exemptions apply only to computer employees whose primary duty consists of":

> (1) The application of systems analysis techniques and procedures, including consulting with users, to determine hardware, software or system functional specifications;
> (2) The design, development, documentation, analysis, creation, testing or modification of computer systems or programs, including prototypes, based on and related to user or system design specifications;
> (3) The design, documentation, testing, creation or modification of computer programs related to machine operating systems; or
> (4) A combination of the aforementioned duties, the performance of which requires the same level of skills.

*Id.* As described in 29 C.F.R. § 541.700(a),

> [t]o qualify for exemption under this part, an employee's "primary duty" must be the performance of exempt work. The term "primary duty" means the principal, main, major or most important duty that the employee performs. Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole.

Section 541.400(a) lists employees who qualify for this exemption as including computer systems analysts, computer programmers, software engineers, and other similarly skilled workers in the computer field. As explained in the preamble to the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

final rule, such job titles alone, however, are not the determining factor for exemption. *See* 69 Fed. Reg. at 22,160. An exempt computer employee's primary duty must consist of those duties discussed in 29 C.F.R. § 541.400(b). As indicated in 29 C.F.R. § 541.401,

> [t]he exemption for employees in computer occupations does not include employees engaged in the manufacture or repair of computer hardware and related equipment. Employees whose work is highly dependent upon, or facilitated by, the use of computers and computer software programs (*e.g.*, engineers, drafters and others skilled in computer-aided design software), but who are not primarily engaged in computer systems analysis and programming or other similarly skilled computer-related occupations identified in § 541.400(b), are also not exempt computer professionals.

As we previously noted, the primary duty of the IT Support Specialist consists of installing, configuring, testing, and troubleshooting computer applications, networks, and hardware. The primary duty of this employee does not involve the " application of systems analysis techniques and procedures, including consulting with users, to determine hardware, software or system functional specifications." 29 C.F.R. § 541.400(b)(1). Nor is the primary duty of the IT Support Specialist "[t]he design, development, documentation, analysis, creation, testing or modification of computer systems or programs, including prototypes, based on and related to user or system design specifications" (29 C.F.R. § 541.400(b)(2)), "[t]he design, documentation, testing, creation or modification of computer programs related to machine operating systems" (29 C.F.R. § 541.400(b)(3)), or "[a] combination of these duties, the performance of which requires the same level of skills." 29 C.F.R. § 541.400(b)(4). Because the primary duty of the IT Support Specialist you described does not consist of duties similar to those discussed in 29 C.F.R. § 541.400(b)(1)-(4), it is our opinion that the IT Support Specialist position does not qualify for the computer professional employee exemption under FLSA sections 13(a)(1) and 13(a)(17). *See* Wage and Hour Opinion Letter August 19, 1999. Therefore, the IT Support Specialist position is covered by the minimum wage and overtime provisions of the FLSA.

This opinion is based exclusively on the facts and circumstances described in your request and is given based on your representation, express or implied, that you have provided a full and fair description of all the facts and circumstances that would be pertinent to our consideration of the question presented. Existence of any other factual or historical background not contained in your letter might require a conclusion different from the one expressed herein. You have represented that this opinion is not sought by a party to pending private litigation concerning the issues addressed herein. You have also represented that this opinion is not sought in connection with an investigation or litigation between a client or firm and the Wage and Hour Division or the Department of Labor.

We trust that this letter is responsive to your inquiry.

Sincerely,
Paul DeCamp
Administrator

FNa1. **Note: The actual name(s) was removed to preserve privacy in accordance with 5 U.S.C. § 552(b)(7).**

FN1. Unless otherwise noted, any statutes, regulations, opinion letters, or other interpretive material cited in this letter can be found at www.wagehour.dol.gov.

FN2. Revisions to 29 C.F.R. Part 541 were published on April 23, 2004, and became effective on August 23, 2004. *See Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees*, 69 Fed. Reg. 22,122 (Apr. 23, 2004).

2006 WL 3406603 (DOL WAGE-HOUR)
END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2007 WL 506575 (DOL WAGE-HOUR)                                                                    Page 1

2007 WL 506575 (DOL WAGE-HOUR)

Wage and Hour Division

United States Department of Labor

Opinion LetterFair Labor Standards Act (FLSA)

January 25, 2007

*** [FNa1]

This is in response to your request for an opinion concerning whether sales employees employed by members of your trade association qualify for the outside sales exemption under section 13(a)(1) of the Fair Labor Standards Act (FLSA). [FN1] Based on a review of the information you provided, it is our opinion that the sales employees discussed below are exempt as outside sales employees.

