UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                            :

PATRICK TRACY, et al., on behalf of themselves  :
and all other employees similarly situated,

                                   :   No. 04-CV-06541 DGL(P)

                          Plaintiffs,   :

                                   :

           v.                      :

NVR, INC.,                             :

                               :

                     Defendant.   :

                               :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DECERTIFY COLLECTIVE ACTION

Of Counsel:

Lorie E. Almon
Richard L. Alfred
Barry J. Miller (*pro hac vice*)
Dana L. Fleming (*pro hac vice*)
James M. Hlawek (*pro hac vice*)

Local Counsel:

William G. Bauer

SEYFARTH SHAW LLP
620 Eighth Avenue
New York, NY 10018
---------------------
Two Seaport Lane, Suite 300
Boston, MA 02210

WOODS OVIATT GILMAN LLP
700 Crossroads Building, 2 State Street
Rochester, NY 14614

*Attorneys for Defendant NVR, Inc.*

Defendant NVR, Inc. ("NVR" or the "Company") moves to decertify the collective action that the Court conditionally certified in this matter because the factual record demonstrates that Plaintiffs' claims that they were misclassified as exempt outside sales personnel present an array of highly individualized issues that cannot be adjudicated on a collective basis.

## I.      PRELIMINARY STATEMENT

This action challenges NVR's practice of classifying its Sales and Marketing Representatives ("SMRs") as exempt from the Fair Labor Standards Act's ("FLSA") overtime pay requirements. SMRs sell new homes to NVR's customers to be constructed in communities that the Company develops with its business partners. They commonly earn commissions in excess of $100,000 per year and are not expected to track or report their working hours to NVR. Based on its understanding and expectation that SMRs conduct a considerable portion of their working duties outside of any fixed location maintained by the Company, in addition to decades of consistent guidance from the U.S. Department of Labor ("DOL") regarding the exempt status of the position, NVR has always classified SMRs as exempt outside salespersons.

The applicable regulations provide that an employee is subject to the outside sales exemption if he (1) has a primary duty of making sales, and (2) is customarily and regularly engaged away from the employer's place of business in performing that primary duty. Plaintiffs do not dispute that SMRs have a primary duty of making sales, and the record reflects that nearly all of the SMRs' working efforts are directed at selling homes. Therefore, for each SMR, the application of the outside sales exemption will depend exclusively on how much time he spends on outside activities in performing his sales duties. This question is, by its nature, a fact intensive inquiry because it requires an analysis of not only what each individual was doing on a daily basis, but where he was doing it and how long he spent on various activities.

1

SMRs are not assigned to a permanent office or any other fixed location, but instead work out of temporary model homes or trailers that are usually in or near the land on which NVR will build homes for its customers.  They have a great deal of latitude in determining how they will go about selling homes.  SMRs also face market conditions and differences in localized policies and practices that vary considerably from place-to-place and change significantly over time.  As a result, SMRs have widely varied experiences from one another and adapt to their unique situations in ways that include undertaking different types of sales activities and spending different amounts of time on various tasks, including their outside sales activities.

The Court conditionally certified a collective action in this matter in June 2007 based on its conclusion that Plaintiffs had met the "minimal, modest and lenient burden" for the issuance of notice to potential class members. Dkt 136, p.4.  After Plaintiffs' counsel issued their notice, approximately 155 individuals filed consents to join this litigation between June and September 2007,[1] and the parties thereafter spent four years conducting discovery pertaining to named Plaintiff Patrick Tracy and a sample group of seven other SMRs.  The factual record as to that small sample demonstrates a rich variety in SMRs' working duties, including substantial variation in the amount of time each SMR spent on outside activities – which is the sole liability issue in this case.  The factors affecting the amount of time that SMRs spend on outside sales activities include the location and stage of development of the SMR's assigned community, the range of homes that NVR offered in each community, prevailing market conditions, whether NVR pursued sales leads through third-party realtors, individualized instruction and training that

---

[1]  Approximately 1,615 present and former SMRs were sent notices of this action.  Miller Dec. ¶4).  Of the 155 opt-in plaintiffs, 20 agreed to be dismissed from the action with prejudice (Dkt 417-436) and two agreed to be dismissed without prejudice as to certain state law claims (Dkt 509).  Approximately 133 SMRs remain in this case.

SMRs received from their local supervisors, and – most importantly – each SMR's own personal approach to the sale of homes.

Given the myriad influences on each SMR's working activities and the degree of freedom that their positions afforded them, there is no sensible way to litigate Plaintiffs' overtime claims on a collective action basis.  There is no generally applicable evidence establishing the amount of time that all SMRs spend on outside activities, and no individual SMR's testimony regarding his own daily activities could stand as proof of the activities of any other SMR.  As such, the opt-in plaintiffs are not "similarly situated" in the sense necessary to proceed on a collective basis. Moreover, as this Court has seen in the context of Plaintiff Tracy's motion for summary judgment, there is considerable dispute between the SMRs who have joined this action and their respective supervisors as to how much time each SMR spent outside.[2]  As such, a trial in this matter could only devolve into a series of mini-trials involving disputed testimony about the daily activities of each individual Plaintiff.  Such an unmanageable morass is inconsistent with any consideration of judicial economy and independently precludes collective action treatment.

Courts have recognized that, irrespective of the modest threshold for conditional certification, Plaintiffs must make a much more substantial showing that members of the opt-in group are "similarly situated" in order to be allowed to proceed to trial on a collective action basis.  Here, no such showing is possible because the SMRs presently before the Court have few commonalities with respect to the only factual issue in this case: how much time each person

---

[2]  *See* Order on Plaintiff's Motion for Summary Judgment (Dkt 394), pp. 8-9 ("Manifestly, the parties have offered nearly diametrically opposed descriptions of NVR's expectations and Tracy's sales activities in and away from the model homes to which he was assigned.  These contested facts are central to the determination of whether Tracy was 'customarily and regularly engaged' outside of NVR's place of business, and present a material question of fact as to whether the 'outside sales' exception applies to him . . . .").

spent outside.  As such, the Court should decertify the collective action and dismiss the opt-in

plaintiffs from the case.

## II.     FACTUAL BACKGROUND

### A.     NVR's Business

NVR sells a variety of new homes for construction, ranging from townhouses to luxury

single family homes.  Madigan Dec. ¶3.[3]  The Company does business throughout the Eastern

United States and is divided into four independent operations that operate in different markets

and focus on different types of products.  *Id*. ¶¶4-5.  Those operations are further divided into

broad geographic Regions, and each Region is comprised of several Divisions serving particular

metropolitan areas.  *Id*. ¶¶6-7.  Regional and Divisional managers are expected to adapt the

Company's business practices to conditions in their respective local real estate markets.  *Id*. ¶8.

NVR's business is to develop tracts of land into custom-built residential communities.

Brader Dec. ¶3.  Rather than purchasing the entire tract of land on which a community will be

developed, NVR generally enters into option contracts providing NVR with the opportunity to

purchase a stated number of lots.  Mock Dep. 324:4-15, 325:9-19; Eshleman Dep. 33:16-34:7,

59:17-60:12; D'Urso Dep. 188:25-191:12.  The specific structure of NVR's option agreements

varies by community.  D'Urso Dep. 188:17-23; 236:24-237:20.  As such, the timing as to when

NVR takes title to a parcel of land and when the title transfers to a homebuyer may vary.  Mock

Dep. 332:3-20; Eshleman Dep. 37:24-38:17; Partington Dep. 92:10-93:6; Brader Dec. ¶13.

However, NVR generally takes title of the land, lot by lot, only when one of NVR's customers

enters into an agreement with NVR to construct a house on the particular lot.  Brader Dec. ¶11.

---

[3] All of the record evidence cited in this Memorandum is included in the Appendix of Record
Evidence Pertaining to Motions Filed August 12, 2011 filed contemporaneously herewith.

Title to the lot then generally passes from NVR to the customer after NVR constructs the home and after closing of the sale of the home.  Brader Dec. ¶12.

NVR makes different types of houses and different price ranges available in each community.  In planning each community, NVR develops a "buyer profile" to target individuals of a particular income level, family situation, or stage of life.  Dabulewicz Dep. 198:13-200:14. SMRs used this information to make their sales and marketing efforts more targeted to buyers with particular characteristics.  A. Wilcox Dep. 361:4-362:22; Donahue Dep. 203:11-204:8.  One SMR tailored her sales process to spend more time reviewing financing options for first-time buyers and more time "prioritizing" the needs of existing homeowners.  McKnight Dep. 208:6-209:3; Grey Dep. 287:20-290:2 (first-time buyers generally less demanding).

**B.      Sales and Marketing Representative Position**

NVR assigns at least one SMR to each community in which it operates.  Brader Dec. ¶4. NVR's communities often have a model home, sales center, or sales trailer where the SMR can meet prospective customers.  Brader Dec. ¶5.  However, as detailed below, several integral components of an SMR's job duties involve marketing and sales efforts undertaken outside the model home.[4]  Delaney Dep. 10:6-11:25, 23:18-25:23; 64:9-16; D. Wilcox Dep. 53:8-14.  To free SMRs to go outside the model home, NVR staffs model homes with other employees in many communities, including Sales and Marketing Associates ("SMAs"), and Model Home Coordinators or Sales Assistants, as warranted by local market conditions.  The importance of an SMR's outside sales activities is evident from the fact that outside sales activities are a part of training (Madigan Dec. ¶¶11-15); that customer surveys and satisfaction letters describe outside

---

[4] Notably, NVR has concurrently moved for summary judgment on three of the eight Plaintiffs from whom it took discovery—Megan Grey, Jessica McKnight, and Amber Wilcox—on the grounds that the discovery record establishes they are properly exempt outside salespersons.

sales activities (Dabulewicz Dep. 286:17-289:4, 301:13-23); and that outside sales activities are included on SMR performance reviews (Savarino Dep. 229:15-233:18, 249:20-250:18).

