**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

**PATRICK TRACY,**
*on behalf of himself and all other*
*employees similarly situated,*

|                              |     |
| ---------------------------- | --- |
|              *Plaintiffs,*   |     |

**v.**

**NVR, INC.**

                                        *Defendant.*

**Civil Action**
**04-CV-06541 DGL (P)**

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR CROSS-MOTION**
**FOR SUMMARY JUDGMENT ON THE CLAIMS OF OPT-IN PLAINTIFFS**
**MEGAN GREY, JESSICA McKNIGHT AND AMBER WILCOX**

**THOMAS & SOLOMON LLP**
*Attorneys for Plaintiffs*
693 East Avenue
Rochester, New York 14607
Telephone: (585) 272-0540

Of Counsel:   J. Nelson Thomas
              Peter J. Glennon
              Sarah M. Born

# TABLE OF CONTENTS

PRELIMINARY STATEMENT.................................................................................1

FACTUAL BACKGROUND .................................................................................3

*Defendant Requires SMRs to Maximize Their Time in the Model Home*...................................3

*Defendant's Sales Process* .................................................................................5

*Activities Outside of the Model Home Were Rarely Performed* ...................................7

*Defendant Controls the Community where the Model Home is Located* ....................................9

ARGUMENT ....................................................................................................10

I.  STANDARD OF REVIEW ...............................................................................10

II.  PLAINTIFFS GREY, MCKNIGHT AND WILCOX ARE NOT OUTSIDE
     SALESPERSONS...........................................................................................11

A.  The Outside Sales Exemption.........................................................................12

B.  Opt-In Plaintiffs Grey, McKnight and Wilcox Must be Engaged in Sales Outside of
    Defendant's Fixed Sites.................................................................................13

   *1.*  The Record Demonstrate the Home Community is a Fixed Site Used by NVR to Make
         Sales..................................................................................................13

      *a.  NVR has now admitted that SMRs use NVR's home communities as a "fixed site" from which
          they makes sales.* ...........................................................................14

      *b.  NVR has a continuing business interest in the home communities so that it cannot count work
          from those locations as "outside" sales work.* ........................................15

   *2.*  Model homes constitutes a "fixed site" from which the NVR makes sales ...................16

C.  The Nature of Plaintiffs' Outside Activities Do Not Meet Exemption. ...................18

D.  Outside Activities Must Occur Customarily and Regularly .......................................21

CONCLUSION.................................................................................................26

## PRELIMINARY STATEMENT

Plaintiffs submit this Memorandum of Law in Support of their Cross-Motion for Summary Judgment on behalf of opt-in plaintiffs Megan Grey, Jessica McKnight and Amber Wilcox ("plaintiffs" or "opt-in plaintiffs"). Discovery has confirmed, and the record evidence establishes that plaintiffs, who were Sales and Marketing Representatives ("SMRs"), were not properly classified by defendant NVR, Inc. ("defendant" or "NVR") as exempt under the "outside sales" exemption and are therefore entitled to summary judgment in their favor.

Indeed, because the facts undisputedly show that the exemption does not apply to plaintiffs, it will be impossible for NVR to establish its ultimate burden of showing that the outside sales exemption applies to plaintiffs.  Therefore, defendant faces many challenges and will not be able to defeat this motion.  First, NVR must demonstrate that the plaintiffs meet every element that permits an exemption from the FLSA.  If it cannot do so, the employee is covered by the requirements of the FLSA. Second, this is no ordinary burden. Due to the remedial nature of the FLSA, all exemptions from its protections are to be "narrowly construed." *Martin v. Cooper Elec. Supply Co.,* 940 F.2d 896, 900 (3d Cir. 1991) (*citing Arnold v. Ben Kanowsky, Inc.,* 361 U.S. 388, 392 (1960)).  *See id.*  Therefore, the employer always shoulders the burden of establishing that employees "plainly and unmistakably" fall within the exemption.

Here, because there are a number of elements that NVR must prove to establish the exemption, NVR must clear a number of hurdles, and do so plainly and unmistakably, in order to evade summary judgment. If NVR fails to clear even just one, it fails to defeat summary judgment. Specifically, NVR must establish each of the following, that: (1) plaintiffs were engaged in sales (an issue which is not in dispute); *and* (2) they performed sales activities outside of the fixed sites used by defendant as headquarters for making sales;

*and* (3) the activities performed outside of defendant's fixed sites were an indispensable part of making those sales; *and* (4) the amount of time plaintiffs spent performing those indispensible activities rose to the level of occurring customarily and regularly.  Defendant's failure to establish any one of those four requirements results in summary judgment for plaintiffs.  This burden is more than NVR can carry in this action.

Indeed, the material facts, which are not seriously disputed by the parties, establish that plaintiffs fall far outside these strict confines of the outside sales exemption.  Not only do they fail to meet the relevant tests specifically, but they fail to even meet what people know an outside sales person does. The outside salesperson travels from customer to customer around a region (or the country as a whole) drumming up business from those customers. The salesperson spends much of her time on the road, visiting locations and is rarely sitting around fixed locations set up by his employer. Therefore, "The reasons for excluding an outside salesman are fairly apparent.  Such salesm[an] . . . works away from his employer's place of business, is not subject to the personal supervision of his employer, and his employer has no way of knowing the number of hours he works per day." *Jewel Tea Co. v. Williams,* 118 F.2d 202, 207-08 (10th Cir. 1941).

Here, if any of the plaintiffs were asked what they did and they answered, "I am in outside sales," the person asking the question would be understandably befuddled given the job of a SMR.  That is because SMRs spent most of their day sitting inside a Model Home, assisting people who would come to the Model Home interested in buying a home.  When a potential customer came in, an SMR relied on the Model Home to encourage the customer to buy defendant's product, and if the customer did so, would do all the essential steps of the sale in that NVR Model Home.  Additionally, NVR exerted complete control over SMRs, including controlling when they were scheduled to be at the Model Home, and what the

SMR did in the Model Home. There is nothing wrong with NVR running its business that way, and indeed, such a business model has proven successful for NVR.   However, NVR cannot count its SMRs as an outside sales force and deprive them of overtime when that is not how SMRs were expected by NVR to perform their job.

Because the defendant cannot show the plaintiffs "plainly and unmistakably" meet each and every element of the outside sales exemption to the FLSA, summary judgment should be granted in plaintiffs' favor.