You state that the sales employee's primary duty is to sell newly-constructed homes. Sales employees usually work out of temporary sales facilities, such as model homes or trailers, that are located in or near the community where the builder is selling homes. The model home or trailer is open only during the time the builder is selling homes in the community and usually contains a temporary sales office that serves as a place to meet potential home buyers. Typically, the garage in the model home is transformed into a temporary sales office and has a desk, a telephone, and a fax machine, but few of the other accoutrements of a typical business office. The builder usually maintains a separate, permanent office location from which other day-to-day operations are conducted, and to which the sales employees report. Once the sales activity in the new home community is complete, the temporary sales office in a model home is restored to a garage, and the model home is returned to a residence and sold.

Sales employees generally leave the model home or trailer for one or two hours a day, one or two times a week, to engage in selling or sales-related activities. These activities include meeting with prospects, realtors, or others involved in the home buying process; showing properties and communities to prospects; touring and demonstrating model homes and home sites; engaging in a wide variety of marketing efforts; and meeting with customers, realtors, construction personnel, and others to ensure customer satisfaction throughout the sale and construction of the new home. An indispensable component of the sales employee's sales effort is to take the customer out to the various home-sites within the community. The sales employee helps the customer understand where a house will be built, where the property lines begin and end, and where the neighboring houses to be built will be situated. In many cases, it will be crucial for customers to understand whether they will be surrounded by other houses or vacant land, how close to road-noise the house will be, and where the location of any land-use restrictions (such as a septic tank) will be on that specific parcel of land. The sales employee also may take customers to view homes under construction or recently-completed homes.

The remainder of the sales employee's week is typically spent with customers inside the temporary sales office in the model home or trailer performing activities in support of the sales employee's sales efforts, such as completing paperwork; prospecting customers; creating customer contact cards and promotional materials; following up with customers; scheduling appointments; calling realtors to generate interest in the homes, including occasionally visiting realtor offices for this purpose; learning about the homes; and other similar sales-related tasks. Most, if not all, of a sales employee's time is spent on sales or these sales-related activities. Sales employees spend at most one or two hours a week performing work that is not otherwise incidental to and in conjunction with their own sales or solicitations.

FLSA section 13(a)(1), 29 U.S.C. § 213(a)(1),

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

provides an exemption from the minimum wage and overtime provisions for "any employee employed . . . in the capacity of outside salesman." The Department has issued regulations, contained in 29 C.F.R. Part 541, that set forth the requirements for this exemption. These regulations were revised effective August 23, 2004 (69 Fed. Reg. 22,122 (Apr. 23, 2004)).

Under 29 C.F.R. § 541.500(a), "[t]he term ' employee employed in the capacity of outside salesman' in section 13(a)(1) of the Act" means " any employee":

> (1) Whose primary duty is: (i) making sales within the meaning of section 3(k) of the Act, or (ii) obtaining orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer; and
> (2) Who is customarily and regularly engaged away from the employer's place or places of business in performing such primary duty.

As described in 29 C.F.R. § 541.700(a), an employee's "primary duty" must be the performance of exempt work. The term " primary duty" means the principal, main, major or most important duty that the employee performs. Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole. As for determining the primary duty for the outside sales exemption, the regulations state that the

> work performed incidental to and in conjunction with the employee's own outside sales or solicitations, including incidental deliveries and collections, shall be regarded as exempt outside sales work. Other work that furthers the employee's sales efforts also shall be regarded as exempt work including, for example, writing sales reports, updating or revising the employee's sales or display catalogue, planning itineraries and attending sales conferences.

29 C.F.R. § 541.500(b).

To qualify for the outside sales exemption,

> [a]n outside sales employee must be customarily and regularly engaged "away from the employer's place or places of business." The outside sales employee is an employee who makes sales at the customer's place of business or, if selling door-to-door, at the customer's home. Outside sales does not include sales made by mail, telephone or the Internet unless such contact is used merely as an adjunct to personal calls. Thus, any fixed site, whether home or office, used by a salesperson as a headquarters or for telephonic solicitation of sales is considered one of the employer's places of business, even though the employer is not in any formal sense the owner or tenant of the property.