        1.     *SMR Sales Training*

The overall training that an SMR receives varies depending on several factors, including, as described below, the SMR's prior industry experience, region, instructors, and hire date. Before becoming SMRs, most new hires attend an introductory "HIT" training program[5] that provides would-be SMRs with a foundation in the field of new home sales and construction and with effective sales techniques to enable them to begin to sell homes in NVR's communities, even if they have no prior experience in the home building industry.[6] Mock Dep. 99:10-14, 105:5-19; Delaney Dep. 32:25-36:21. While many of the training topics are common, the specifics of how the topics are covered varies based on the instructor. Sobieski Dep. 101:21-102:2; D. Wilcox Dep. 97:25-98:1; Partington Dep. 126:14-127:3. Also, since there have been changes to the training program since 2000, the training experiences of SMRs differ depending on when they were trained. Brader Dep. 135:17-25; D'Urso Dep. 123:6-16.

As part of the introductory program, the Company teaches trainee SMRs effective sales techniques through a six-step approach that is sometimes referred to as the "Sales Process."[7] The Sales Process is designed as a foundation from which SMRs will develop as salespeople; it is not intended to prescribe a mandatory or lockstep approach to sales or to suggest that certain steps

---

[5] The program at times has been called HIT (for "High Intensity Training"), CCS ("Customer Centric Selling"), and PSS ("Professional Selling Skills"). Savarino Dep. 81:25-83:8-12.

[6] Some SMRs may not go through HIT training if, for example, they have sufficient sales experience with another homebuilder. Brader Dep. 75:18-24.

[7] The six steps of the Sales Process are (i) Greeting; (ii) Prequalifying; (iii) Demonstrating the Home and the Homesite; (iv) Demonstrating the Financing/Cost Estimate Sheet; (v) Gaining a Commitment/Closing the Sale; and (vi) Follow-Up. Barrett Dep. Ex. 2.

must be followed for every sale.  Barrett Dep. 117:23-24, 121:21-122:7; Partington Dep. 111:17-112:21; Madigan Dec. ¶16.  NVR expects that SMRs will tailor the basic concepts that comprise the Sales Process based on their individual strengths and personalities.  Mock Dep. 277:14-278:17; Brader Dep. 51:20-52:16; D. Wilcox Dep. 106:15-107:6.  NVR also expects that SMRs will use their own judgment in adapting an approach appropriate to each individual sales opportunity, including omitting steps of the Sales Process as warranted.  Mock Dep. 278:18-279:7; Partington Dep. 111:17-112:21.

After SMRs complete introductory training, they receive individual, field-based training from their Sales Managers and/or SMR mentors over a period of time that can span months or even years, depending on the SMR and his previous experience.  Mock Dep. 99:24-99:4; Delaney Dep. 32:10-20.  The field-based training often involves learning by observing more experienced SMRs.  Mock Dep. 214:14-215:7; Donahue Dep. 167:10-168:2.  The field-based training helps SMRs to learn the peculiarities of their local real estate market (Brader Dep. 75:3-7; Mock Dep. 106:16-112:12; Partington Dep. 38:7-40:10; D'Urso Dep. 114:3-10) and/or their community (Donahue Dep. 165:9-166:13).  As part of their field-based training, the SMRs may move from community to community working with different SMR mentors.  Tracy Dep. 62:13-24.  Thus, the field training that each individual SMR receives varies greatly depending not only on the SMRs' Division or community, but also on the particular experience and style of their Sales Managers and SMR mentors.  D. Wilcox Dep. 99:25-100:5.

The culmination of training is a "demo day," in which SMRs demonstrate that they have developed the basic skills needed to sell homes.  Partington Dep. 143:3-144:8; Barrett Dep. 16:2-7.  The demo day is comprised of a role playing exercise in which the SMR must demonstrate sales skills to an instructor or manager, just as he would in the process of making a sale to a

potential customer.  Madigan Dec. ¶15; Delaney Dep. 37:7-19.  No two demo days are ever the same.  D. Wilcox Dep. 100:23-101:3; Sobieski Dep. 91:5-7.  The specifics of the role play differ depending on the Division, the community, and the instructor.  D. Wilcox Dep. 101:4-10.  Even with the same instructor, the demo day varies, depending on the community and the price point of the buyer portrayed in the demo day.  Delaney Dep. 38:15-23.  The instructors test for certain critical skills, including outside activities such as demonstrating a homesite.  Savarino Dep. 85:24-86:14; Sobieski Dep. 90:18-92:18.  However, it is not possible to test all key skills during a demo day.  D. Wilcox Dep. 101:8-10.  Demo days also vary depending on the way an SMR responds to an instructor's request.  For example, if asked to differentiate an NVR home from a competitor's home, some SMRs might go outside to show structural features of a home under construction and others might answer verbally.  D. Wilcox Dep. 101:11-102:14.

Upon completion of training, SMRs generally are assigned to a community of their own when a position becomes available.  Brader Dec. ¶8.  The Company takes an individual's personal style into account in assigning SMRs to communities, attempting to match an SMR's strengths with the characteristics of available communities.  Mock Dep. 148:13-25.

## 2.   *SMR Compensation Is Based Solely on Sales*

SMRs generally receive no salary—their compensation consists of sales-based commissions, incentive bonuses, and/or prizes.  A. Wilcox Dep. 176:2-13; Delaney Dep. 104:19-24.  The job pays handsomely, with a compensation plan that provides SMRs who meet minimum expectations more than $100,000 per year, and many SMRs exceed those thresholds and earn substantially more.  A. Wilcox Dep. 153:22-154:11 ($105,000 - $115,000); Dabulewicz Dep. 369:6-13 ($114,047); McKnight Dep. 122:23-124:17 ($139,000 - $224,000); Grey Dep. Ex. 21 ($120,278 - $134,868); Brader Dec. ¶ 14-17 ($105,599 (Donahue); $134,978 (Savarino); and $172,225 (Tripler)).  Each SMR's monthly sales quota depends on several factors, including the

type of community (e.g., high-volume vs. low-volume, townhome vs. single-family), the number of available homesites in the community, the time of year, the state of the economy, and the state of the real estate market.  Madigan Dec. ¶35, Tripler Dep. 94:8-95:20, 99:15-100:5; Barr Dec. ¶¶12-13; Delaney Dep. 107:24-109:6.

### 3. *Oversight of SMRs*

The level of oversight to which each SMR is subject varies depending on several factors, including the geography of the Sales Manager's territory, the SMR's experience, and whether the SMR's community is considered a "problem" community.  Mock Dep. 229:22-230:19; Partington Dep. 55:12-57:2.  Sales Managers may also visit SMRs who are struggling to meet their monthly sales quotas more frequently.  D'Urso Dep. 156:13-157:8; Barrett Dep. 67:13-20. Sales Managers, however, generally do not observe SMRs performing their duties on a daily basis.  Partington Dep. 55:12-57:2, 74:17-75:24, 84:14-85:7 (visit SMRs generally once per week); Barrett Dep. 65:20-66:7, 66:15-23 (visit SMRs as infrequently as once per month).

NVR puts SMRs in "an environment to manage their own operation."  Delaney Dep. 23:15-17.  Aside from weekly sales meetings that last approximately 1-3 hours, SMRs set their own schedule and hours of work.  Delaney Dep. 94:22-95:2, 98:13-14; Partington Dep. 34:8-22. SMRs make their own decisions as to how and when to perform sales-related activities.  A. Wilcox Dep. 367:5-19.  As a result of the flexibility that the position affords, SMRs develop their own, varied approaches to selling homes.  D. Wilcox Dep. 106:18-108:13.  Effective SMRs are even able to adapt different approaches depending on the unique needs of a particular customer.  Delaney Dep. 74:12-22.

### C. SMRs Leave the Model Home Frequently to Make Sales

SMRs engage in a variety of activities to further a sale or assist prospective customers in selecting homes.  Many of those activities occur outside of the model home.  Mock Dep. 301:25-

304:7, 313:19-314:8; Delaney Dep. 10:6-21.  Indeed, many SMRs spend many hours per week performing sales activities outside the model home.  *See e.g*., Marsinek Dec. ¶18 (estimating that he spent 6-13 hours conducting sales activities outside the model home each week); Adams Dec. ¶14 (6-14 hours); Wright Dec. ¶20 (7-14 hours); Drake Dec. ¶14 (9-18 hours); Barr Dec. ¶11 (12-20 hours).  The total amount of time that an SMR spends on outside activities varies depending on several factors.  For example, in communities offering several different home styles, SMRs may have to leave the model home frequently to demonstrate the different home styles to prospective customers.  Adams Dec. ¶7; Grizzell Dec. ¶7; Barr Dec. ¶5; Marsinek Dec. ¶5.  Also, expectations of local managers impact SMRs' outside activities.  In some Divisions, SMRs may leave the model home less frequently because local Sales Managers prefer them to be available in the model home to greet walk-in prospects in high-traffic communities.  Barrett Dep. 56:9-58:24, 61:13-62:16.  Other Sales Managers expect that SMRs will regularly be away from the model to show homesites or to meet with prospective customers.  Mock Dep. 121:10-17. These two examples do not begin to fully capture the multitude of factors affecting each SMR's level of outside activities.  As detailed below, many of the fundamental aspects of the position provide both compelling reasons for SMRs to engage in outside activities and a remarkable degree of freedom in choosing when and how often to engage in such activities.

## 1. *Demonstrating Homesites*

Taking customers outside of the model to show them a homesite is extremely important, and it should happen for each customer before a home is purchased.  Sobieski Dep. 174:17-175:17; Mock Dep. 306:25-310:25; Partington Dep. 135:22-136:24; A. Wilcox 250:3-252:19; Delaney Dep. 10:6-9, 21.  The process of demonstrating a homesite serves several vital functions.  Aberi Dep. 119:21-120:3 (helps avoid misunderstandings with customers); Aberi Dep. 245:18-246:2 (most buyers cannot envision their home without seeing homesite); A.