## FACTUAL BACKGROUND

Defendant is in the business of selling new, custom-built homes.  Plaintiff's Statement of Facts Not In Dispute Pursuant to Local Rule 56 in Support of Their Cross-Motion for Summary Judgment on the Claims of the Opt-In Plaintiffs ("SF") ¶ 1; Madigan Decl. ¶3. The way defendant goes about selling homes is unique in many respects and sets it apart from traditional real estate sales.  SF ¶ 2.  Defendant's Sales Process centers on its Model Home, located within a fixed site tract of land, defendant calls a "community."  SF ¶ 2. The defendant creates the Model Home both as the demonstration site for all the features in any home that is to be built, and as a location from which all indispensible aspects of the sale can take place. SF ¶¶ 3, 21.  Indeed, if a customer wants to buy a home from NVR, NVR requires the customer to visit the Model Home in order to see its products, and then complete the Sales Process from that model.  SF ¶ 4.

### *Defendant Requires SMRs to Maximize Their Time in the Model Home*

Because the Model Home plays such a central role in NVR's Sales Process, NVR required SMRs to be in the Model Home as much as possible – to be at the ready to make a sale to any customer walking into the Model Home.  SF ¶ 5. To that end, NVR set the hours plaintiffs were required to be at the Model Home, as well as the advertised Model Home

hours for the week.  SF ¶ 6.  NVR expected SMRs to be in the Model Home during the Model Home's scheduled hours, and, during those hours, NVR instructed SMRs to limit any time outside of the Model Home during those hours so as not to miss sales opportunities.  SF ¶ 6.  SMRs could not vary their hours of work without the permission of management.  SF ¶ 7.  Indeed, by posting and advertising the Model Home open hours, NVR created an expectation that a sales employee would be available during those hours to assist potential customers visiting the Model Home.  SF ¶ 8.  Thus, it was imperative that SMRs be available in the Model Home during those posted hours.  SF ¶ 8.

NVR also instructed SMRs on how to schedule their work.  SF ¶ 9.  For example, NVR told SMRs to book appointments at the Model Home either outside of the open hours or during specific hours to avoid having appointments during high traffic times.  SF ¶ 9.

In the event SMRs needed to leave the Model Home during open hours, NVR required them to post a sign indicating that they were in the community and would be back momentarily.  SF ¶ 10.  The sign was designed to encourage potential customers to wait at the Model Home for the SMR's return so that the opportunity to make a potential sale was not lost.  SF ¶ 10.  NVR's emphasis on not leaving the Model Home was so strong that SMRs understood that they would be subject to disciplinary action if the Model Home was left unattended for extended periods of time during open hours.  SF ¶ 11.

NVR also controlled whether a community would be assigned a Sales and Marketing Assistant ("SMA") or a Model Home Coordinator. SF ¶ 12. While SMRs were not observed on a daily basis, defendant was in contact with them throughout the week and required SMRs to provide weekly reports regarding sales and traffic to the Model Home. SF ¶ 13. Additionally, NVR held weekly sales meetings with SMRs that they were required to attend. SF ¶ 14. SMRs received periodic written reviews and had to meet sales quotas set by

management. SF ¶ 15. SMRs, therefore, had no control over their day-to-day schedules and

activities because they were required to be at the Model Home by defendant.  SF ¶ 16.

The necessary corollary of this restrictive sales process is what NVR did not have the

SMRs do. SMRs were not spending their time going from one customer location to another.

They were not spending their days on the road visiting various locations trying to drum up

sales. They were not setting independent schedules detailing which customer they would visit

when and where. In fact, SMRs were spending their time sitting in NVR's chair, at NVR's

desk, at NVR's Model Home, in NVR's community waiting for customers to visit. They

rarely had reason to leave the Model Home, and almost never left a NVR community—other

than to meet weekly at NVR's sales office to discuss how sales at the Model Home were

going.  SF ¶¶ 14, 43.

***Defendant's Sales Process***

Hand-in-hand with its unique sales model, NVR focused all essential sales activities

from the Model Home. SF ¶ 17. NVR instructed SMRs how they were to sell from the Model

Home during NVR's corporate training program, and NVR monitored the Sales Process to

make sure SMRs followed it. NVR's Sales Process is a six-step process and includes: (1)

Greeting; (2) Prequalifying; (3) Demonstration; (4) Financing/Cost Estimate; (5) Closing the

Sale; and (6) Follow-up.[1]  *See* SF ¶ 17; Deposition of Christopher Brader, dated September

16, 2010 ("30(b)(6) Dep.")(attached as Exhibit 6 to Dkt. No. 618) 100:4-10; Ex. 2 at

TracyNY003787-003791; NVR Training Manual.  Of course not all steps are completed with

each customer because not every customer ended up purchasing a home with defendant. SF ¶

---

[1]      This six-step Sales Process has been utilized by plaintiffs throughout the applicable time
period, and although the titles of the six steps have been changed, the activities corresponding to each
step remain the same.  *See* Jan 2008 and 2009 Sales Process Participant Guides (six steps of the Sales
Process are (1) Prospecting; (2) Assess & Consult; (3) Demonstrating the Home and Homesite; (4)
Conducting the financial analysis; (5) Close; and (6) Service).

18.

Because the Model Home is the focal point for NVR's Sales Process, and because NVR wanted SMRs to stay in the model, NVR made sure everything the SMRs needed to complete a sale was located in the Model Home.  SF ¶ 21.  For example, NVR ensured that each Model Home had an area map, a community map, site plan, floorplan brochures, floorplan blueprints, photographs of featured home types, and a sample of the different home features and options, as well as a telephone, internet connection, fax machine, copy machine, and a desktop computer or laptop.  SF ¶ 21.  Having these tools available in the Model Home allowed SMRs to complete the entire sales process from within the Model Home.  SF ¶ 21.

Indeed, SMRs could perform the following tasks from inside the Model Home:

- Greeting and starting NVR's Sales Process with potential customers who visited the Model Home;
- Setting appointments with potential customers to complete the Sales Process;
- Making follow-up calls with potential customers who previously visited the Model Home;
- Making telephone calls to schedule appointments with potential customers who had previously visited the Model Home; and
- Completing the Sales Process with potential customers, including completing the purchase agreements with customers.  SF ¶ 22.

Even non-sales activities could be completed from the Model Home:

- Writing thank you notes to potential customers who visited the Model Home;
- Maintaining the appearance of the Model Home;
- Shopping the competition by calling neighboring communities for information of their traffic and sales; and
- Attending color appointments and pre-construction meetings with customers after the purchase agreement had been signed.  SF ¶ 22.