29 C.F.R. § 541.502.

The Wage and Hour Division has long recognized that

> [r]eal estate salesmen stationed in a model home on a tract from which parcels of real property are being sold with or without improvements, leaving the model home for such purposes, customarily and regularly, would meet the requirement of the definition, so far as making sales "away from" the employer's place of business is concerned. This is true even though all of the property shown to prospects by the salesmen is within the tract on which the model home is located.

Field Operations Handbook (FOH) § 22e06(c). In short, "[s]o long as a salesman customarily and regularly goes to the site of the property or to prospects as a part of making his sales, this requirement for 'outside' sales work would be met." *Id.* "The phrase 'customarily and regularly' means a frequency that must be greater than occasional but which, of course, may be less than constant. Tasks or work performed 'customarily and regularly' includes work normally and recurrently performed every workweek; it does not include isolated or one-time tasks." 29 C.F.R. § 541.701. However, " [n]othing in [29 C.F.R. § 541.701] requires that, to meet the definition of 'customarily and regularly,' a task be performed more than once a week or that a task be performed each and every workweek." 69 Fed. Reg. at 22,187.

Please note that under 29 C.F.R. § 541.500(c), " [t]he requirements of Subpart G (salary requirements) of this part do not apply to the outside sales employees."

After reviewing the information provided, we believe that the sales employees in this case qualify for the outside sales exemption under section

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

13(a)(1) of the FLSA. First, the sales employees meet the requirement that the primary duty must be making sales within the meaning of section 3(k) of the FLSA because the sales employee's primary duty is to sell newly-constructed homes. "Real estate salesmen will generally meet this test, since ' sales' under Sec. 3(k) of the Act include contracts to sell." FOH § 22e06(a). As you state, most, if not all, of a sales employee's time is spent on sales or sales-related activities. Sales employees spend at most one or two hours a week performing non-exempt work. Other duties of the sales employees such as meeting with prospects, realtors, or others involved in the home buying process; showing properties and communities to prospects; touring and demonstrating model homes and home sites; and meeting with customers, realtors, construction personnel, and others to ensure customer satisfaction throughout the sale and construction of the new home, are examples of work performed incidental to and in conjunction with the sales employee's own outside sales or solicitations. In addition, such tasks as completing sales-related paperwork, prospecting customers, engaging in a wide variety of marketing efforts including creating customer contact cards and promotional materials, following up with customers, scheduling appointments, calling realtors to generate interest in the homes, and learning about the homes are also considered the type of duties that further the employee's sales efforts and, therefore, are regarded as exempt work. *See* 29 C.F.R. §§ 541.500(b), -.503 ; Wage and Hour Opinion Letters December 21, 1967 and April 21, 1964 (copies enclosed); FOH § 22e06(e).

Second, the sales employees meet the requirement that they be customarily and regularly engaged away from the employer's place or places of business in performing their primary duty of selling newly-constructed homes. As you describe, sales employees generally leave the model home or trailer one or two hours a day, one or two times a week, to engage in the selling or sales-related activities described above. As you further note, "an indispensable component" of the sales employee's sales effort is to take the customer out to the various home-sites within the community so that the sales employee is able to help the customer understand where a house will be built, where the property lines begin and end, and where the neighboring houses to be built will be situated. In addition, the sales employee also may take customers to view homes under construction or recently-completed. All these types of activities are certainly critical, or as you state "indispensable components" of the overall sales effort, and would almost always have to occur away from the model home. Accordingly, the described activities qualify as being "customarily and regularly engaged away from the employer's place . . . of business." [FN2] Therefore, the sales employees in question are exempt outside salespersons.

This opinion is based exclusively on the facts and circumstances described in your request and is given based on your representation, express or implied, that you have provided a full and fair description of all the facts and circumstances that would be pertinent to our consideration of the question presented. Existence of any other factual or historical background not contained in your letter might require a conclusion different from the one expressed herein. You have represented that this opinion is not sought by a party to pending private litigation concerning the issues addressed herein. You have also represented that this opinion is not sought in connection with an investigation or litigation between a client or firm and the Wage and Hour Division or the Department of Labor.

We trust that this letter is responsive to your inquiry.

Sincerely,
Paul DeCamp
Administrator

FNa1. **Note: The actual name(s) was removed to preserve privacy in accordance with 5 U.S.C. § 552(b)(7).**

FN1. Unless otherwise noted, any statutes, regulations, opinion letters, or other interpretive material cited in this letter can be found at www.wagehour.dol.gov.