Wilcox Dep. 245:16-246:9 (shows how far back home will sit and size of yard); Delaney Dep. 24:24-25:19 (allows SMR to paint the picture of where various rooms will be located); D. Wilcox Dep. 50:19-51:9 (allows customer to see orientation of sun and view adjacent lots to determine if neighborhood feels right).  Demonstrating the homesite also allows the SMR to make a friendly, emotional connection with the customer, such as through showing a family where a swing set could go.  Sobieski Dep. 169:2-8, 175:3-17; Marsinek Dec. ¶6.

Demonstrating the homesite is particularly important to certain sales.  For example, the lot may be adjacent to something that cannot be adequately described in a model home, such as an adjacent farm with an undesirable odor (D. Wilcox Dep. 146:24-147:8); a brick retaining wall (McKnight Dep. 108:2-110:2); a common driveway (McKnight Dep. 174:18-177:4); railroad tracks (McKnight Dep. 110:10-112:9); cell phone towers (McKnight Dep. 142:4-144:19); power lines (McKnight Dep. 144:25-146:22); or a Wal-Mart (Partington Dep. 176:2-16). Demonstrating the homesite may also be particularly important where the land is unique, such as where the land is unusually sloping or undulating (D. Wilcox Dep. 176:5-16, 189:21-190:17) or where the shape of the lot is unusual (D. Wilcox Dep. 198:11-199:9).[8]

The frequency of SMRs' homesite demonstrations depends on a variety of factors, including the SMR's own preference.  For example, one SMR chose only to show homesites to prospects who prequalified for financing.  A. Wilcox Dep. 277:5-19.  SMRs also have less flexibility to show homesites at times when customer traffic is high.  Donahue Dep. 257:24-

---

[8]  Customers may even, on rare occasions, buy homes without seeing the homesite (Sobieski Dep. 175:18-22; Aberi Dep. 121:15-122:4), such as military buyers posted overseas (Mock Dep. 307:14-16) or investors who will not live on-site (D. Wilcox Dep. 115:5-12).  Showing a homesite may also be impractical before grading, curbs, and roads are installed.  Tracy Dep. 84:7-85:5; Dabulewicz Dep. 274:8-21; Donahue Dep. 259:9-260:19; Barrett Dep. 108:19-109:21.

258:13.  Single-family home communities may require more frequent homesite demonstrations than townhome communities because there is greater variability in lot sizes.  Grey Dep. 95:6-18. Environmental factors also play a role, such as the season, the weather on a given day, and whether the homesite was muddy.  Grey 152:22-153:5; Savarino 264:22-265:8; Tripler Dep. 181:3-9; McKnight Dep. 220:23-221:10; Partington Dep. 135:220-136:11; Donahue Dep. 255:15-25; Dabulewicz Dep. 324:19-325:11.  Another factor is the interest of individual customers—some customers want to see multiple homesites, which requires the SMR to spend more time outside of the model.  Tripler Dep. 184:10-192:16; Donahue Dep. 247:25-248:4; A. Wilcox Dep. 246:10-20, 253:2-254:7.  The preferences of an SMR's Sales Manager also affect the frequency with which an SMR demonstrates homesites.  One Sales Manager, for example, wanted SMRs to show each customer three homesites so that they could compare features and narrow the selection to the customer's favorite site.  Partington Dep. 132:22-134:13.  Another SMR from a different region showed prospective customers an average of just two lots, believing that amount was sufficient for comparison.  Barr Dec. ¶4.  Other SMRs testified that they rarely showed more than one homesite to a customer.  Dabulewicz Dep. 241:24-243:8.  One SMR testified that, in his experience, customers did not have much concern about where their homes were located and that, rather than demonstrating homesites, he would generally discuss homesites with customers by showing them paper site plans or display maps in the model.  Tracy Dep. 102:22-106:3.  Another SMR testified that she did not consider homesite demonstration to be important to her sales approach, at least for some customers.  Dabulewicz Dep. 265:15-266:6. Given these variables, it is not surprising that SMRs gave a wide range of estimates as to the frequency of their homesite demonstrations.  McKnight Dep. 219:12-220:22 (5 times per week in one community, 7 times per month in a second, and 10 times per week in a third, but only after

the road was put in); Donahue Dep. 253:15-255:6 (2 to 4 times per month in one community and

1 to 3 times per month in another); A. Wilcox Dep. 261:19-262:12 (8 times per week).

      The amount of time that SMRs spend on each homesite demonstration also varies

significantly.  Demonstrating a homesite can take as much as two hours, depending on the

circumstances.  Aberi Dep. 120:13-23; Grizzell Dec. ¶9 (demonstrating homesite for NVHomes

takes about 1 hour, not including travel time); Wright Dec. ¶11 (if customer has questions or lot

is irregularly shaped, homesite demonstration may take 60-75 minutes).  Some SMRs, by

contrast, testified that they spent only a few minutes on each homesite demonstration.  Donahue

Dep. 271:19-273:23 (5 to 10 minutes, on average); McKnight Dep. 121:24-122:19 (10 to 15

minutes); Tripler Dep. 168:24-169:10 (as long as 20 minutes).  Numerous factors impact the time

that an SMR spends on each homesite demonstration, including the SMR's individual sales

approach (Mock Dep. 318:24-319:7; Barrett Dep. 107:3-10) and the number of questions raised

by the customer (Tripler Dep. 167:10-23, 168:13-170:13; Wright Dec. ¶8).  Local staffing

decisions also have an impact.  In some cases, an SMR may feel rushed to complete a homesite

demonstration because he does not have back-up support in the model home, whereas, in other

cases, SMRs have additional staff in the model.  Brader Dep. 141:14-145:4.

      The idiosyncrasies of each community also affect the time that it takes to demonstrate a

homesite.  For example, SMRs may spend more time on a homesite addressing concerns about

something undesirable in the area, such as a farm (D. Wilcox Dep. 145:17-146:17) or an unruly

neighbor (A. Wilcox Dep. 246:18-247:24), or where there are unusual easement issues

(Dabulewicz Dep. 302:5-9).  Demonstrating a homesite is particularly time-consuming when site

development is not completed, in which case SMRs may use devices such as tape measures and

cones to measure the lot boundaries and to help customers visualize what the property will look

like when it is developed.  Grey Dep. 101:15-17; Tripler Dep. 164:14-165:8; A. Wilcox Dep.

245:16-246:9; Partington Dep. 138:14-139:5.  "Taping off" a homesite can take an hour or more.

Aberi Dec. ¶6.  Given the time-consuming nature of this process, not all SMRs choose to "tape

off" the property for their customers—one SMR testified that she typically asked a construction

supervisor to complete that task.  Donahue Dep. 269:5-17, 270:16-271:18.

## 2. *Meeting with Realtors*

In many areas, SMRs met with realtors to persuade realtors to bring their clients to NVR

communities and to buy NVR homes.  Mock Dep. 188:14-24; A. Wilcox Dep. 114:19-23.  NVR

expected SMRs in these areas to build relationships with realtors to expand and grow their

business.  Grey Dep. 113:13-18.  Sometimes meeting with realtors would involve direct

marketing, such as visiting realtor offices to discuss NVR homes or to drop off marketing

materials, whereas other times marketing would be more indirect, such as attending realtor

awards banquets, trade shows, or lunches to network.[9]  D. Wilcox Dep. 186:20-187:9; Eshleman

Dep. 101:8-24; McKnight Dep. 255:15-256:6.  The level and quality of an SMR's activity in

engaging with realtors can significantly affect an SMR's sales.  Mock Dep. 231:3-20.  One SMR

received 50% of her business through reaching out to realtors.  A. Wilcox Dep. 369:22-370:17.

In 2005, more than 39% of sales in the Syracuse Division were generated through realtors.

Delaney Dec. ¶25.

The importance of meeting with realtors varies dramatically by region.  For example, in

some states, such as Pennsylvania, West Virginia, and North Carolina, NVR has a co-op program

---

[9]  SMRs are encouraged to meet with realtors in person because information delivered by mail
tends to be disregarded.  Eshleman Dep. 102:9-103:1.  These meetings often occurred off-site.
Donahue Dep. 536:9-11 (meeting realtors away from model home is preferable to avoid
interruptions); Barr Dec. ¶9.

in which realtors are paid a fee for bringing in customers, while in other regions, such as

Baltimore, NVR generally does not maintain such an incentive program for realtors.  In states

where there is a co-op program, SMRs spend more time visiting realtor offices and attending

realtor functions.  D. Wilcox Dep. 159:5-16, 160:3-9.  The size of the co-op fee, which varies by

region, is also a factor in engaging with realtors.  In the Delaware Division, for example, NVR

only paid a $500 co-op fee, which gave realtors little incentive to push NVR homes and SMRs

little incentive to visit realtors.  Donahue Dep. 341:3-22, 346:18-25; *see also* McKnight Dep.

186:24-187:10, 225:12-256:7 (meetings with realtors limited to semi-annual luncheon and two

trips to drop off flyers over three-year period).

     The amount of time that SMRs met with realtors also varied by individual.  One Sales

Manager expected all of his SMRs to visit realtors on a weekly basis, typically outside of the

model.  Partington Dep. 103:12-24.  Other SMRs had more discretion.  A. Wilcox Dep. 343:11-

344:9 (visited realtors' offices during grand opening or special marketing events in her

community); Savarino Dep. 291:23-25 (attended "broker breakfasts" with realtors up to three

times per month); Tripler Dep. 298:5-17, 312:6-318:5 (attended broker breakfasts approximately

once per quarter, arriving thirty minutes early to network); Dabulewicz Dep. 326:10-328:18

(attended two separate realtor conventions in a month, both lasting entire day); Grey Dep. 111:8-

113:22 (traveled up to 50 miles to deliver "realtor baskets" to realtors); A. Wilcox Dep. 107:11-

19, 110:6-112:25, 113:5-114:13, 129:7-12 (visited six to eight realtors in their offices for

approximately two hours whenever NVR had spec home for sale).