Although the Sales Process involved several steps, it is undisputed that it was just a few of those steps that were essential in order to make a sale.  Those steps were:

- Greeting the customer;
- Prequalifying the customer, or discovering the customer's basic needs;
- Demonstrating the financing/cost estimate sheet; and
- Gaining a commitment/closing the sale.  SF ¶ 24.

These components (and only these components) were absolutely necessary to complete a sale and were completed with every customer who bought a house from defendant. SF ¶ 25. These steps were therefore indispensable to NVR's Sales Process. SF ¶ 25. Moreover, SMRs completed all of these indispensable steps inside the Model Home virtually 100% of the time. SF ¶ 21.

There were other sales activities that were not indispensible to NVR's sales process, but might be performed inside the Model Home or the NVR community, including:

- Demonstrating the home and the homesite; and
- Demonstrating a home under construction or a completed home owned by a previous customer to a potential customer. SF ¶ 27.

These activities, however, were not necessary for SMRs to complete a sale, and plaintiffs often completed sales without ever leaving the Model Home. SF ¶ 28. Further, on many other occasions plaintiffs completed sales without ever performing some or all of these steps because they simply weren't indispensible elements in the Sales Process. SF ¶ 29.

### *Activities Outside of the Model Home Were Rarely Performed*

Plaintiffs performed some activities, many which were only performed rarely, that occurred outside of the Model Home, such as:

- Assisting customers in a walk-thru of their home under construction;
- Attending weekly sales meetings at the corporate office;
- Dropping off contracts at the corporate office;
- Meeting with realtors;
- Showing the community to potential customers;
- Delivering closing gifts to customers who recently closed on their new home;
- Shopping the competition by visiting neighboring communities;
- Visiting other NVR communities to complete post-sale activities with customers in my previous community;
- Attending marketing and networking events; and
- Meeting with customers. SF ¶ 30.

Significantly, even for those very limited tasks, none were essential to the Sales

Process.  SF ¶ 31.  Further, many occurred on NVR's premises and others were unrelated to making a sale.  SF ¶¶ 31-34.

Indeed, SMRs rarely had to network with realtors, or utilize other marketing strategies outside of the Model Home because the customers came to SMRs at the Model Homes.  SF ¶ 31.  Additionally, SMRs were able to do most marketing efforts, such as mailings and follow-up calls, from the Model Home.  SF ¶ 32.  Even shopping the competition could often be performed from the Model Home by making telephone calls to the competing communities thereby alleviating any need for regular visits to those communities.  SF ¶ 33.

Similarly, when defendant allowed plaintiffs to cross-sell in communities other than the communities to which they were assigned, plaintiffs would perform the components of the Sales Process from either their assigned-community Model Home or NVR's Model Home of the cross-sale community.  SF ¶ 36.  On rare occasions, NVR would have a spec home become available.  SF ¶ 37.  In those particular instances, SMRs would have to demonstrate a completed home to potential customers.  SF ¶ 37.  Even then, though, SMRs used the Model Home to complete all other aspects of the Sales Process.  SF ¶ 37.  Still, the vast majority of the houses sold were not built until after the sale was complete.  SF ¶ 37.

Further, many of these activities, such as assisting customers in a walk-thru of their home under construction, dropping off contracts at the corporate office, and delivering closing gifts to customers who recently closed on their home only occurred after SMRs had completed a sale, and thus were not even part of the Sales Process.  SF ¶ 34.

Thus, because all of the essential elements of NVR's Sales Process were designed to be completed inside the Model Home, it was an isolated incident where SMRs were required to leave the Model Home to perform an essential step of the Sales Process.  SF ¶ 35.

To the extent SMRs left the Model Home to perform an activity, NVR trained them

to complete any such activity as quickly as possible because SMRs were required by NVR to be in their Model Home during open hours.  SF ¶ 38.  Indeed, by posting open hours for the Model Home, NVR created an expectation that SMRs would be available in the Model Home during those hours.  SF ¶ 39.  Thus, NVR's business could not be successful if SMRs were away from the Model Home for more than brief periods of time.  SF ¶ 40.

Altogether, the time spent outside the Model Home was minimal because the vast majority of SMRs' job responsibilities were performed inside of the Model Home, and any single activity that was performed outside of the Model Home involved a negligible amount of time. SF ¶ 41. Indeed, anything to the contrary would frustrate NVR's Sales Process, which demanded plaintiffs be available in the Model Home as much as possible in order to meet with customers and make sales, and to rely on the Model Home to make sales.  SF ¶ 43.

Therefore, the vast majority of plaintiffs' time was spent inside the Model Home, and all indispensable components of defendant's sales process were completed inside of the Model Home.

### Defendant Controls the Community where the Model Home is Located

NVR, unlike other builders, also maintains ownership and control over each of its communities.  SF ¶ 44.  To start, pursuant to land purchase agreements, NVR maintains ownership of the land for undefined periods of time.  SF ¶ 45.  According to the purchase agreements NVR enters into with the land developers in each community, NVR is contractually obligated to buy certain lots of land within a certain period of time.[2]  SF ¶ 45; Glennon Aff. at Ex. L.  NVR therefore owns the land and does so indefinitely, or until it

---

[2]  Defendant's attempt to characterize such contracts as "options" based on layperson testimony is misguided.  Def. Decert. Memo at 4-5.  The only "option" provided for in these agreements is the option to breach the contract, which is an option in all contracts.  *See* Glennon Aff. ¶ 44; *see also* Glennon Aff., Ex. L.

conveys it to a customer, which may not occur for years.  SF ¶ 45.

In addition to owning or having an obligation to own the land on which each community rests, NVR exerts complete control over the entire community, including how the community will take shape and develop, until every lot on the tract of land is sold.  SF ¶ 46. For years, NVR determines and controls which lots are available for an SMR to sell to a potential customer.  SF ¶ 47.  NVR additionally controls what types of home styles may be built on the available lots.  SF ¶ 47.  NVR's communities offer a variety of different amenities such as tot lots, pools, golf courses, club houses and walking trails.  SF ¶ 48.  The types of amenities offered by each community are determined by defendant.  SF ¶ 48.

Overall, the facts clearly establish that plaintiffs were not "customarily and regularly" engaged in sales activities outside the community, and certainly not outside the Model Homes.

## ARGUMENT

### I.    STANDARD OF REVIEW

It is well settled that a motion for summary judgment should be granted if no genuine issue of material fact exists.  *See* Fed. R. Civ. P. 56(a); *see also Tracy v. NVR, Inc.,* 599 F. Supp. 2d 359, 361 (W.D.N.Y. 2009) (Larimer, J.).