FN2. It is the nature of the time spent outside the model home, rather than the amount of time, that drives our conclusion. Virtually all of the indispensable components of the sales effort are concentrated in the outside period.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2007 WL 506575 (DOL WAGE-HOUR)

2007 WL 506575 (DOL WAGE-HOUR)
END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2007 WL 506574 (DOL WAGE-HOUR)

Wage and Hour Division

United States Department of Labor

Opinion LetterFair Labor Standards Act (FLSA)

January 25, 2007

\*\*\* [FNa1]

This is in response to your request for an opinion concerning whether sales associates employed by your client qualify for the outside sales exemption under section 13(a)(l) of the Fair Labor Standards Act (FLSA). [FN1] Based on the information presented, it is our opinion that your client's sales associates are exempt as outside sales employees.

You state that your client is a multi-state real estate and construction company that employs sales associates to market and sell single-family housing units to the public. The company's sales associates are employed to sell homes to be built on available home sites within residential communities built and developed by the company itself as part of a common land plan. Sales associates are based at the company's offices located within subdivisions that are in the process of being constructed and sold, or in temporary sales trailers outside such subdivisions, sometimes as far as 10 to 20 miles away.

The company's sales offices are the locations from which the sales process begins. At the initial walk-in, the sales associate meets with the prospective buyer and conducts a preliminary interview to register the prospect; to determine his/her housing needs; to introduce the prospect to the amenities of the community; and to preview the nature, location, and pricing of the units that are available for sale. Thereafter, the sales associate leaves the sales office with the prospect and conducts a tour of the community, the model homes, and available units, and travels to available, undeveloped lots that are offered for sale in the community.

Because customers frequently do not make a decision at the time of the initial site visit, the sales process continues through subsequent telephone contacts with the prospect to respond to questions and concerns about the community, proximity to schools, shopping and public services, financing options, construction delivery schedules, and related buyer concerns. Sales associates spend relatively little work time on the telephone, typically 60 minutes or less per work day. This estimate includes time spent following up with prospective buyers who have previously had a walk-through visit, speaking with independent realtors who represent prospective buyers, and other duties related to selling new homes. Following up with prospects typically consumes up to a third of a sales associate's workweek.

Ultimately, sales associates are expected to close sales by having buyers return to the company's sales office in order to complete a contract of sale. Once a home is under contract, the sales associate is required to attend pre-construction orientation with the buyer, to walk the home site with the buyer, to show the buyer how the home is to be constructed, and to point out exterior features such as where the well and septic systems are to be located. Sales associates are also required to communicate with construction personnel to investigate backlogs and delays in the construction process and to answer buyer concerns about such matters, because time of delivery is frequently a paramount concern.

The company's sales offices may or may not be located within a community that is under development. When the offices are not located within the development, the associates must travel to the location where model homes are available for inspection or to the site of the available lots being offered for sale. Even where the sales office is

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

located within a sales community, sales associates must leave the office to escort prospective buyers on a tour of the amenities available in the community and the model units being offered for sale. The visual inspection of the properties for sale in the community and the sales associate's ability to demonstrate the unique architectural and design features of the company's home products outside of the office are critical to the sales process.

The company's sales associates are also responsible for ensuring the readiness of all model sales units for buyer walk-throughs. Accordingly, sales associates inspect each model sales unit at the start and end of each work day. Sales associates engage in relatively little paperwork, and none that is not directly related to the sales process. For example, when a prospect first visits a sales office, the sales associate is responsible for ensuring the satisfactory completion of a sales registration form. Subsequently, sales associates are responsible for presenting and completing the sales contract on behalf of the company and for assisting the buyer in completing mortgage qualification forms if such assistance is requested.

In order to increase their knowledge of the community and closing success, the company's sales associates are expected to travel outside the sales office to meet with independent realtors regarding the benefits of the homes and the community they are selling, to build relationships with buyer associates, and to obtain information about new and existing home inventories within the sales market. The sales associates are required to familiarize themselves with schools, churches, libraries, shopping, entertainment venues, and government facilities serving its communities because knowledge of community services is critical to prospective buyers. In connection with "shopping the competition," sales associates are responsible for filing reports with sales managers and for participating in weekly sales meetings to share such information with co-workers. The company's sales associates also spend an additional one to two hours per week traveling to and attending sales training programs offered by the company in locations away from the sales offices. In a typical week, the company's associates spend approximately as much time in these activities away from the sales office or model home as they do in their in-office activities.