     **3.**     ***Tours of Completed Homes and Homes Under Construction***

     For a variety of reasons, SMRs often take customers outside of the sales center to show

completed homes or homes under construction.  First, in some cases, the sales center may be an

RV or a trailer rather than a model home (Grey Dep. 28:15-29:2; Tripler Dep. 105:22-108:2;

Barrett Dep. 85:19-86:16) in which case the SMR must go outside to show customers an actual home (Delaney Dep. 54:3-9). Even when the sales center is a model home, the model is just a single home style that will not fit the needs of every prospective customer. Brader Dep. 138:17-139:21; Aberi Dep. 104:4-13. Thus, for those prospective customers who do not want or cannot afford a home similar to the model, an SMR must show the prospect other homes (Eshleman Dep. 125:2-126:18, 129:14-19), including other homes within the community and model homes in other communities (Eshleman Dep. 127:24-128:9; Dabulewicz Dep. 334:5-7; A. Wilcox Dep. 264:17-265:10, 272:9-274:12; Delaney Dep. 10:6-13, 65:5-16). Taking customers to models in other communities can be time-consuming, especially where the other community is miles away. Grey Dep. 28:15-29:7 (nearest model home was 14 miles from RV to which she was assigned); Savarino Dep. 130:19-133:15 (nearest model home was 10 miles from the off-site sales center).

The frequency with which an SMR shows homes outside the model depends on factors such as the number of different home styles offered in the community—on average, the model represents just one of three to eight home styles offered in the community. Aberi Dec. ¶13; Drake Dec. ¶4; Delaney Dep. 64:23-65:6; A. Wilcox Dep. 273:23-274:12. In one region, SMRs show homes outside of the model to as many as 70% of their prospects (Eshleman Dep. 126:8-127:23), whereas in another region, the frequency is only about 25% (Aberi Dep. 106:16-107:4).

SMRs also occasionally take prospects to tour completed, occupied homes. An SMR may do so when there is no other means to show a particular floor plan or home feature. Savarino Dep. 168:3-25; Dabulewicz Dep. 334:5-335:21; Tripler Dep. 153:12-154:2. This practice varies. One SMR rarely showed occupied homes because he felt it was an invasion of the homeowner's personal space. Tripler Dep. 153:12-155:15. By contrast, other SMRs would show the same completed home repeatedly, as many as fifteen times. McKnight Dep. 157:13-

16

158:6; Dabulewicz Dep. 349:24-350:10.  The extent to which SMRs show occupied homes also varies depending whether there is a homeowner in the area with a unique floor plan or feature who is willing to allow demonstrations.  D. Wilcox Dep. 195:16-197:7.  The number of times that an individual SMR demonstrates occupied homes also may vary widely over time.  Donahue Dep. 302:2-14 (as many as four demonstrations in some months and none in others); A. Wilcox Dep. 268:15-269:23 (four demonstrations per week during some periods, and none over the course of several months during other periods).

The time that it takes to demonstrate a completed home also varies widely.  One SMR tried to do a focused, quick tour to protect the privacy of the homeowner.  Donahue Dep. 298:7-299:5.  Other SMRs spent 30-60 minutes, not including travel time, depending on the size of the house, the prospect's interest and comfort being in an occupied home, the amount of time the homeowner authorized for the showing, and the prospect's interest.  Dabulewicz Dep. 336:5-337:7; A. Wilcox Dep. 269:24-270:23.  The time commitment also varies depending on the distance to the completed home.  In some larger communities, even seeing a completed home within that community would require driving.  Grey Dep. 96:14-97:6; A. Wilcox Dep. 254:14-255:5.  In other cases, SMRs must drive to another community to show a completed home.[10] One SMR traveled approximately 30 miles round trip to show a completed home to a prospect. A. Wilcox Dep. 270:24-271:14, 299:19-300:23.

Some SMRs also show homes under construction to prospective customers.  Some customers, for example, may want to see a feature that can only be seen in a home being built for another customer.  A. Wilcox Dep. 265:17-266:2; Delaney Dep. 65:7-16.  Other customers like

---

[10]  The distance between NVR communities varies.  Communities in densely populated areas tend to be closer together than communities in rural areas.  Drake Dec. ¶9; Barr Dec. ¶7.

to check homes under construction out of curiosity (Brader Dep. 48:5-11; Dabulewicz Dep.

149:7-19) or to examine construction quality (Brader Dep. 150:16-25).  The policies and

practices surrounding the showing of homes under construction varies widely.  In some

Divisions, SMRs are not permitted to show homes under construction for safety reasons.

Savarino Dep. 158:23-25.  These practices have changed over time.  In the Washington West

Division, for example, SMRs were at one point prohibited from showing homes under

construction, but that prohibition was lifted in an effort to improve customer service.  Mock Dep.

198:15-201:6.  SMRs in Washington West are now encouraged to show houses under

construction in the appropriate circumstances.  *Id*. 195:8-196:13.

Even in Divisions where SMRs have always been allowed to show homes under

construction, there are wide variances.  In some communities, for example, SMRs generally

show homes under construction only when the project manager is not available.  Eshleman Dep.

134:18-24; Grey Dep. 168:21-6.  Also, some SMRs prefer not to show homes under construction

if they are busy with other prospects (Donahue Dep. 290:9-291:8), because they believe it is

dangerous (Tracy Dep. 85:6-15), or because they think a house under construction does not

properly represent the Company's product (Tracy Dep. 85:6-15).  Showing homes under

construction may also not be possible during certain phases of construction.  Donahue Dep.

283:19-284:10; Marsinek Dec. ¶8.  As a result of this confluence of factors, the frequency with

which an individual SMR shows homes under construction varies widely.  A Wilcox Dep.

271:17-272:8 (as much as 8 times per week); Aberi Dec. ¶17 (at least twice per week, on

average); Donahue Dep. 288:11-289:13, 289:25-290:9 (average of 5-10 times per month,

depending on factors such as stage of development in community).

The time that it takes to show a home under construction also depends on multiple factors, including the phase of construction, the customer, and whether construction workers are present (Dabulewicz Dep. 186:10-23; Donahue Dep. 285:6-24); whether the house is a townhome or a single-family home (McKnight Dep. 95:13-19); and the customer's level of interest (D. Wilcox Dep. 138:5-139:21; Dabulewicz Dep. 189:8-190:10). SMR estimates of the length of such demonstrations vary widely. Dabulewicz Dep. 187:5-10 (as long as two hours); Grey Dep. 166:11-21 (30-35 minutes); McKnight Dep. 223:5-15 (30-35 minutes); Dabulewicz Dep. 150:4-14 (15-45 minutes depending on the size and location of the home); Tripler Dep. 205:23-206:4 (10-20 minutes); Donahue Dep. 285:21-286:5 (15-20 minutes); A. Wilcox Dep. 311:15-21 (15 minutes).

Some SMRs also choose to inspect homes under construction on their own from time to time, in order to ensure the timeliness and quality of construction as a means to promote customer satisfaction. SMRs may be more likely to do so if they have a production background or if they have concerns about the production team. Eshleman Dep. 120:19-121:18. The frequency of such inspections varies widely. Eshleman Dep. 120:19-121:15 (as much as two times per week); McKnight Dep. 162:4-12 (every house sold); Donahue Dep. 292:4-293,4 (weekly "drive-by" inspections of homes under construction); A. Wilcox Dep. 347:19-349:10, 350:6-351:7 (whenever significant progress on home was made, up to eight times per month depending on number of homes under construction); Marsinek Dec. ¶12 (one to two hours per week); Tripler Dep. 209:5-23 ("drive-by" inspection two or three times per week).

### 4.    *Showing the Community*

In some communities, it is particularly important for SMRs to show prospects the surrounding area outside of the NVR community. For example, when an NVR community is not close to a large city or is located in an area that is not considered sophisticated, it is important for

SMRs to take prospects on a driving tour of the area to demonstrate nearby amenities, such as shopping, family entertainment, and restaurants.  D. Wilcox Dep. 51:10-25, 52:6-21, 171:25-173:4.  One SMR in such an area would gather several prospects in her Escalade to show them nearby amenities.  D. Wilcox Dep. 171:25-173:4.  It may also be important for an SMR to show the surrounding area where there is an attractive amenity in the area, such as a country club or a new road that would save commuting time.  D. Wilcox Dep. 192:24-194:8, 204:3-205:9.  Showing the surrounding area may also be important for prospects who are relocating from long distances and are not familiar with the area.  Delaney Dep. 10:14-21.

Similarly, in some communities, it may be important to take prospects out of the model home to show amenities within the NVR community.  For example, some NVR communities have "amenities centers" that include pools, golf courses, tennis courts, and other recreational facilities.  SMRs showed these centers to some, but not all of their prospects.  Grey Dep. 174:12-176:10.  In some communities, for example, the amenities centers were in plain sight, and the SMR did not feel a need to leave the model home to show them.  McKnight Dep. 211:7-18.

### 5.       *Shopping the Competition*

Analyzing competitors' sales activities is an important part of each SMR's duties, and SMRs are evaluated on how they shop the competition.  Eshleman Dep. 105:11-17; Savarino Dep. 171:3-5.  The way SMRs shop the competition varies and may include activities both outside and inside the model home.  Some SMRs may, for example, shop the competition by visiting their counterparts at other builders, others visit competitors' communities to look for sold signs, and others monitor real estate transactions in local papers.  Sobieski Dep. 128:6-22.  Still others walk through their competitors' models, taking notes on available amenities and

obtaining sales brochures.[11]  Savarino Dep. 171:11-172:19; 233:19-234:24; Tripler Dep. 225:10-227:20.  Others gather competitive information by phone, fax or e-mail.  Grey Dep. 279:21-24.