Ultimately, in an FLSA misclassification case, the employer carries the heavy burden of proving that the employee was properly classified as exempt.  *Id.* (internal citations omitted); *see also Arnold v. Ben Kanowsky, Inc.,* 361 U.S. 388, 392 (1960); *Idaho Sheet Metal Works, Inc. v. Wirtz,* 383 U.S. 190, 206 (1966).  Indeed, the United States Supreme Court, Circuit Courts, and District Courts have repeatedly held that "exemptions from the Act's requirements are to be '*narrowly construed* against the employers seeking to assert them and their application limited to those establishments *plainly and unmistakably* within their terms

- 10 -

and spirit.'" *Martin v. Cooper Elec. Supply Co.,* 940 F.2d 896, 900 (3d Cir. 1991) (citing *Arnold v. Ben Kanowsky, Inc.,* 361 U.S. 388, 392 (1960)) (emphasis added); *see Idaho Sheet Metal Works, Inc. v. Wirtz,* 383 U.S. 190, 206 (1966); *Donovan v. Frezzo Bros., Inc.,* 678 F.2d 1166, 1173 (3d Cir. 1982); *Todaro v. Twp. of Union,* 40 F. Supp.2d 226, 228 (D.N.J. 1999); *see also Falleson v. Paul T. Freund Corp.,* No. 03-CV-6277L, 2007 WL 4232783, at * 3 (W.D.N.Y. Nov. 28, 2007) (Larimer, J.); *Rubery v. Buth-Na-Bodhaige, Inc.,* 470 F. Supp. 2d 273, 276 (W.D.N.Y. 2007)(Larimer, J).   Accordingly, any doubt about whether an exemption applies should be resolved in the employees' favor.

Therefore, the only way for defendant to survive this motion is to present sufficient evidence supporting its heavy burden, that plaintiffs were "plainly and unmistakably" within the "terms and spirit" of the outside sales exemption which is to be "narrowly construed." Further, they must make this showing on each and every element of the exemption. The failure to meet even one element means summary judgment in plaintiffs' favor is appropriate. Because it is undeniably clear that plaintiffs do not fit within the outside sales exemption, defendant cannot meet its considerable burden of proving that plaintiffs are properly classified as exempt.   Accordingly, plaintiffs' cross-motion for summary judgment should be granted.

## II.   PLAINTIFFS GREY, MCKNIGHT AND WILCOX ARE NOT OUTSIDE SALESPERSONS

A true outside, exempt salesperson is one who is out making personal calls and is not supervised or controlled by her employer. *Jewel Tea Co. v. Williams,* 118 F. 2d 202, 207-08 (10th Cir. 1941); *see also* 29 C.F.R. § 541.501.   On the other hand, employees who work from fixed sites which the employer uses to make sales are non-exempt inside sales employees.   This case concerns such employees.

A.     The Outside Sales Exemption

In harmony with the legislative intent of the outside sales exemption, the regulations define the outside salesperson as any employee whose primary duty is making sales and who is "customarily and regularly engaged away from the employer's place or places of business in performing such primary duty."  29 C.F.R. § 541.500.  The regulations set forth the narrow scope of the outside sales exemption:

> An outside sales employee must be customarily and regularly engaged "away from the employer's place or places of business."  The outside sales employee is an employee who makes sales at a customer's place of business or, if selling door-to-door, at the customer's home.  Outside sales does not include sales made by mail, telephone, or the Internet unless such contact is used merely as an adjunct to <u>personal calls</u>.  Thus, <u>any fixed site</u>, whether home or office, <u>used by a salesperson as a headquarters</u> or for telephonic solicitation of sales is <u>considered one of the employer's places of business</u>, even though the employer is not in any formal sense the owner or tenant of the property.  However, an outside sales employee does not lose the exemption by displaying samples in hotel sample rooms during trips from city to city; these sample rooms should not be considered as the employer's place of business.  Similarly, an outside sales employee does not lose the exemption by displaying the employer's products at a trade show.  If selling actually occurs, rather than just sales promotion, trade shows of short duration (i.e., one or two weeks) should not be considered as the employer's place of business.

29 C.F.R. § 541.502 (emphasis added).

Not all activities outside of the employer's place of business matter – only activities of such quality that they are indispensable matter in the analysis.  *See* FLSA Letter 2007-4. Thus, the nature of the activities in the outside period need to be considered, as well as the length of time employees spent performing those activities.  *See Tracy*, 599 F. Supp. 2d 359. Accordingly, defendant must demonstrate, plainly and unmistakably, that opt-in plaintiffs Grey, McKnight and Wilcox were: (1) engaged in sales;[3] (2) performed sales activities outside its place of business; (3) the outside activities were indispensable to making sales; and (4) the

---

[3]      The parties do not dispute that opt-in plaintiffs Grey, McKnight and Wilcox were engaged in sales under the meaning of 3(k) of the Act.

outside activities were of a sufficient amount of time to constitute customarily and regularly. Defendant cannot meet this burden.

**B.**   **Opt-In Plaintiffs Grey, McKnight and Wilcox Must be Engaged in Sales Outside of Defendant's Fixed Sites**

The first hurdle NVR must overcome to meet its burden of plainly and unmistakably proving that plaintiffs are exempt from the FLSA's overtime requirements is to demonstrate that they were engaged in activities outside of its place of business.

The first question in this analysis is what constitutes "any fixed site" used by the employee for sales. 29 C.F.R. § 541.502. Activities performed from any such fixed site will not count towards "outside" sales work. As set forth below, the home communities are fixed sites which NVR controls and uses to make sales. Additionally, the Model Home also qualifies as a "fixed location" from which NVR makes sales.

1.   <u>The Record Demonstrates the Home Community is a Fixed Site Used by NVR to Make Sales</u>

This Court addressed the issue of whether the home community counts as a fixed site from which NVR conducts sales. *Tracy,* 599 F. Supp. 2d at 362-63. There, based on the arguments advanced by the plaintiffs, and based on the discovery completed at that point, this Court could not conclude that as a matter of law that the home community constituted "any fixed site" from which sales were conducted by SMRs. *Id.* (noting that the DOL "generally assumed" the community qualified as "outside sales," and rejecting the plaintiffs' argument[4] that sales anywhere other than at the customer's home or place of business did not

---

[4]      In rejecting this argument, this Court looked at the first two sentences of the § 541.502. The first sentence defines outside sales as those occurring at the customer's place of business and the second excludes from outside sales those activities occurring at the employer's place of business. This Court wrote that the regulations therefore failed to account for activities which fell outside these two sentences and that such activities did not count automatically count as inside sales. *Tracy,* 599 F. Supp. 2d at 363. Plaintiffs continue to believe that the first sentence sets forth what constitutes outside sales. The next sentence (as well as ones that follow) is not set up as a dichotomy with the first

- 13 -

constitute outside sales work). This Court also noted, however, that under the DOL opinion letters, the home community would qualify as an inside sales site if the employer maintained a "continuing interest" in the community even after the sale of a lot. *Id.* at 363.