FLSA section 13(a)(l), 29 U.S.C. § 213(a)(l), provides an exemption from the minimum wage and overtime provisions for "any employee employed... in the capacity of outside salesman." The Department has issued regulations, contained in 29 C.F.R. Part 541, that set forth the requirements for this exemption.

Under 29 C.F.R. § 541.500(a), "[t]he term ' employee employed in the capacity of outside

salesman' in section 13(a)(1) of the Act" means " any employee":
> (1) Whose primary duty is: (i) making sales within the meaning of section 3(k) of the Act, or (ii) obtaining orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer; and
> (2) Who is customarily and regularly engaged away from the employer's place or places of business in performing such primary duty.

Id. As described in 29 C.F.R. § 541.700(a),
> an employee's "primary duty" must be the performance of exempt work. The term " primary duty" means the principal, main, major or most important duty that the employee performs. Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole.

As for determining the primary duty for the outside sales exemption, the regulations state that the
> work performed incidental to and in conjunction with the employee's own outside sales or solicitations, including incidental deliveries and collections, shall be regarded as exempt outside sales work. Other work that furthers the employee's sales efforts also shall be regarded as exempt work including, for example, writing sales reports, updating or revising the employee's sales or display catalogue, planning itineraries and attending sales conferences.

29 C.F.R. § 541.500(b).

To qualify for the outside sales exemption,
> [a]n outside sales employee must be customarily and regularly engaged "away from the employer's place or places of business." The outside sales employee is an employee who makes sales at the customer's place of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

business or, if selling door-to-door, at the customer's home. Outside sales does not include sales made by mail, telephone or the Internet unless such contact is used merely as an adjunct to personal calls. Thus, any fixed site, whether home or office, used by a salesperson as a headquarters or for telephonic solicitation of sales is considered one of the employer's places of business, even though the employer is not in any formal sense the owner or tenant of the property.

29 C.F.R. § 541.502.

The Wage and Hour Division has long recognized that

> [r]eal estate salesmen stationed in a model home on a tract from which parcels of real property are being sold with or without improvements, leaving the model home for such purposes, customarily and regularly, would meet the requirement of the definition, so far as making sales "away from" the employer's place of business is concerned. This is true even though all of the property shown to prospects by the salesmen is within the tract on which the model home is located.

Field Operations Handbook (FOH) § 22e06(c). In short, "[s]o long as a salesman customarily and regularly goes to the site of the property or to prospects as a part of making his sales, this requirement for 'outside' sales work would be met." Id. "The phrase 'customarily and regularly' means a frequency that must be greater than occasional but which, of course, may be less than constant. Tasks or work performed 'customarily and regularly' includes work normally and recurrently performed every workweek; it does not include isolated or one-time tasks." 29 C.F.R. § 541.701.

Please note that, under 29 C.F.R. § 541.500(c), "[t]he requirements of Subpart G (salary requirements) of this part do not apply to the outside sales employees."

Based on a review of the information you provided, it is our opinion that the sales associates employed by your client qualify for the outside sales exemption under section 13(a)(l) of the FLSA. First, the sales associates employed by your client meet the requirement that the primary duty must be making sales within the meaning of section 3(k) of the FLSA because the sales associates' principal

duty is to sell homes. "Real estate salesmen will generally meet this test, since 'sales' under Sec. 3(k) of the Act include contracts to sell." See FOH § 22e06(a). Other duties of the sales associates, such as contacting the prospective buyer by telephone following a site visit to respond to questions concerning financing or construction delays, inspecting each model unit at the start and end of the workday to ensure readiness of model units for buyer walk-throughs, aiding a prospect in completing the sales registration form, meeting with independent realtors to obtain information concerning existing home inventories, "shopping the competition," and traveling to and attending sales training programs, are, in this case, examples of work performed incidental to, and in conjunction with, the sales associates' own outside sales or solicitations. These are also the type of duties that further the employee's sales efforts and, therefore, are regarded as exempt work. See 29 C.F.R. §§ 541.500(b), 541.503; Wage and Hour Opinion Letters December 21, 1967 and April 21, 1964 (copies enclosed); FOH § 22e06(e).