The amount of time spent outside the model home shopping the competition varies widely depending on a number of factors.  One important factor is the distance to competitors' communities.  A. Wilcox Dep. 312:21-314:16 (traveled 19, 27, and 33 miles on trips to shop competition); Donahue Dep. 373:14-17, 382:9-14, 398:8-21, 400:3-5 (drove 79, 134, and 137 miles in separate months visiting competition).  The amount of time also depends on market dynamics, such as the level of activity in the local housing market, the number of competitors in the vicinity, and the price point of competitors' products.  Sobieski Dep. 160:22-161:13; Mock Dep. 322:11-20; Tripler Dep. 225:10-13; Savarino Dep. 233:19-234:24; Dabulewicz Dep. 163:15-165:8; D'Urso Dep. 140:3-8; A. Wilcox Dep. 121:18-122:17.  These market dynamics change over time.  Dabulewicz Dep. 163:15-164:4; Donahue Dep. 351:25-352:4.  Another important factor is the stability of the competition.  When competitors undergo significant changes, such as changes in incentives, lot sizes, or sales representatives, it is particularly important for the SMRs to monitor the competition.  Donahue Dep. 357:24-358:7.  It was especially important for SMRs to shop the competition frequently during the recent market downturn because competitors made rapid changes to adapt, and SMRs needed to understand what their competitors were doing.  D. Wilcox Dep. 167:23-168:11; Savarino Dep. 231:16-21.

Individual factors also impact the importance of visiting competitors.  For example, it is important for SMRs who are not making their quota to visit competitors to try to determine why

---

[11]  Some SMRs may delegate shopping the competition to SMAs, although that practice is not encouraged.  Sobieski 225:21-226:6.  Even in regions where SMRs could send co-workers, at least some SMRs prefer to visit the competition themselves.  Donahue Dep. 350:24-351:2.

they are losing sales.  Dabulewicz Dep. 162:15-163:5.  Shopping the competition is also critical

for SMRs who may not be familiar with a particular area.  D. Wilcox Dep. 200:2-22.

While SMRs were required to shop the competition at least quarterly (McKnight Dep.

181:15-182:24), some SMRs took it upon themselves to shop the competition more frequently.

Dabulewicz Dep. 162:15-163:11 (up to once per month); Donahue Dep. 357:2-22 ("expected to

know what our competitors were doing pretty much all of the time").  The total amount of time

spent shopping the competition varies widely.  A. Wilcox Dep. 122:21-124:18 (three hours per

month visiting six or seven competitors' neighborhoods); Eshleman Dep. 107:5-14 (three to

twelve hours per assessment); Aberi Dec. ¶20 (twenty hours per year shopping competition).

### 6.      *Cross-Selling and Other Sales Outside of the Community*

SMRs in some Divisions are permitted to "cross-sell" homes in any community being

constructed in that Division.  Dabulewicz Dep. 351:23-352:2 (cross-selling allowed in Syracuse

Division).  In other Divisions, SMRs are permitted to sell homes only in their own assigned

community.  Donahue Dep. 312:11-20 (cross-selling not permitted in Delaware Division).  Even

in Divisions where cross-selling is generally permitted, cross-selling may be temporarily

prohibited during periods of increased market activity.  Mock Dep. 271:7-19, 272:20-273:14.

Where cross-selling is permitted, each SMR's level of cross-selling activity is left to the

SMR's discretion.  Some SMRs may hand a prospect interested in another community over to

another SMR, rather than to take the time to travel to the other community.  Aberi Dep. 245:6-

17.  On the other hand, other SMRs might take the prospect to another community whenever

possible to prevent another SMR from obtaining credit for a sale that they could have completed themselves.[12]  McKnight Dep. 138:23-139:11.

Similar to cross-selling, SMRs assigned to new communities may maintain responsibility for finalizing sales at their previous communities.  Tripler Dep. 268:19-269:24; Donahue Dep. 228:22-229:10.  The time spent completing such sales depends on factors such as the distance between communities and the time it takes to finalize the sales.  Tripler Dep. 269:8-24 (42 mile distance between current and former community); Donahue Dep. 404:14-405:25 (over 200 miles of travel between communities over six-week period); Donahue Dep. 231:17-232:5 (seven to eight months traveling between communities to finalize sales).

Some SMRs may also sell homes on lots outside of NVR communities, which may involve visits to off-site locations to demonstrate non-community homes or homesites. Dabulewicz Dep. 371:2-25; Donahue Dep. 314:16-315:14.  One SMR made at least five such trips, traveling more than 150 miles in total.  Donahue Dep. 379:16-20.

### 7.    *Preconstruction Meetings*

SMRs may be involved in preconstruction meetings, during which the project manager discusses the construction process with the customer.  In some Divisions, SMRs are required to attend such meetings.  Donahue Dep. 233:13-22, 238:21-25.  In other areas, the practice varies. One SMR made it her personal practice to attend every preconstruction meeting involving her customers.  Grey Dep. 119:7-14.  Other SMRs attended some preconstruction meetings, but not

---

[12]  This may be affected by differences in specifics of the cross-selling policies in place in a given Division.  In some areas, cross-selling requires the SMR to accompany the prospect to another community to be credited with the sale.  Delaney Dep. 52:10-13.  However, in some areas, the SMR can refer the prospect to an SMR in another community for the home/homesite demonstration and still receive credit for the sale.  A. Wilcox Dep. 255:6-258:7.

others.  Aberi Dep. 120:8-13; A. Wilcox Dep. 291:14-292:11 (attended 80% of preconstruction meetings that occurred in model, and 15% of those that occurred at homesite).

The length and location of SMRs' involvement in preconstruction meetings also varies. One SMR estimated that such meetings lasted between 30 and 60 minutes (Grey Dep. 119:7-17) and another estimated that the meetings could take 10 minutes or less (A. Wilcox Dep. 295:19-296:6).  The meetings could take place in the model home, at the homesite, or both.  Brader Dep. 47:13-23; Aberi Dec. ¶16; Dabulewicz Dep. 148:3-14; Donahue Dep. 233:25-235:4; A. Wilcox Dep. 290:9-25, 291:14-17.

### 8.    *Other Outside Marketing Efforts*

SMRs engage in a variety of marketing activities outside the model home aimed at generating sales.  For example, all SMRs in the Washington Tri-State Division network at breakfasts and other events as part of a Sales and Marketing Council.  D. Wilcox Dep. 227:17-25.  Other SMRs attend trade shows to sell homes (Donahue Dep. 538:12-540:12) or to become more knowledgeable about vendor products in the homes (D. Wilcox Dep. 157:5-19).  Others prospect for sales at Home Builders' Association functions (Eshleman Dep. 112:8-19) or Chamber of Commerce shows (Tracy Dep. 193:23-194:6; Partington Dep. 179:23-180:21). SMRs' marketing activities may also include outside tasks such as posting fliers in apartment complexes (Brader Dep. 115:10-13), visiting businesses to distribute marketing packets (A. Wilcox Dep. 237:17-241:10), or driving through the community to put up signs or to make sure signs and promotional materials are in place (Aberi Dec. ¶19; A. Wilcox Dep. 352:6-354:10).

The amount of time that an SMR spends on marketing activities outside of the model depends on the community.  In low-traffic communities or communities not visible from the surrounding environment, for example, SMRs may have to spend much more time outside the model generating prospects.  A. Wilcox Dep. 228:8-239:10, 241:7-242:24; Mock Dep. 189:7-

191:14, 322:2-10.  The amount of time spent on marketing activities may also depend on the interest and creativity of the SMR.  One SMR, for example, took it upon herself to regularly visit businesses and ask them to distribute NVR fliers to their customers in exchange for the SMR agreeing to do the same for the other business (A. Wilcox Dep. 237:17-240:4) and hosted a donut breakfast at a school to tell teachers about the NVR community (A. Wilcox Dep. 240:7-16).  Another SMR arranged tables with food and drink close to the main road to attract prospects.  D. Wilcox Dep. 155:21-157:4.  Another organized ice cream socials and barbeques in her community.  Partington Dep. 166:9-167:18.  Yet another rented an RV (on his own initiative), drove it to another community in an early stage of construction, and spent up to seven hours a day on the weekends prospecting for customers and demonstrating homesites.  Eshleman 131:8-19, 194:14-195:18; Aberi Dec. ¶¶8, 10, 12.  Certain marketing events, such as day-long golf outings or charitable walks, can also significantly increase the number of hours an SMR spends outside the model home.  Marsinek Dec. ¶18; A. Wilcox Dep. 117:11-120:20.

### 9.    *Ongoing Customer Service*

Meeting with customers is an integral part of the SMRs' sales efforts.  Grey Dep. 34:10-18.  Those meetings often occur outside the SMR's model home in a variety of locations, including restaurants, the customer's place of employment or residence, or another NVR community.  Mock Dep. 247:20-248:12; D. Wilcox Dep. 83:24-84:3, 88:15-17, 171:8-18, 183:15-185:10; Savarino Dep. 163:19-23; Tripler Dep. 294:14-25; A. Wilcox Dep. 231:21-25; Delaney Dep. 76:8-18.  One SMR testified to as many as six customer meetings outside the model in a single month.  Grey Dep. 34:2-18, 49:4-51:9.  SMRs may hold such meetings with customers for a variety of purposes, including helping them choose colors, cabinets, and other features for their new homes (Grey Dep. 66:3-68:7; Partington Dep. 182:8-19); providing them with sales materials (Grey Dep. 109:23-110:8); or reviewing sales contracts (Savarino Dep.

163:13-23; Partington 139:14-140:4; Donahue Dep. 317:16-319:20, 325:2-326:3).  The SMR's

willingness to leave the model to meet with a customer varies based on factors, including

whether the SMR is struggling to reach a quota.  Mock Dep. 249:6-19.  Periodic sales contests

also motivate SMRs to go to great lengths to meet with customers.  Mock Dep. 253:5-9;

McKnight Dep. 159:2-160:2 (drove 70 miles to meet customer and complete contract to win

sales contest); Dabulewicz Dep. 373:3-22 (traveled to hospital and spent 45-60 minutes meeting

with customer who had just had a baby to complete sale); A. Wilcox Dep. 323:5-324:14 (drove

up to 90 minutes to meet customer and generate interest in buying a home).

        Some SMRs also visit past customers to foster a good relationship with a source of

referral business.  Mock Dep. 192:5-194:9; Barrett Dep. 116:18-117:11.  For example, some

SMRs regularly drop off a "closing gift" to customers.  Grey Dep. 63:24-164:14; Wilcox Dep.