Given the more complete record at this juncture, this Court can now rule that NVR's home community does constitute "any fixed site" from which SMRs conduct sales for two independent reasons.

> a.     *NVR has now admitted that SMRs use NVR's home communities as a "fixed site" from which they make sales.*

As noted above, the regulations dictate that the employer's place of business is any "fixed site" used as a "headquarters" to make sales. Under the regulations, the employer's place of business need not be owned, or even leased, by the employer. *See* 29 C.F.R. § 541.501 ("even though the employer is not in any formal sense the owner or tenant of the property"). Accordingly, a sales employee is considered an "outside sales employee" only if he makes "personal calls" upon his customers at their "place of business or, if selling door-to-door, at the customer's home."[5] *Id.* ("Outside sales does not include sales made by mail, telephone or the Internet *unless such contact is used merely as an adjunct to personal calls*.") (emphasis added).

Here, defendant claims that the entire community is the fixed site from which it makes sales. Indeed, in its submissions in support of summary judgment and decertification, defendant claims that SMRs show homesites in the community as well as homes under construction and completed homes of previously customers in the community – in addition

---

sentence, but instead a series of non-exclusive examples of activities that are clearly not covered by the first sentence. Even if this Court leaves it previously ruling intact, plaintiffs are entitled to judgment as a matter of law for the separate reasons set forth above.

[5]      Discovery has shown that SMRs, including opt-in plaintiffs Grey, McKnight and Wilcox, do not make sales at the customer's place of business or home.

to all of the sales activities which take place in the Model Home located in the community.[6] There can be no dispute that the tracts of land upon which defendant builds communities are "fixed sites." Therefore, defendant claims that its "fixed site" for making sales includes the entire community. To find otherwise would allow defendant in one breath to claim that it expects SMRs to use the entire community to makes sales, and then in the next breath claim that NVR's community is not a "fixed site" used as a "headquarters" from which it makes sales. Simply, defendant cannot have it both ways.

> b.   *NVR has a continuing business interest in the home communities so that it cannot count work from those locations as "outside" sales work.*

This result is also consistent with the continuing business interest analysis noted in both the DOL's 2007-4 Opinion Letter and this Court's prior Order finding that a fixed site where the employer has a continuing business interest meets the definition under the regulations. *See Wage and Hour Op. Letter,* FLSA Letter 2007-4, 2007 WL 506577 (Jan. 25, 2007); *Tracy,* 599 F. Supp. 2d at 363. Here, defendant cannot show that it does not have a continuing business interest in its communities because the record undisputedly demonstrates that defendant *does* have a continuing business interest in the entire tracts of land upon which it builds communities.

Indeed, defendant owns the land on which it builds communities and sells its homes. While not a requirement under the regulations, *see* 29 C.F.R. § 541.502 ("even though the employer is not in any formal sense the owner or tenant of the property"), defendant owns,

---

[6]      As these papers make clear, the actual facts in the record do not support the inflated claims of the defendant as to the activities of the SMRs. But that is not relevant for this argument. Here, the defendant's mischaracterization only hurts them; it does not save them. By claiming that sales activities occurred at the fixed site of NVR's home community, all NVR has done is placed sales activities on a fixed site they control (the community), thus meaning these activities do not count towards "outside" sales work. This approach demonstrates the proverbial warning about not jumping from a frying pan into the fire. Put differently, in order to defeat summary judgment, NVR would not just need to show there was work outside the Model Home, NVR would also need to show that work was performed away from any fixed site it controlled.

- 15 -

or is obligated to own, the entire tracts of land to be developed into the communities.  *See* Glennon Aff. at ¶ 12, Ex. L (Land Purchase Agreements).  This establishes an ever greater level of control maintained by defendant and further supports the conclusion that, pursuant to both the legislative intent and the plain text of the regulations, each of defendant-owned and controlled communities constitute defendant's place of business.  Accordingly, defendant has a clear interest in each community because there is no guarantee of the community's success and whether it will be able to sell the lots it is obligated to purchase; indeed, defendant is obligated to purchase the agreed upon number of lots regardless of the community's success.

Specifically, plaintiffs Grey, McKnight and Wilcox performed the vast majority of sales activities inside of their community. SF ¶ 43. Moreover, any activities that were performed outside of their community were ancillary to the Sales Process because NVR created its business model so that SMRs did not have to market for business outside of their communities. SF ¶ 31.

2. <u>Model homes constitute a "fixed site" from which the NVR makes sales</u>

The Model Home also constitutes a "fixed site" used as a "headquarters" from which defendant makes sales and work performed from that location counts as inside sales work. This Court made this holding previously.  *Tracy,* 599 F. Supp. 2d at 362 ("While NVR disputes this conclusion, it is consistent with 29 C.F.R. § 541.502, and I find no reason to disturb it."). Indeed, NVR's entire business model is structured around the Model Home.  SF ¶ 2.  Moreover, defendant simply cannot show that it does not have a continuing business interest in the Model Home.  Defendant's Sales Process is centered around the Model Home, and it utilizes the Model Home as its sales office until the community sells out, which typically takes years to happen.  SF ¶¶ 2, 46.

Whether the entire community or the Model Home is considered defendant's place of business, either fits the "fixed site" envisioned under the regulations and enables defendant to exercise the level of control usually absent with respect to an outside sales employee. For example, NVR not only has knowledge of the hours worked by plaintiffs Grey, McKnight and Wilcox, it maintains control over their activities while in the community. SF ¶ 6. NVR controls when the community and the Model Home will be open to customers and, consequently, dictates when plaintiffs must be manning the Model Home. SF ¶ 6. Accordingly, because customers and potential customers are invited by NVR to the communities to experience defendant's product, NVR creates an expectation an SMR will be available during its posted open hours. SF ¶ 8. Thus, NVR discouraged plaintiffs Grey, McKnight and Wilcox from leaving their Model Homes and communities for extended periods of time during open hours so as to not miss sales opportunities. SF ¶ 6; *see* 30(b)(6) Dep. 113:20-25, 143:23-24 ("We want the model open as much as possible."). Thus, NVR has day-to-day control over plaintiffs Grey, McKnight and Wilcox, including their schedules and work load, and is therefore aware of their working hours, by stationing them at "fixed sites" to be used as a "headquarters" from which to make sales. SF ¶¶ 5-11, 16. Because NVR has no trouble exerting control over the community and Model Homes, nor does it lack control over its employees while they engage in sales within those communities and Model Homes, the intent of the exemption is clearly not furthered by exempting plaintiffs as outside salespersons.