Second, the sales associates meet the requirement that they be customarily and regularly engaged away from the employer's place or places of business in performing their primary duty of selling homes. As you describe, a sales associate leaves the sales office with the prospect and conducts a tour of the community, the model homes, and available units, and travels to available, undeveloped lots that are offered for sale in the community. While the sales office is the employer's place of business, because it is a fixed site used as a "headquarters" for making sales, see 29 C.F.R. § 541.502, the lots for sale are not part of the employer's place of business but rather are the products to be sold by the sales associates. Once a home is under contract, the sales associate is required to walk the home site with the buyer, show the buyer how the home is to be constructed, and point out exterior features, such as where the well and septic systems are to be located. The visual inspection of the properties for sale in the community and the sales associate's ability to demonstrate the unique architectural and design features of the company's home products outside of the office are critical to the sales process. Thus, leaving the sales office to show properties, even properties located within the same subdivision, satisfies the requirement that the sales associates be engaged away from their employer's place of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

business in performing their primary duty of selling homes. Furthermore, you indicate that activities away from your client's offices constitute a significant amount of the sales associates' typical workweek, demonstrating that these outside activities are customary and regular. *See* 29 C.F.R. § 541.500(a)(2).

Therefore, the sales associates in question are exempt outside salespersons.

This opinion is based exclusively on the facts and circumstances described in your request and is given based on your representation, express or implied, that you have provided a full and fair description of all the facts and circumstances that would be pertinent to our consideration of the question presented. Existence of any other factual or historical background not contained in your letter might require a conclusion different from the one expressed herein. You have represented that this opinion is not sought by a party to pending private litigation concerning the issues addressed herein. You have also represented that this opinion is not sought in connection with an investigation or litigation between a client or firm and the Wage and Hour Division or the Department of Labor.

We trust that this letter is responsive to your inquiry.


Sincerely,
Paul Decamp
Administrator


FNa1. **Note: The actual name(s) was removed to preserve privacy in accordance with 5 U.S.C. 552 (b)(7).**

FN1. Unless otherwise noted, any statutes, regulations, opinion letters, or other interpretive material cited in this letter can be found at www.wagehour.dol.gov.

2007 WL 506574 (DOL WAGE-HOUR)
END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2007 WL 506577 (DOL WAGE-HOUR)

Wage and Hour Division

United States Department of Labor

Opinion LetterFair Labor Standards Act (FLSA)

January 25, 2007

*** [FNa1]

This is in response to your correspondence requesting an opinion regarding whether timeshare salespeople at resort properties may qualify for the outside sales exemption from the minimum wage and overtime requirements provided by section 13(a)(1) of the Fair Labor Standards Act (FLSA) and the implementing regulations at 29 C.F.R. Part 541. [FN1] It is our opinion that the salespeople do not qualify for the outside sales exemption.

You describe three very similar groups of employees whose primary duty is to promote and to sell timeshare interests in resorts to prospective owners. The first group of employees, Group One, works from locations some distance (two to five miles) away from the resort sites. Groups Two and Three work primarily at the resorts.

Group One employees greet the "prospects," who have been scheduled by employees not at issue here, at the sales office and show them an introductory film. Group One employees do not have an "office" at the sales office, but merely gather at the facility a few minutes before they are scheduled to meet the prospects. After the film, the salesperson drives the prospects to the resort and gives them a tour of the property, including the residences, buildings and grounds, streets, walking paths, spas, golf courses, and other facilities the resort property offers. After touring the property

and if the prospect decides to purchase a timeshare interest, the Group One salesperson returns the prospects to the sales office to handle the closing process. The total process takes 2-3 hours, and the average salesperson gives 1-3 tours a day for a total of 30-40 hours a week, but may work more from time to time.

Group Two employees perform work almost identical to that performed by Group One employees, except that Group Two employees meet the prospects at the resort instead of at the off-site sales office, and therefore do not drive the prospects to and from the resort. Group Three employees are likewise very similar except that they have a larger role in scheduling their prospects. Their prospects come from people who already are staying at the resort as guests and who respond to promotional incentives, who request to see a presentation, or who are directly solicited by the salesperson. In all other material respects, all salespeople perform the same duties: greeting prospects, showing an introductory film, giving a tour of the property and any other facilities or attractions the resort property offers, closing the deal with interested prospects, and engaging in occasional sales-related training.