354:11-355:4.  Division-level policies regarding this practice varied.  For example, one Division

discouraged the practice (Donahue Dep. 308:3-311:8) and another reimbursed SMRs for closing

gifts for a period of time but later discontinued the practice (A. Wilcox Dep. 355:5-19).

        **10.**     ***Dual Shops and Other Staffing Models***

        NVR's staffing models, which vary from community to community and from time to

time based on market conditions and other factors, also affect SMRs' outside activities.  Brader

Dec. ¶3.  In some communities and in some market conditions, NVR assigns additional staff,

including Model Home Coordinators, to assist SMRs with administrative duties and to allow

SMRs to focus on generating sales.  Mock Dep. 215:17-216:5; Tripler Dep. 110:25-111:7;

McKnight Dep. 236:18-237:18; Brader Dec. ¶9.  SMRs delegate administrative tasks to their

coordinators so that they have more time to spend with customers.  McKnight Dep. 237:10-18.

The SMA and SMR-IT positions provide additional support to SMRs, which gives them more

flexibility to leave the model home.  A. Wilcox Dep. 112:4-12; Brader Dec. ¶7.

NVR also sometimes assigns two SMRs to the same model.  Grey Dep. 134:24-6; Savarino Dep. 185:6-23, 219:21-221:7.  In so-called "dual shops," one SMR can cover traffic at the model while the other engages in outside activities, increasing the total time each SMR spends outside.  Grey Dep. 134:24-6; Grizzell Dec. ¶4; Brader Dec. ¶6.  By contrast, in some areas, NVR may give a single SMR responsibility for selling in multiple communities at the same time.  Donahue Dep. 183:22-25; A. Wilcox Dep. 206:24-208:22.

### 11.  *Spec Homes*

While NVR generally builds homes only after a customer has purchased a specific home for construction, it sometimes finds itself in a position to sell "spec homes" after they have been built.  Tripler Dep. 133:11-23.  Spec homes commonly arise when a customer loses financing, at which point the SMR is left with the difficult task of trying to sell a customized home to a new buyer.  D. Wilcox Dep. 78:34-79:15; Tripler Dep. 133:11-23.  Spec homes also commonly arise in townhouse communities, where NVR may be left with completed units in a building that have not sold.[13]  D. Wilcox Dep. 133:24-134:22; Tripler Dep. 133:24-134:11.  The number of spec homes at any one time varies, and poor market conditions may produce a glut of spec homes.  D. Wilcox Dep. 135:5-11.  In some Divisions, there may be between three and fifteen spec homes at a given time.  Sobieski Dep. 217:7-218:4.

Demonstrating a spec home is different from demonstrating a home under construction because in showing a spec home, the SMR is more likely to spend time addressing objections about the home, such as the carpet and the cabinets.  Donahue Dep. 339:10-20.  An SMR may also have to demonstrate the same spec home a number of times before achieving a sale, which

---

[13]  Occasionally, a community may be fully sold except for a single spec home.  In that case, rather than keeping an SMR on-site, NVR would assign an SMR from another community to travel to the spec home whenever prospects wanted to see it.  D. Wilcox Dep. 180:3-15.

of course, requires leaving the model.  McKnight Dep. 188:9-25.  The time spent demonstrating

a spec home also depends on the customer and the size of the house.  Tripler Dep. 142:11-25.

Estimates of the time it takes to demonstrate a spec home vary widely.  D. Wilcox Dep. 181:9-13

(90 minutes); Tripler Dep. 145:15-146:3 (an hour); McKnight Dep. 189:10-16 (30 minutes);

Savarino Dep. 155:25-156:19 (15 minutes).

## III.   ARGUMENT

### A.   On a Motion for Decertification, the Court Must Apply a Stringent Standard in Determining Whether the Members of the Collective are Similarly Situated

In order to pursue this claim on a collective basis, Plaintiffs bear the burden of showing

that they are similarly situated with respect to the application of the "outside sales exemption."

*See Zivali v. AT & T Mobility, LLC*, _ F. Supp. 2d _, 2011 WL 1815391, *2 (S.D.N.Y. May 12,

2011) (plaintiffs continue to bear burden of showing that class members are similarly situated at

decertification stage).  This burden is onerous because the inquiry presented by a motion to

decertify a collective action involves a "more stringent" factual determination than is applied in

the context of a conditional certification of an FLSA collective action.  *Zivali,* 2011 WL

1815391, *2; *Cunningham v. Elec. Data Sys. Corp.*, 754 F. Supp. 2d 638, 644-45 (S.D.N.Y

2010) (citations omitted).[14]  Unlike the first stage, where Plaintiffs need only show a "colorable

basis" for their assertion that they are similarly situated, in the second phase, the Court must

examine a variety of factors, including "(i) disparate factual and employment settings of the

---

[14]  Certification proceedings in putative FLSA collective actions typically are divided into two
stages.  *See*, *e.g.*, *Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1213-14 (5th Cir. 1995).  At the
first stage, courts generally hold plaintiffs only to a "lenient standard" of making a "minimal"
showing that members of the collective are similarly situated to secure conditional certification.
*Scholtisek v. Eldre Corp.*, 229 F.R.D. 381, 387 (W.D.N.Y. 2005) (Larimer, J.).  The second
stage, which typically occurs after discovery, requires courts to make factual findings and
examine "the evidentiary record to determine whether the 'opt-in' plaintiffs are, in fact, similarly
situated . . . ."  *Cruz v. Lyn-Rog, Inc.*, 754 F. Supp. 2d 521, 523-24 (S.D.N.Y. 2010).

individual plaintiffs; (ii) defenses available to the defendants which appear to be individual to each plaintiff; and (iii) fairness and procedural considerations counseling for or against collective action treatment." *Zivali*, 2011 WL 1815391, *2 (citations omitted).

Recognizing the difficulty inherent in allowing cases challenging application of an FLSA exemption to proceed on a collective basis, numerous courts have declined to allow FLSA claims to proceed on a collective basis if application of the exemption requires individualized inquiries. *See, e.g.*, *Diaz v. Elec. Boutique of Am., Inc.*, 2005 WL 2654270, *4 (W.D.N.Y. Oct. 17, 2005) (Elfvin, J.) (denying conditional certification where analysis of exemption would require "determination of every individual [plaintiff's] exempt or nonexempt status"); *Holt v. Rite Aid Corp.*, 333 F. Supp. 2d 1265, 1271 (M.D. Ala. 2004) (exemption required "fact-intensive determination" and examination of employees' day-to-day tasks); s*ee also Myers v. Hertz Corp.*, 624 F.3d 537, 547-52 (2d Cir. 2010) (certification properly denied where examining application of exemption would require highly individualized analysis regarding each individual's duties).

### B.    The Outside Sales Exemption

In this case, Plaintiffs challenge NVR's classification of its SMRs as subject to the outside sales exemption to the FLSA's overtime pay requirements.  Under controlling DOL Regulations, an outside salesperson is an employee (1) whose primary duty is making sales, and (2) who is customarily and regularly engaged away from the employer's place or places of business in performing such primary duty.  29 C.F.R. § 541.500.  As the Tenth Circuit observed shortly after the enactment of the outside sales exemption:

> The reasons for excluding an outside salesman are fairly apparent.  Such salesmen, to great extent, work[ ] individually.  There are no restrictions respecting the time he shall work and he can earn as much or as little, within the range of his ability, as his ambition dictates.  In lieu of overtime, he ordinarily receives commissions as extra compensation.  He works away from his employer's place of business, is not subject to the personal supervision of his employer, and his employer has no way of knowing the number of hours he works

per day.  To apply hourly standards primarily devised for an employee on a fixed
hourly wage is incompatible with the individual character of the work of an
outside salesman.

*Jewel Tea Co. v. Williams*, 118 F.2d 202, 207-08 (10th Cir. 1941).

### 1.     *Plaintiffs Concede That Their Primary Duty Was Making Sales*

The first element of the outside sales exemption does not rely on any specific or technical

definition of what it means to be "making sales."  *See Gregory v. First Title of Am., Inc.*, 555

F.3d 1300, 1308 (11th Cir. 2009) (outside sales exemption "requires an objective demonstration,

*inter alia*, that an employee has *in some sense* made a sale") (citation omitted).  Plaintiffs

concede, as they must, that each of them had a primary duty of making sales.  *See* 2d Am.

Complaint (Dkt 80), ¶58.  Indeed, the factual record in this matter reflects that SMRs' <u>only</u> real

duty is to sell homes, and that any activity they undertake that is not itself the drafting of a sales

contract is, in some manner, intended to foster and promote their ability to sell homes.  Mock

Dep. 171:25-172 (SMRs' "number one duty . . . is to sell homes"); D'Urso Dep. 17:25-18:9

(SMR is "a person that sells [NVR's] homes").

### 2.     *SMRs Who Spend One to Four Hours Per Week on Sales*
###        *Activities Outside the Model Home Are "Customarily and Regularly"*
###        *Engaged in Sales Activity away from NVR's Places of Business*

In a series of Opinion Letters and other guidance spanning more than forty years, DOL

has analyzed employees with duties very similar to the SMRs and concluded that such

employees generally meet the outside sales exemption.  DOL first determined that real estate

salesmen working from a model home meet the outside sales exemption in 1964.  *See* Wage &

Hour Div. Op. Ltr., January 31, 1964, 1964 DOLWH LEXIS 156 ("FLSA1964-1").  In a second

letter that same year, DOL explained that the exemption applies even to salesmen whose outside

work occurs primarily within their assigned residential community.  *See* Wage & Hour Div. Op.

Ltr., April 21, 1964, 1964 DOLWH LEXIS 198 ("FLSA1964-2").  DOL reiterated this

determination in its Field Operations Handbook ("FOH"), noting that "real estate salesmen" who operate from model homes on tracts of land on which homes are to be built will generally qualify for the outsides sales exemption.[15]  FOH § 22e06(c) (1965).