Thus, it is undisputed that plaintiffs Grey, McKnight and Wilcox perform the majority of their sales activities, including all indispensable components of the Sales Process, inside of the Model Home.

**C.     The Nature of Plaintiffs' Outside Activities Do Not Meet Exemption**

Another element that NVR would need to, but cannot, show to defeat this motion is that the nature of plaintiffs' outside activities meets the outside sales exemption. As the DOL opined, and this Court acknowledged, "it is the nature of the activities, rather than the amount of time, that drives [the] conclusion. Virtually all of the indispensable components of the sales efforts are concentrated in the outside period." *Wage and Hour Op. Letter;* FLSA Letter 2007-2, 2007 WL 506575 (Jan. 25, 2007), at *3, n.2; *Tracy,* 599 F. Supp. 2d at 362. Thus, in order to meet its burden, defendant must show, plainly and unmistakably, that all indispensable components are concentrated in the outside period. The record, however, plainly and unmistakably shows that the outside activities were not indispensable components of NVR's Sales Process, and that the vast majority of sales activities whether measured in time, importance, or absolute numbers, including *all* indispensable components of the Sales Process, were performed *inside* the Model Home. SF ¶¶ 23-26.

Indeed, of NVR's six-step Sales Process – (i) Greeting; (ii) Prequalifying; (iii) Demonstrating the Home and the Homesite; (iv) Demonstrating the Financing/Cost Estimate Sheet; (v) Gaining a Commitment/Closing the Sale; and (vi) Follow-Up, *see* Def. Decert. Meml. at 6 – NVR admits only four steps are necessary for defendant to make a sale: the Greeting; Prequalifying; Demonstrating the Financing/Cost Estimate Sheet; and Gaining a Commitment/Closing the Sale. SF ¶¶ 24-26. And, all four components are virtually always completed inside of the Model Home.  SF ¶ 26.

NVR admits, and plaintiffs agree, that "the initial greeting and interaction with the customer at the very beginning to determine their needs is a critical part of the Sales Process." 30(b)(6) Dep. 103:12-15. Understandably, without initiating the relationship with the customer, no sale may be accomplished. It is also undisputed that the greeting is virtually

always completed inside the Model Home. *See* SF ¶¶ 24-26; 30(b)(6) Dep.105:6-9, 123:3-5.

Prequalifying is when SMRs determine the prospect's needs and screen customers as to their seriousness and ability to purchase a home from defendant at that time. The parties agree that this step is a "critical part of the Sales Process" that is virtually always completed within the Model Home. SF ¶¶ 24-26; 30(b)(6) Dep. 137:13-14; 106:17-18, 108:15-109:2.

The next indispensable component is demonstrating the financing/cost estimate sheet. The parties agree that a sale cannot be completed without determining what the costs to the customer will be, and whether the customer has such funds secured.  *See* SF ¶¶ 24-25; 30(b)(6) Dep. 145:6-13. NVR admits, and plaintiffs agree, that this step always occurs either in the Model Home or at defendant's mortgage office. SF ¶ 26; 30(b)(6) Dep. 110:15-21.

Lastly, the parties agree that gaining a commitment/closing the sale is an indispensable component of defendant's Sales Process.  SF ¶¶ 24-25; 30(b)(6) Dep. 147:8-10, 152:7-11. Indeed, absent the performance of this step, there would be no sale.  The parties also agree that the closing of the sale virtually always occurs in the Model Home.  SF ¶ 26; 30(b)(6) Dep. 111:7-13.  Thus, all of the indispensable activities occur within the Model Home.

NVR is therefore forced to cite to activities that are not an essential part of the sales process, if at all, to justify the exemption. For example, NVR relies heavily on SMRs demonstrating homesites to potential customers, despite NVR's protestation to the contrary. In fact, NVR admitted during its Rule 30(b)(6) deposition that demonstrating homesites is not necessary to sell a home.  *See* 30(b)(6) Dep. 147:17-20 (demonstrating a homesite not necessary to sell a house); *see also* SF ¶ 28.  Further, defendant's own secret shopper checklist also exposes exactly how flimsy defendant's claim is that this activity is a critical part of the sales process.  Indeed, defendant's secret shopper report consists of not less 124 different points the secret shopper evaluates the SMR on, and of those, only four (less than 4%) of

which evaluate whether the SMR "offered" to show a homesite. If such an activity were truly an important part of the sales process, it would be mentioned more than four times out of 124 in the secret shopper evaluation. *See* Glennon Aff. Exhibit M at Bates Nos. Tracy-NY 006087-006090. Thus, defendant's own report belies its contention on this score and is consistent with the undisputed evidence in this case. *See* 30(b)(6) Dep. 151:3-7, 22-25 (demonstrating a home under construction not necessary to sell a house); 147:17-20 (demonstrating a homesite not necessary to sell a house);[7] Grey Dep. 174-177 (recalls touring a community **once** with a customer); McKnight Dep. 209-211 (**never** showed community and amenities because they were in plain eyesight of the Model Home). Indeed, opt-in plaintiffs Grey, McKnight and Wilcox often complete sales without ever demonstrating a home under construction. SF ¶ 28.

Further, meetings with realtors[8] and shopping the competition, regardless of whether such activities took placed outside of the community or Model Home, also did not constitute indispensable components to making sales.[9] *See* Def. Meml. The majority of defendant's sales were generated from its marketing and advertising efforts inviting potential customers to its communities. Moreover, SMRs were able to market to realtors and shop the competition

---

[7]     Indeed, defendant admits that SMRs' primary duty is to sell houses, not land. Defendant's Memorandum of Law in Support of its Motion for Summary Judgment of Opt-In Plaintiff Megan Grey ("Def. Meml.") at 1, 3; SF ¶ 1; Def. Decert. Meml. at 1. That fact seriously dilutes any claim that showing a homesite was an "indispensable component" of selling new construction homes.

[8]     Other marketing activities are treated the same as meeting with realtors because plaintiffs did not have to participate in marketing events and activities to generate business. SF ¶¶ 4, 31. Indeed, the majority of the marketing efforts performed by plaintiffs occurred in the Model Home in the form of mailings, telephone calls, and emails.