Section 13(a)(1) of the FLSA provides an exemption from the statute's minimum wage and overtime requirements for "any employee employed . . . in the capacity of outside salesman." The Department's regulations define that phrase as including "any employee":
    (1) Whose primary duty is:
        (i) making sales within the meaning of section 3(k) of the Act, or
        (ii) obtaining orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer; and
    (2) Who is customarily and regularly engaged away from the employer's place or places of business in performing such primary duty.
29 C.F.R. § 541.500. "Primary duty" means "the principal, main, major, or most important duty that the employee performs." 29 C.F.R. § 541.700. FLSA section 3(k) defines "sale" as "any sale,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

exchange, contract to sell, consignment for sale, shipment for sale, or other disposition." *See also* 29 C.F.R. § 541.501.

Under 29 C.F.R. § 541.701, "[t]he phrase ' customarily and regularly' means a frequency that must be greater than occasional but which, of course, may be less than constant. Tasks or work performed 'customarily and regularly' includes work normally and recurrently performed every workweek; it does not include isolated or one-time tasks."

The regulations provide further guidance regarding what it means to be "engaged away from the employer's place of business" for purposes of 29 C.F.R. § 541.500. "The outside sales employee is an employee who makes sales at the customer's place of business or, if selling door-to-door, at the customer's home. Outside sales does not include sales made by mail, telephone or the Internet unless such contact is used merely as an adjunct to personal calls."

29 C.F.R. § 541.502. Outside sales employees may perform promotional work as an exempt outside sales activity if it "is actually performed incidental to and in conjunction with an employee's own outside sales or solicitations." 29 C.F.R. § 541.503. Whether promotional work is to be considered exempt is determined on a case-by-case basis. *Id.*

You ask that we assume that the selling activities of the individuals in question culminate in their making sales within the meaning of section 3(k) of the FLSA, and that all sales representatives are engaged in making their own sales or in activities that are directly and closely related to their own sales efforts as required by the regulations. Therefore, the question that remains is whether the salespeople are customarily and regularly engaged away from the employer's place of business in performing their primary duty of making sales. A resort such as the one you describe is generally maintained on a permanent basis as a location of the employer and is staffed with the necessary personnel for maintaining the resort facilities. We understand that although the employer sells timeshare interests in some of the properties on the resort, the employer also retains a continuing business interest in the remaining resort facilities, and in maintaining both the resort and the timeshare

units that have been sold. Under these facts, the entire resort must be considered the employer's place of business. This position is consistent with the Department's previous conclusions that employees selling developed campsites from within a "condominium" campground, and apartment rental agents who never leave the apartment community, are not exempt outside sales employees because they never leave the employer's place of business. *See* Wage and Hour Opinion Letter July 31, 1973 (campground sales employees); Wage and Hour Opinion Letter Dec. 21, 1971 (apartment rental agents) (copies enclosed). The Department has reached a different conclusion in cases involving real estate sales employees selling lots of land from a model home on a subdivision, who customarily and regularly leave the model home, because the employer does not maintain a continuing interest in the subdivision lots once they are sold or in the other facilities in the subdivision, and thus these areas are not part of the employer's place of business. Wage and Hour Field Operations Handbook § 22e06(c).

Although the Department has not previously taken a position regarding whether the section 13(a)(1) outside sales exemption applies to employees who sell timeshares on site at resorts, *see* Wage and Hour Opinion Letter Feb.1, 1985 (copy enclosed), after giving the matter careful consideration, the Department believes that the outside sales exemption does not apply to employees who sell timeshares on site at resorts because these employees are not "engaged away from the employer's place or places of business." 29 C.F.R. § 541.500. You explain that Group One employees split their time between the sales office and the resort property. While you say that the Group One employees do not have an "office" at the sales office, it appears to be property of the employer, and the Group One employees return there to perform deal closing functions. Therefore, this qualifies as a place of business of the employer. Similarly, as described above, the entire resort qualifies as a place of business of the employer. All of the Group One employees' sales activities occur either at the sales office or at the resort property, both of which qualify as the employer's places of business. Therefore, it is our opinion that the Group One employees do not satisfy the outside sales exemption because they do not engage in sales away from the employer's place or places of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2007 WL 506577 (DOL WAGE-HOUR)                                                    Page 3

business.

Analysis of the Group Two and Three employees is similar. While you do not indicate where the Group Two and Three employees start their sales presentations, we presume that there is a sales office or area from which the tours regularly start that is analogous to the model home. Therefore, as with the Group One employees, Group Two and Three salespeople never leave the employer's place of business, namely, the resort, and therefore do not qualify for the outside sales exemption.