More recently, DOL issued two Opinion Letters reaffirming its longstanding position that new home sales employees operating from models are properly exempt.  *See* Wage & Hour Div. Op. Ltr. 2007-1, Jan. 25, 2007 ("FLSA2007-1"); Wage & Hour Div. Op. Ltr. 2007-2, Jan. 25, 2007 ("FLSA2007-2").  One letter analyzed employees based out of sales offices located up to 20 miles from the communities in which they sold homes.  Although these employees spent some time in the "office," they also spent time accompanying prospects on walk-throughs, preparing models for viewing, and traveling throughout the community.  *See* FLSA2007-1.  They also regularly left the office to meet with realtors, familiarize themselves with the surrounding area, and shop the competition.  In determining that these individuals were outside sales employees, DOL reiterated that the employer's "place of business" could not include those portions of the community outside of the model home because "[the] lots for sale are not part of the employer's place of business but rather are products to be sold by the salespeople."  *Id.*

---

[15]  NVR does not concede that model homes constitute NVR's place of business.  In its second 1964 Opinion Letter, DOL noted, "not every home called a 'model home' would be a place of the employer," because a model home is "in the nature of an 'open house' to which a salesman is assigned to meet prospects who may buy that house or another similar one on the tract may more properly be viewed as analogous to the hotel sample room of a traveling salesman . . . than an actual place of business of the employer."  1964 DOLWH LEXIS 198, *3; *see also* FOH § 22e06(c).  NVR does not maintain model homes on a permanent or long-term basis; instead, the Company generally sells them to investors, then leases them back until it sells the surrounding lots.  Aberi Dec. ¶22; Delaney Dep. 48:20-49:5; Eshleman Dep. 33:16-37:12.  Moreover, NVR does not use the model homes primarily as office space from which to conduct sales, but as an example of the Company's product.  Eshleman Dep. 125:2, 128:24; Delaney Dec. ¶9.  The model homes therefore do not constitute NVR's place of business under DOL's framework.

The second 2007 Opinion Letter also concerned employees who left the model to meet with prospects, tour and demonstrate model homes and homesites, and engage in a variety of marketing efforts.  DOL concluded that these employees were also exempt outside salespeople, confirming its prior determinations that the "employer's place of business" does not include the community surrounding the model home and that sales-related activities outside the model home constitute time "engaged away from the employer's place of business."[16]  FLSA2007-2, p. 3. DOL concluded that such real estate salespeople were "customarily and regularly" away from the employer's place of business when they left the model home "one or two hours a day, one or two times a week, to engage in . . . selling or sales-related activities . . . ."  *Id*. (emphasis added).

In ruling on Plaintiff's Motion for Summary Judgment, this Court extended deference to the 2007 DOL Opinion Letters, recognizing that in view of the ambiguities of the governing statute and regulations, "the Court is compelled to accept the DOL's reasoning."  Order (Dkt 394), p. 6.  Several other courts have extended the same deference and adopted the DOL's analysis of the application of the outside sales exemption to new home sales employees.  *See Edwards v. KB Home*, 2011 WL 3270250 (S.D. Tex. July 28, 2011), *3-4 (relying on Opinion Letters in dismissing overtime claim on grounds that sales personnel working from model home met "the classic definition of outside salesperson"); *Billingslea v. Brayson Homes, Inc.*, 2007 WL 2118990 (N. D. Ga. July 20, 2007) (relying on Opinion Letters to hold real estate salespeople working from model homes to meet outside sales exemption); *Maddock v. KB Home, Inc.*, 248 F.R.D. 229, 241 (C. D. Cal. 2007) ("Because the DOL opinion letters are consistent

---

[16]  DOL found that activities such as demonstrating homesites and taking customers to view their homes under construction were "outside sales activities" because they are indispensable to the overall sales effort.  *Id.*

with the DOL's longstanding position on real estate agents, the Court finds the opinion letters

persuasive.").

### C.    Determining Whether SMRs Meet the Outside Sales Exemption Requires Highly Individualized Fact Inquiries Inappropriate for Collective Litigation

By its nature, application of the FLSA's exemptions requires a highly individualized,

fact-intensive analysis. *See Rubery v. buth-Na-Bodhaige, Inc.*, 470 F. Supp. 2d 273, 276

(W.D.N.Y. 2007) (Larimer, J.) ("[I]n determining whether an employee is exempt, there must be

an intensive inquiry into the facts of the particular case").[17]  Because the outside sales exemption

depends on the nature and location of an individual's daily activities, cases challenging the

application of that exemption are particularly ill-suited to collective action treatment. *In re Wells*

*Fargo Home Mortg. Overtime Pay Litig.*, 268 F.R.D. 604, 611 (N.D. Cal. 2010) ("[W]hen an

employer asserts an exemption as a defense, such as the outside sales exemption, the resolution

of which depends upon how employees spend their time at work . . . common issues of law or

fact are unlikely to predominate."); *Wong v. HSBC Mortg. Corp.*, 2010 WL 3833952 (N.D. Cal.

Sept. 29, 2010) (decertifying FLSA collective action challenging application of outside sales

exemption because only way to determine applicability of exemption was to examine

circumstances of each individual's employment); *Oetinger v. First Residential Mortg. Network,*

*Inc.*, 2009 WL 2162963 (W.D. Ky. July 16, 2009) (same).  As the Ninth Circuit explained,

"analysis of the outside salesperson exemption preclude[s] certification because that analysis

would require an individualized inquiry into the manner in which each [worker] carried out his

or her work, and that burden was not lessened by the presence of other issues susceptible to

---

[17]  Plaintiffs acknowledge this proposition and compiled extensive citations for their own
assertion that "[e]vidence of plaintiffs' actual activities is critical in a FLSA misclassification
case such as this one," in the context of a motion to compel information about each individual
opt-in plaintiff's actual daily working activities.  *See* Dkt 529, pp. 8-9.

common proof." *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 944 (9th Cir. 2009).[18]

Trial of such a case "would unavoidably require . . . several hundred mini-trials with respect to

each [employee's] actual work performance," and even if nine out of ten class members were

properly nonexempt, it would be impossible for "the finder of fact accurately [to] separate the

one exempt [employee] . . . without resorting to individual mini-trials." *Wells Fargo*, 268 F.R.D.

at 610-12 (internal quotations and citations omitted).

        Recent guidance from the U.S. Supreme Court further supports the conclusion that

Plaintiffs cannot show that members of the class are similarly situated in the sense required to

proceed on a collective action basis.  In *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541 (2011),

the Court held that a District Court abused its discretion in certifying a class of employees

alleging widespread gender discrimination.  In reaching this result, the Court expounded upon

the standard that plaintiffs must meet to show "questions of law or fact common to the class"

under Fed. R. Civ. P. 23(a)(2), an inquiry essentially identical to the FLSA's "similarly situated"

requirement at the decertification stage.[19]  The Supreme Court held that the District Court must

conduct a "rigorous analysis" as to whether the plaintiffs' claims "in fact" depend on a "common

contention" of "such a nature that it is capable of classwide resolution," meaning that

---

[18]  Although the courts in *Vinole* and *Wells Fargo* considered certification of state law claims
pursuant to Fed. R. Civ. P. 23, the same reasoning applied to FLSA claims in both cases.  *See
Vinole*, 571 F.3d at 945 ("On the current record and given the state of the law . . . it appears
likely that at least the federal and California outside sales exemption will apply in this action.").

[19]  *See MacGregor v. Farmers Ins. Exch.,* 2011 WL 2981466, *4 (D.S.C.) (applying
"illuminating" reasoning of *Dukes* to determine whether class members were similarly situated in
FLSA collective action); *Pefanis v. Westway Diner, Inc.*, 2010 WL 3564426, *3-4 (S.D.N.Y.) (in
context of motion to decertify, "similarly situated" inquiry turns on whether plaintiffs make
"persuasive showing" that their claims derive from "common practice or scheme that violated
the law"); *Diaz*, 2005 WL 2654270, *6 (plaintiffs failed to meet commonality requirement of
Rule 23 "for the same reasons that plaintiffs cannot meet the similarly situated requirement of
class certification under the FLSA," namely that individual fact determination is necessary to
determine exempt status).

"determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* at 2551-52.  The *Dukes* plaintiffs' claims were not capable of classwide resolution because local supervisors exercised discretion in employment matters, such that "demonstrating the invalidity of one manager's use of discretion will do nothing to demonstrate the invalidity of another's," and thus class members' claims would not "depend on the answers to common questions." *Id*. at 2554.  Applying reasoning similar to the Ninth Circuit's analysis in *Vinole*, the Supreme Court rejected the plaintiffs' attempt to extrapolate a common issue from anecdotal evidence of a sample of plaintiffs, finding that such evidence fell "well short" of a showing of commonality. *Id.* at 2555.

District Courts have already begun to apply the reasoning in *Dukes* to decertify similar misclassification cases.  In *Cruz v. Dollar Tree Stores, Inc.*, 2011 WL 2682967 (N. D. Cal. July 8, 2011), store managers claimed they were misclassified as exempt executives and denied overtime pay.  The court characterized *Dukes* as providing "forceful affirmation of a class action plaintiff's obligation to provide common proof of class-wide liability in order to justify class certification." *Id.*, *5.  Citing *Dukes*, the court held that the plaintiffs had "failed to provide common proof to serve as the 'glue' that would allow a class-wide determination of how class members spent their time on a weekly basis," which precluded a showing of commonality in their misclassification claim. *Id.*  The court went on to note that the plaintiffs had provided "no reliable means of extrapolating from the testimony of a few exemplar class members to the class as a whole," as to how the class members spent their time. *Id.*  Another court recently applied *Dukes* in the conditional certification context, noting that the Supreme Court's "discussion of the propriety of class actions generally provides guidance in deciding when certification of a collective action under the FLSA is appropriate" and recognizing that "it is not enough for

35

plaintiffs to raise a common question as to whether they and other employees with similar job duties were properly classified as exempt.  Rather, the answer to that question must be susceptible to proof that can be extrapolated to the class plaintiffs seek to represent." *Ruiz v. Serco, Inc.*, No. 10-cv-394-bbc, at 14 (W.D. Wis. Aug. 5, 2011).