[9]     While defendant also relies on the SMRs' cross-selling responsibilities as an example of sales activities outside of the community, reliance is unfounded. Indeed, the completion of the same Sales Activities in a different community is no different than the retail employee who is instructed to work at a different store location. As such, to the extent this Court determines whether the defendant's place of business is the entire community or the Model Home, such location in a different community would also be performed at defendant's place of business, and, therefore, cannot be deemed an outside activity. SF ¶36. Additionally, plaintiffs leave the community to drop off contracts and attend weekly sales meetings, both at the corporate office. However, it seems the parties agree that they are not sales related activities.

from within the community, specifically, the Model Home.  Thus, meeting with realtors and shopping the competition outside the community were not indispensable components of defendant's Sales Process.[10]   SF ¶¶ 31, 33.

The record is clear, and the facts are undisputed, that plaintiffs Grey, McKnight and Wilcox performed <u>all</u> indispensable components of the Sales Process from within the Model Home.  SF ¶¶ 25-26,

Other activities relied on by NVR are admittedly not part of the Sales Process, for example, anything  post sale, such as the follow-up step of the Sales Process and showing homes under construction after purchase, occur only *after* the sale has been completed, and the customer is under contract to purchase a house.[11]   SF ¶ 34; 30(b)(6) Dep. 111:24-112:3.  Logic dictates that anything that occurs after the sale cannot possibly be "indispensable" to making an earlier event occur. As a result, defendant cannot refute that virtually all indispensable components of its sales efforts are concentrated during the outside period.  To the contrary, <u>all</u> indispensable components of its Sales Process are concentrated *inside* the Model Home, and therefore within the community.  Accordingly, plaintiffs are not exempt as outside salespersons on this basis alone.

### D.    Outside Activities Must Occur Customarily and Regularly

Independent of any other analysis, the regulations also dictate that the outside salesperson must be "customarily and regularly engaged" in activities outside of the

---

[10]     On rare occasions, a spec home may become available in a community.  While showing a spec home may be necessary to sell it, all of the other indispensable activities to making the sale occurred in the Model Home, just like all other sales.  SF ¶ 37.

[11]     The follow-up step includes pre-construction meetings, which defendant argues is an activity performed outside of the Model Home.  *See* Def. Decert. Meml. at 23.  However, the record clearly shows that, the majority of the time, the pre-construction meetings were completed within the Model Home.  *See* SF ¶ 22; Grey Dep. 122:15-22; Wilcox Dep. 290:8-292:8. Regardless, the pre-construction meeting is only performed *after* the sale is completed, and, thus, cannot be an indispensable sales activity. *See* SF ¶ 34; 30(b)(6) Dep. 102:17.

employer's place of business:

> The phrase "customarily and regularly" means a frequency that must be greater
> than occasional but which, of course, may be less than constant.  Tasks or
> work performed "customarily and regularly" includes work normally and
> recurrently performed every workweek; it does not include isolated or one-time
> tasks.

29 C.F.R. § 541.701.  This Court has also recognized that, in addition to the nature of the

activities, the length of the activities is a dispositive issue in determining whether the outside

sales exemption applies here.  *See Tracy,* 599 F. Supp. 2d at 362.

Courts have drawn general boundaries regarding what constitutes "customarily and

regularly," based on the percentage of time an employee performs those exempt tasks.

Indeed, frequencies as high as 67% have been held to fall short of "customarily and

regularly." *Jackson v. Go-Tane Services, Inc.*, 56 Fed.Appx. 267, 272, n. 8 (7th Cir. 2003); *see

also Secretary of Labor v. Daylight Dairy Prods., Inc.*, 779 F.2d 784, 787 (1st Cir. 1985) (76%

"falls short of 'regular and customary'"). This Court has held that if an employee spends less

than 80% of his time performing a task it is at least an issue of fact whether the employee

engaged in such work "customarily and regularly." *Rubery v. Buth-Na-Bodhaige, Inc.*, 470 F.

Supp.2d 273, 278 (W.D.N.Y. 2007) (Larimer, J.); *Falleson v. Paul T. Freund Corp.*, No. 03-

CV-6277L, 2007 WL 4232783 (W.D.N.Y. Nov. 28, 2007) (Larimer, J.)(denying defendant's

motion for summary judgment where plaintiff estimated 75-80% of her time was spent

working in the office); *see also Casas v. Conseco Finance Corp.*, No. Civ.00-1512, 2002 WL

507059, at *10 (D. Minn. Mar. 31, 2002)(holding that a sales employee who spends 80-90%

of his time at the sales site cannot be "customarily and regularly" engaging in outside sales).

Thus, defendant must clearly and unmistakably show that opt-in plaintiffs Grey,

McKnight and Wilcox performed the outside activities at such a frequency to constitute

"customarily and regularly."  Defendant cannot meet that burden because the record shows

that plaintiffs spent less than 1.2 hours, on average, (or, at most,[12] 3.1% of their time), performing activities outside of the Model Home per week.

　　To start, here, many of the activities performed by plaintiffs outside of the community and the Model Home occurred so infrequently that they could not possibly be considered as having occurred "customarily and regularly." For example, plaintiffs rarely had to meet with realtors because the majority of their sales resulted in potential customers visiting the Model Home. *See* SF ¶ 44; McKnight Dep. 187:2-7 (met with realtors **twice** outside the Model Home during her career with defendant); Grey Dep. 111:5-113:8, 113:19-114:4 (recalls making realtor baskets on **two** occasions); Wilcox Mileage Expense Reports (reflects leaving the community **five** times in 2007 for realtor related activities, and a **total of three** times for realtor related activities from 2001-2006). Similarly, plaintiffs were not required to leave the community, to shop the competition; instead, after visiting the competitor community the first time, plaintiffs were able to shop the competition by telephone from inside the Model Home. *See* SF ¶ 33; Wilcox Dep. The same rings true for activities such as showing the community to potential customers (*see* Grey Dep. 174-177 (recalls touring a community **once** with a customer); McKnight Dep. 209-211 (**never** showed community and amenities because they were in plain eyesight of the Model Home)), touring spec homes (*see* McKnight Dep. 188-89 (**nine** times during entire employment); Grey Dep. 269:19-274:24 (only had **three** spec homes during her employment)), and meeting customers outside of the Model Home (*see* Wilcox Dep. 297 (met a customer outside the Model Home on **one** occasion); McKnight Dep. 158-59 (met a customer outside the Model Home on **one** occasion); Grey Dep. 178:19-

---

[12]　　Plaintiffs have based their calculations on 35 hours per week, which represents only the amount of time they were scheduled by NVR to be in their Model Homes, or at the weekly sales meeting.  However, plaintiffs typically worked over 40 hours per week, working both before and after their scheduled shifts, and on their days off in order to perform activities in the Model Home. Therefore, the percentage of time possibly spent outside the Model Home is only reduced from 3.1%.