This opinion is based exclusively on the facts and circumstances described in your request and is given based on your representation, express or implied, that you have provided a full and fair description of all the facts and circumstances that would be pertinent to our consideration of the question presented. Existence of any other factual or historical background not contained in your letter might require a conclusion different from the one expressed herein. You have represented that this opinion is not sought by a party to pending private litigation concerning the issue addressed herein. You have also represented that this opinion is not sought in connection with an investigation or litigation between a client or firm and the Wage and Hour Division or the Department of Labor.

We trust that the above is responsive to your inquiry.

Sincerely,
Paul DeCamp
Administrator

FNa1. **Note: The actual name(s) was removed to preserve privacy in accordance with 5 U.S.C. § 552(b)(7).**

FN1. Unless otherwise noted, any statutes, regulations, opinion letters, or other interpretive material cited in this letter can be found at www.wagehour.dol.gov.

2007 WL 506577 (DOL WAGE-HOUR)
END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

LEXSEE 1964 DOLWH LEXIS 156

21 BL 402; 21 BL 501

Wage and Hour and Public Contracts Divisions
Washington, D. C. 20210

*1964 DOLWH LEXIS 156*

January 31, 1964

**JUDGES:** Clarence T. Lundquist, Administrator

**OPINION:**

[*1]
This is in further reply to your letter of November 6, 1963, requesting clarification of the application of the exemption provided in section 13(a)(1) of the Fair Labor Standards Act for an "outside salesman" to certain operations in your industry. Your specific questions are as follows:

(a) Is this exemption applicable to real estate sales agents employed by a real estate broker or agency to elicit written offers from interested purchasers to buy real estate listed with such broker or agency by the owners of such property, where the duties of such agents are performed away from the broker or agency office premises?

(b) Is this exemption applicable to sales agents employed by a real estate broker or firm to obtain contracts from interested buyers for the purchase of a home built, or to be built, by Builder A, where the duties of such agents are performed at the site of model homes constructed by Builder A and away from the office premises of the real estate broker or firm?

(c) Is this exemption applicable under the factual situation given in question (b) where Builder A retains a business interest in a real estate brokerage firm which conducts a general real estate sales    [*2]    business. The real estate sales agents employed by it perform their duties at the site of Builder A's model homes, as well as at the model home sites of other builders in the same area?

As defined in section 541.5 of Regulations, Part 541 (copy enclosed) an "outside salesman", within the meaning of section 13(a)(1) of the act, is one who, in addition to meeting certain other requirements set forth in the regulations, is "employed for the purpose of and who is customarily and regularly engaged away from his employer's place or places of business in . . . making sales within the meaning of section 3(k) of the act. . ."

It seems clear that the eliciting of written offers to purchase real estate, as in your question (a), and the obtaining of contracts to purchase model homes, as in your question (b), constitute the making of "sales", within the meaning of section 3(k) of the act (copy enclosed). The determining factor is thus whether or not these sales are made away from the employer's place or places of business, within the meaning of Regulations, Part 541.

In discussing the meaning of the phrase "away from his employer's place or places of business", section 541.502 of the regulations [*3]    comments to the effect that, characteristically, the outside salesman is one who makes his sales at his customer's place of business, as distinguished from his employer's place of business. Section 541.502 further states that any fixed site used by a salesman as a headquarters must be construed as one of his employer's places of business, even though the employer is not in any formal sense the owner or tenant of the property. Thus, where a salesman is stationed at a fixed site, such as a model home, at which he receives prospective buyers and attempts to sell similar homes to be

1964 DOLWH LEXIS 156, *

built on that or other sites, the model home constitutes one of "his employer's places of business", and the exemption consequently does not apply. The result would be no different whether, as in your question (b), the builder-owner of the model home has no connection with the real estate brokerage firm by which the sales agent is employed or, as in your question (c), the builder-owner retains a business interest in the brokerage firm.

With respect to your question (a), the facts supplied do not provide sufficient basis for a ruling. In general, however, where a real estate sales agent calls upon prospective [*4] purchasers or, by appointment, accompanies them to the location of the properties listed with the real estate broker or agency by the owners of such property for the purpose of obtaining written offers to purchase, the requirement discussed in section 541.502 would appear to be met.

    Sincerely yours,

**Legal Topics:**

For related research and practice materials, see the following legal topics:
Labor & Employment LawWage & Hour LawsDefenses & ExemptionsGeneral Overview