An attempt to analyze the application of the outside sales exemption to the SMRs participating in this litigation would be particularly challenging because of the nature of the evidence bearing on SMRs' outside activities.  Because it has always regarded its SMRs as exempt outside sales personnel, NVR does not keep records of SMRs' day-to-day activities. Mock Dep. 219:2-220:10; Brader Dep. 31:12-34:2.  Evidence of the activities each SMR undertook and the amount of time spent on outside efforts will therefore come into evidence only through detailed testimony from each individual SMR and his respective individual Sales Manager(s).  Mock Dep. 220:13-221:9, 229:3-16 (Company's understanding of SMRs' activities comes only through individual observation by Sales Managers); Delaney Dep. 10:24-12:22, 142:13-25 (Regional Manager's knowledge of SMRs' activities depended on information provided by Sales Managers); Barrett Dep. 65:15-66:13 (Sales Managers observed, but did not "monitor" SMRs because job was "self-policing").  Moreover, as described above, the record reflects substantial variation regarding the type of outside activities that each opt-in plaintiff undertook and the amount of time that each SMR spent on each such activity.  Even a single SMR's outside activities may vary considerably in their nature or quantity from time-to-time based on changes in market conditions, the community to which they are assigned, or different prevailing management expectations. Madigan Dec. ¶10; D'Urso Dep. 160:20-161:16, 164:22-165:4; Grey Dep. 144:19-22; Savarino Dep. 291:23-292:16.

### D.   Determinations of Damages Would Present a Second Highly Individualized Inquiry Incompatible with Proceeding on a Collective Basis

Calculating damages for failing to pay one-and-one half times an employee's "regular rate" for overtime work presents a unique difficulty in the current action not found in other FLSA cases because the "regular rate" must be imputed based on individual commissions and hours. SMRs who earned the same amount of commissions will have spent different hours to earn the same amount; and SMRs who put in the same amount of hours will have different earnings to show for it. The imputed "regular rate"—earnings divided by hours—will differ from week-to-week for every SMR, requiring the same individualized proof as liability and further confounding a trial of the action with even greater manageability problems.

Here too, the Supreme Court's recent guidance is instructive. In *Dukes*, the Court rejected the plaintiffs' attempt to replace an individual damages determination with "Trial by Formula," whereby a sample of class members could be selected and statistical modeling could yield a classwide damages determination, holding that such an approach prevents the employer from litigating its defenses to individual claims and thereby violates Due Process.[20] *See* 131 S.Ct. at 2561. The *Cruz* court recognized that this aspect of *Dukes* also applies to overtime claims, noting that "[i]n light of the Supreme Court's rejection of [the 'Trial by Formula'] approach, it is not clear . . . how, even if class-wide liability were established, a week-by-week analysis of every class member's damages could be feasibly conducted." 2011 WL 2682967*, *6;

---

[20] Indeed, even before *Dukes*, individualized damages inquiries were recognized to be unsuitable for collective action treatment. *See, e.g., Batiz v. Am. Sec. Servs.*, No. 5:06-cv-00566, at 9 (C.D. Cal. Sept. 22, 2010) (decertifying class because allowing plaintiffs to individually testify as to damages or computing classwide damages based on sample of class was inappropriate); *Ray v. Motel 6 Operating, Ltd. P'ship*, 1996 WL 938231, *4 (D. Minn. Mar. 18, 1996) (denying certification in part because "amount of overtime hours worked varies between Plaintiffs"); *England v. New Century Fin. Corp.*, 370 F. Supp. 2d 504, 511 (M.D. La. 2005) ("[D]amages would necessarily require a case-by-case inquiry, thereby rendering it impossible to try this case as a collective class.").

*see also Altier v. Worley Catastrophe Response, LLC*, 2011 WL 3205229, *15-17 (E.D. La. July 26, 2011) (applying *Dukes* to deny class certification in wage case presenting "significant individualized damages issues" and "[o]ther individualized evidentiary issues").

> **E.   Unique Evidentiary Issues Specific to Each SMR Would Further Complicate Any Attempt to Adjudicate Plaintiffs' Claims on a Collective Basis**

The Court should also decertify the collective action on the grounds that serious spoliation issues at the core of this case would render it impossible to adjudicate on a collective basis. Discovery has revealed serious issues regarding Plaintiffs' failure to preserve, and outright destruction of, material evidence. For example, Plaintiff Donahue admitted that she destroyed highly probative evidence, namely some of the only contemporaneous records of her hours of work and travel outside the model home. Donahue redacted information from an expense report before producing it to NVR, then shredded the original, rendering the redacted information lost forever. Donahue Dep. 567:12-22. More concerning, Plaintiffs have actually *altered* material evidence. Donahue produced a day runner that included duplicate pages for certain months, with some stamped "redacted" and containing information regarding Donahue's outside activities that was removed or overwritten on an otherwise nearly identical version of the same page that was not stamped "redacted." The Court has observed that these developments are concerning and raise "real questions" about Plaintiffs' compliance with their obligations. *See* Trans. March 9, 2011 Hearing (Dkt 565) pp. 64-65.[21] NVR intends to file a motion seeking sanctions including an adverse inference regarding Donahue's spoliation as soon as permitted.[22]

---

[21] Magistrate Judge Payson made similar comments at a hearing on August 9, 2011. A transcript of those proceedings has not yet been prepared as of this filing. Miller Dec. ¶¶17-20.

[22] At the August 9, 2011 hearing, Magistrate Judge Payson directed NVR to refrain from filing a further motion regarding Donahue's destruction of evidence until Plaintiffs' counsel have had a

Plaintiffs' destruction of evidence is not limited to Donahue.  In fact, the spoliation at issue occurred because Plaintiffs' counsel failed to instruct the opt-in Plaintiffs to preserve evidence.  Donahue testified that she was never told not to destroy documents.  Donahue Dep. 485:24-486:21, 575:21-576:13.  Donahue later provided discovery responses reflecting that she received no direction on that subject from Plaintiffs' counsel for more than two years after she joined the litigation.  Moreover, Plaintiffs' counsel has represented that their advice to Donahue regarding her preservation of evidence was in accordance with their firm's "standard practices." The failure to preserve evidence therefore likely extends throughout the putative class.[23]

The unusual spoliation issues identified above render it unworkable for this case to proceed as a collective action.  The duty to preserve evidence runs to each individual plaintiff. *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 685 F. Supp. 2d 456, 466 (S.D.N.Y. 2010) (court instructed jury, "The question as to whether the [Defendants] have proven spoliation is personal to each plaintiff and must be decided by you as to each plaintiff individually.").  Given the spoliation revealed in discovery, a collective trial in this case would require a myriad of fact-specific inquiries regarding each Plaintiff's preservation of evidence, including (1) what documents each originally possessed; (2) what advice (if any) each received from counsel; (3) what steps (if any) each took to search for relevant evidence; (4) whether each destroyed relevant evidence; and (5) the nature of any evidence destroyed by each.

---

further opportunity to search for any evidence reflecting that their firm provided written advice to Donahue regarding her obligations to preserve evidence.  Miller Dec. ¶¶18-19.

[23] Unsurprisingly, other Plaintiffs' testimony reveals deficiencies in their preservation of documents.  A. Wilcox Dep. 190:20-25, 196:10-15 (plaintiff destroyed appointment book tracking work activity for 2007 after joining case, and did "absolutely not" know of requirement to preserve evidence); A. Wilcox Dep. 214:2-8, 219:2-222:11 (after initially producing a few documents, plaintiff found 350 pages of material produced day before deposition).

Moreover, an *additional* individualized inquiry would be necessary to fashion a remedy for each Plaintiff's spoliation.  The range of potential remedies for spoliation includes dismissal, preclusion of evidence, imposition of an adverse inference, assessment of attorneys' fees, and further discovery.  *Green v. McClendon*, 262 F.R.D. 284, 288-92 (S.D.N.Y. 2009).  Spoliation sanctions require a "case-by-case approach," assessing the wrongdoer's failures along a "continuum of fault" in order "to tailor sanctions to insure that spoliators do not benefit from their wrongdoing—a remedial purpose that is best adjusted according to the facts and evidentiary posture of each case."  *Reilly v. Natwest Mkts. Grp., Inc.*, 181 F.3d 253, 267 (2d Cir. 1999), *cert. denied*, 528 U.S. 1119 (2000); *Cedar Petrochem., Inc. v. Dongbu Hannong Chem. Co.*, 769 F. Supp. 2d 269, 288 (S.D.N.Y. 2011) (spoliation sanctions assessed on case-by-case basis); *Montreal Pension Plan*, 685 F. Supp. 2d at 469 ("selection of the appropriate remedy [for spoliation] is a delicate matter requiring a great deal of time and attention by a court").  These individualized inquiries required to remedy Plaintiffs' spoliation—on top of the individualized inquiries regarding the underlying FLSA claim—would render a collective trial unworkable.

## IV.   CONCLUSION

For all of the foregoing reasons, the Court should decertify the FLSA collective action in this matter and dismiss the claims of the opt-in Plaintiffs without prejudice.

Dated: August 12, 2011                Respectfully submitted,
                                      /s/ Barry J. Miller

| SEYFARTH SHAW LLP | | WOODS OVIATT GILMAN LLP |
|---|---|---|
| Richard L. Alfred | Lorie E. Almon | William G. Bauer |
| Barry J. Miller | 620 Eighth Avenue | 700 Crossroads Bldg., 2 State St. |
| Dana L. Fleming | New York, NY 10018 | Rochester, NY 14614 |
| James M. Hlawek | (212) 218-5500 | (585) 987-2800 |
| 2 Seaport Lane, Suite 300 | lalmon@seyfarth.com | wbauer@woodsoviatt.com |
| Boston, MA 02210 | | |
| (617) 946-4800 | | |
| bmiller@seyfarth.com | | |

*Attorneys for Defendant NVR, Inc.*