23, 179:2-22 (met a customer outside the Model Home on **one** occasion as an SMR)).

Because the record is clear that the majority of the "outside activities" performed by plaintiffs did not even occur *on a yearly basis,* let alone a monthly or weekly basis, such activities were isolated events, and the time spent performing such activities should not be considered in determining whether plaintiffs were "customarily and regularly" performing sales activities outside of defendant's place of business.  *See* 29 C.F.R. § 541.701 (customarily and regularly "does not include isolated or one-time tasks").

The remaining activities that took plaintiffs outside of the Model Home— demonstrating homesites, demonstrating homes under construction and completed homes to potential customers, and assisting customers in a walk-thru of their houses under construction—did not accrue enough time to be considered "customarily and regularly:"

| Activity | Average Number of Times per Week | Average Length of Time | Total Amount of Time per Week | Percentage of Time[13] |
|---|---|---|---|---|
| Demonstrating Homesites | 2-3 times per week[14] | 5-7 minutes[15] | 10-21 minutes per week | .4% - 1% |
| Demonstrating Homes Under Construction and Completed Homes to Potential Customers | 0-3 times per week[16] | 10-15 minutes[17] | 0-45 minutes per week | 0% - 2.1% |

---

[13]     Percentage is based on 35 hours per week, representing the number of hours that NVR required plaintiffs to be stationed at the Model Home or in attendance at the weekly sales meeting. However, plaintiffs typically worked over 40 hours per week because they were required to work before and after their scheduled hours, and on their days off to complete work in the Model Home, such as completing paperwork, making telephone calls, and meeting with customers in the Model Home.  Grey Aff. ¶¶ 71-73; McKnight Aff. ¶¶ 69-70; Wilcox Aff. ¶¶ 79-81; Glennon Aff. ¶ 122.

[14]     McKnight Aff. ¶ 47 (on average 3 times per week); Wilcox Aff. ¶ 42 (on average 2 times per week); Grey Dep. 96:4-5 (on average 2 times per week).

[15]     McKnight Aff. ¶ 48 (on average 5 minutes); Wilcox Aff. ¶  (on average 5-7 minutes).

[16]     *See* McKnight Aff. ¶ 49 (on average 0-1.5 times per week); Wilcox Aff. ¶ 39 (on average 3 times per week); Grey Dep. 160:7 (on average 2 times per week).

[17]     *See* McKnight Aff. ¶ 50 (on average 5-10 minutes); Wilcox Aff. ¶ 40 (on average 10-15 minutes); Grey Dep. 166:17-21 (on average 15 minutes).

| Assisting Customers in a Walk-Thru of their Home Under Construction | 0-3 times per week[18] | 10-12 minutes[19] | 0-36 minutes per week | 0% - 1.7% |
|---|---|---|---|---|
| **TOTAL PER WEEK** | | | 10 minutes – 1 hour 42 minutes | .4% - 4.8% |

However, assisting customers in a walk-thru of their home under construction only happens *after* the sale is completed, and therefore, cannot be considered a sales activity. Thus, the average time plaintiffs spent outside the Model Home performing sales activities is reduced to **10 minutes to 1 hour 6 minutes**. Moreover, should this Court find that the entire community is NVR's place of business, all of plaintiffs' sales activities occur within the community.

Considering plaintiffs worked at a minimum 35 hours per week,[20] the time spent outside the Model Home performing ancillary sales activities accounted for, at most, only .4% to 3.1% of plaintiffs' workweek. Clearly, under the regulations and controlling case law, such a low frequency cannot possibly be considered "customarily and regularly." *See* 29 C.F.R. §§ 541.501 *et seq.; Jackson*, 56 Fed.Appx. at 272, n.8; *Daylight Dairy*, 779 F.2d at 787; *Rubery*, 470 F. Supp. 2d at 278; *Falleson,* 2007 WL 4232783; *Casas*, 2002 WL 507059, at *10; *see also* U.S. Dep't of Labor, *Wage & Hour Op. Letter*, 2006 WL 3930478; U.S. Dep't of Labor, *Wage & Hour Op. Letter*, 2006 WL 3406603.

Thus, it is clear that, under whatever standard this Court adopts to determine whether plaintiffs are exempt outside salespersons, plaintiffs are not "customarily and regularly"

---

[18]    *See* McKnight Aff. ¶ 49 (on average 0-1 times per week); Wilcox Aff. ¶ 47 (on average 3 times per week)

[19]    *See* McKnight Aff. ¶ 50 (on average 10 minutes); Wilcox Aff. ¶ 48 (on average 10-12 minutes)

[20]    35 hours reflects the lowest number of hours plaintiffs were required to work based on the hours defendant scheduled them to be in the Model Home and the weekly sales meeting. Indeed, plaintiffs typically worked more than 40 hours per week because they were required to work before and after their scheduled hours, and on their days off to meet with potential customers and complete the day-to-day activities that they were unable to complete during Model Home open hours. *See* Grey Aff. ¶¶ 71-73; McKnight Aff. ¶¶ 69-70; Wilcox Aff. ¶¶ 79-81.

engaged in sales activities outside of the Model Home, let alone the community. For this Court to deny summary judgment, it would need to necessarily hold that activities an employee performed significantly less than 5% of this time could constitute activities she did "customarily and regularly." Such a finding by a jury would be legally impermissible. Accordingly, because defendant cannot meet the high standard of demonstrating that plaintiffs are outside salespersons, plaintiffs' cross-motion for summary judgment should be granted.

## CONCLUSION

A person would be forgiven for being befuddled if a SMR told him that her job was in "outside sales." That claim would not make sense because that is not what SMRs do.  Neither common sense nor the law supports such a result. Plaintiffs' cross motion for summary judgment should be granted.

Dated:  November 28, 2011

**THOMAS & SOLOMON LLP**

By:    s/ Sarah M. Born
J. Nelson Thomas, Esq.
Peter J. Glennon, Esq.
*Attorneys for Plaintiffs*
693 East Avenue
Rochester, New York 14607
Telephone:  (585) 272-0540
nthomas@theemploymentattorneys.com
pglennon@theemploymentattorneys.com
sborn@theemploymentattorneys.com