UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                   :

PATRICK TRACY, et al.,                   :   No. 04-CV-06541 DGL(P)
on behalf of themselves and all other     :
employees similarly situated,       :
                                   :
                    Plaintiffs,   :
                                   :
          v.                    :
                                   :
NVR, INC.,                         :
                                   :
                    Defendant.   :
                                   :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## REPLY MEMORANDUM IN FURTHER SUPPORT OF
## <u>DEFENDANT'S MOTION TO DECERTIFY COLLECTIVE ACTION</u>

<u>Of Counsel:</u>

Lorie E. Almon
Richard L. Alfred
Barry J. Miller (*pro hac vice*)
James M. Hlawek (*pro hac vice*)

<u>Local Counsel:</u>

William G. Bauer

SEYFARTH SHAW LLP
620 Eighth Avenue
New York, NY 10018
---------------------
Two Seaport Lane, Suite 300
Boston, MA 02210

WOODS OVIATT GILMAN LLP
700 Crossroads Building, 2 State Street
Rochester, NY 14614

*Attorneys for Defendant NVR, Inc.*

Despite the voluminous briefing now before the Court and the long history of motion practice in this action, the liability issue presented in this case is quite simple. NVR asserts that its SMRs were subject to the outside sales exemption to the FLSA's overtime pay requirements. In a decades-long series of Opinion Letters and other guidance, the Department of Labor has provided a direct analysis of how that exemption applies to new home sales employees like the SMRs. Pursuant to that guidance, if an SMR spends one to two hours on outside sales efforts, once or twice per week, he or she is "customarily and regularly" engaged in outside sales activities and exempt.

For purposes of the Court's present certification determination, the overriding issue is therefore whether the opt-in plaintiffs are "similarly situated" with respect to the nature and extent of their outside sales activities, such that the Court can make a <u>collective</u> determination as to whether the opt-ins exceeded the threshold of outside sales efforts necessary to meet the exemption. If they are not similarly situated in that regard, then the liability question can only be resolved through a multitude of individual inquiries – an inefficient, unwieldy, and impracticable prospect that renders collective resolution of Plaintiffs' claims inappropriate.

The record reflects that the nature and extent of the opt-ins' outside sales efforts varied significantly depending on multiple factors, including local market conditions that changed over time, each SMR's unique personality and selling style, and the communities to which they were assigned. It is only by assessing each of those factors for each opt-in plaintiff that the Court can determine whether an individual SMR exceeded the threshold for exempt status. Any attempt to aggregate those variables across scores of SMRs and make an overarching determination of whether all members of the group are exempt would result in an unmanageable quagmire.

In their Opposition, Plaintiffs attempt to distract from the straightforward inquiry now before the Court because it can yield only one result – decertification of their collective action claims.  To avoid this, Plaintiffs attempt to obscure and distort the record to make it appear that a heterogeneous collection of more than 130 SMRs who worked for NVR in locations from New York to Tennessee all did the same thing in the same way over a period of approximately ten years and through several dramatic cycles in the real estate market.  Plaintiffs similarly attempt to downplay the significance of the opt-ins' outside sales activities, characterizing such tasks as showing customers the land on which their homes would be built a "dispensable" part of selling homes.  The record belies both of these mischaracterizations.

Plaintiffs also focus on similarities among the opt-ins that are not germane to the present certification inquiry.  For example, Plaintiffs provide superficial observations that SMRs are subject to the same generic job description, attend the same initial training program, and are provided with similar resources to help them sell homes.  Even where those observations are supported by the record, they are irrelevant because they do not allow the Court to make a collective determination as to whether the opt-ins engaged in a sufficient level of outside activities necessary to establish the exemption.  Plaintiffs similarly focus on NVR's uniform internal classification of SMRs as exempt as a basis to proceed collectively, despite the Second Circuit's instruction that such internal classifications have no bearing on whether opt-ins actually fall under the exemption.  These distractions cannot overcome the evidence in the record of substantial variation in SMRs' actual performance of their jobs.

Notably, Plaintiffs recognize that the extent and nature of their outside sales activities can only be determined through person-by-person inquiries.  In their pending motion to strike the testimony of managers and other SMRs, Plaintiffs acknowledge that it is only the opt-ins

themselves and their direct supervisors who can testify to the extent of each SMR's outside sales activities.  In making this point, Plaintiffs concede that the only way to determine any given SMR's level of outside activity is a direct examination of his or her individual circumstances.  For that reason, there are no efficiencies to be gained by the continued certification of this matter as a collective action, and collective resolution of Plaintiffs' claims would be unworkable.

## I.     IN ORDER TO PROCEED COLLECTIVELY, THE OPT-IN PLAINTIFFS MUST BE SIMILARLY SITUATED IN THEIR OUTSIDE SALES ACTIVITIES.

The Court's certification determination turns on whether the opt-in plaintiffs are similarly situated in the extent and nature of their outside sales activities – if they are not similarly situated in that respect, determination of whether the outside sales exemption applies to them would require individualized inquiries that would render collective litigation inappropriate. *See Myers v. Hertz Corp.*, 624 F.3d 537, 555 (2d Cir. 2010) (collective action requires that opt-ins be "'similarly situated' to the named plaintiffs *with respect to whether a FLSA violation has occurred*") (emphasis added); *Perkins v. S. New England Tel. Co.*, 669 F. Supp. 2d 212, 220 (D. Conn. 2009) (opt-ins must be "similarly situated *in the areas of their jobs which are relevant to the FLSA misclassification inquiry*") (emphasis added); *see also Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2551 (2011) ("What matters to class certification . . . is not the raising of common 'questions' – even in droves – but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation.") (citation omitted).  In attempting to show that they are "similarly situated," Plaintiffs ignore the determinative issue in this action and focus their Opposition on points unrelated to whether the opt-ins are similarly situated with respect to the outside sales activities that will determine whether they are exempt.

First, while Plaintiffs spend much of their Opposition pointing out that NVR has a training program as well as a "sales process" and provides the same basic resources to SMRs to

enable them to sell new homes (Opp. at 6-8, 18-22), these "similarities" have no bearing on the opt-ins' exempt status. While there are certainly some things that SMRs had in common (as is the case with any group of employees working for the same company), the similarities that Plaintiffs invoke are irrelevant to NVR's Motion to Decertify because they shed no light on the extent of the opt-ins' actual outside sales activities, whether individually or as a group.

Second, Plaintiffs argue that even if SMRs are not similarly situated in terms of their outside sales activities, a collective proceeding is still appropriate unless the differences among the opt-ins are "entirely personal." Opp. at 22-26. However, Plaintiffs misstate the applicable law – no court in this jurisdiction has held that certification turns on whether differences among opt-ins are "entirely personal," and the standard that Plaintiffs posit is inconsistent with the bevy of cases in which courts have decertified collective actions without relying on entirely personal factors. Moreover, even if Plaintiffs' proposed standard had support in the law, the record shows that the opt-ins' outside sales activities depend on a variety of factors that are, in fact, personal to each individual. A collective trial in this matter is therefore inappropriate.

### A. *Plaintiffs' job descriptions and general duties are not grounds for certification.*

In contending that decertification is inappropriate, Plaintiffs point to purported similarities in their job descriptions and expectations (Opp. at 3, 8), as well as their general duties and responsibilities (Opp. at 6, 8, 11).[1] Plaintiffs do not, however, provide evidence that those common traits translate into similarities in the extent of their outside sales activities. They do not, for example, point to a provision in their job descriptions that in any way illuminates the

---

[1] Plaintiffs' assertion that "Defendant had the same job expectations of each opt-in" (Opp. at 3) is belied by the record. NVR's expectations vary depending on a number of factors (Brader Dep. 14:3-16:13), and those varying expectations affect the outside activities of SMRs. For example, some local Sales Managers expect SMRs to be consistently available in the model home to greet walk-in prospects, particularly in high-traffic communities. Barrett Dep. 56:9-58:24, 61:13-62:16. Other local Sales Managers expect that SMRs will regularly be away from the model to show homesites or to meet with prospective customers. Mock Dep. 121:10-17.

frequency or duration of their outside sales efforts.  More to the point, Plaintiffs identify nothing that would aid the Court in determining whether the opt-ins, as a collective group, were above or below the threshold that the DOL has established for the application of the outside sales exemption to new home sales employees.  The asserted similarities that Plaintiffs identify are therefore insufficient to avoid decertification.  *Espenscheid v. DirectSat USA, LLC*, 2011 WL 2009967, *6 (W.D. Wis. May 23, 2011) (decertification proper where "[t]he single fact that all technicians were subject to the same policies, practices and job descriptions does not permit a conclusion that a small sub-set would automatically be representative of the whole"); *Prise v. Alderwoods Group, Inc.*, _ F. Supp. 2d _, 2011 WL 4101145, *17 (W.D. Pa. Sept. 9, 2011) (to avoid decertification, "similarities between . . . plaintiffs . . . must extend beyond the mere facts of job duties and pay provisions") (internal quotations and citations omitted).

To the extent that Plaintiffs' assertions about similarities in job descriptions, duties, or tools of the SMRs' trade are intended as independent grounds for a finding that the opt-ins are "similarly situated" in the sense relevant to determining whether this case should proceed on a collective basis, those assertions are misguided.  This is not a case involving the FLSA's administrative or executive exemption, where the existence of a job description identifying common duties might weigh in favor of class certification.  For example, in *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233 (11th Cir. 2008), an executive exemption case that Plaintiffs discuss in great detail (Opp. at 13-14), the defendant's liability turned on whether the opt-ins' primary duty was management.  *See id.* at 1266; 29 C.F.R. § 541.100(a)(2) (executive exemption requires primary duty of management).  In that case, the plaintiffs' claims could be resolved in one stroke by examining the extent of their managerial authority, which was framed and

delimited by the job description for the position.  Accordingly, the court found collective proceedings to be appropriate.  *See Morgan*, 551 F.3d at 1266.

In contrast to *Morgan*, this is an outside sales exemption case where liability, and hence the Court's certification determination, turns on a different set of factors.  Here, the liability inquiry will turn on the extent of the opt-ins' actual outside sales activities, and the Court's certification determination turns on whether Plaintiffs can show that they are similarly situated in that regard.  Plaintiffs' assertion that "any variation in duration or style [of outside sales activities] is of no import to the Court's certification determination" (Opp. at 23), therefore, fundamentally ignores what this case is about.  Since the SMRs' job descriptions and their general duties make no prescription as to the extent of their outside sales activities, Plaintiffs' focus on those similarities among SMRs is a red herring.

**B.     *NVR's "sales process" and training program do not establish that SMRs were similarly situated with respect to their outside sales activities.***

Plaintiffs also argue that a collective trial in this matter is appropriate because NVR has a common "sales process" and a core training program that instill a "regimented" sales approach.  Opp. at 7-11, 20.  However, the record does not support this assertion.  Rather, the record shows that NVR's "sales process" is a tool that is given to SMRs as part of the Company's training program, which each SMR uses differently based on his or her individual skills and selling style, as well as the unique circumstances of a particular sales opportunity.  Mock Dep. 277:14-15 ("You say process.  It's a framework for them to use . . . ."); Brader Dep. 52:12-14 ("Each sales rep brings their own personality, their own skills, their own experience to the table as they perform their duties."); D. Wilcox Dep. 106:18-20 ("There's not really a standard sales process that people go through.  There's some things we want them to do.  A process – it's different.  It's

not an assembly line.").  This flexibility results in the significant variations in the extent of the SMRs' outside sales activities as set forth in NVR's Motion to Decertify.

To the extent that Plaintiffs offer their observations about NVR's sales process or training to support an inference that there is pressure on SMRs to focus on inside activities or to limit their outside sales activities, such a showing would still not establish that *all* SMRs failed to meet the relatively modest threshold of one to four hours per week in outside sales activities. Indeed, any such inference is debunked by the unrebutted testimony from a number of SMRs reflecting that they spent well in excess of that threshold on outside sales activities each and every week.  *See, e.g.*, Marsinek Dec. ¶18 (estimating that he spent 6-13 hours on outside sales activities each week); Adams Dec. ¶14 (6-14 hours); Wright Dec. ¶20 (7-14 hours); Drake Dec. ¶14 (9-18 hours); Barr Dec. ¶11 (12-20 hours).  Regardless of their common job descriptions, general job duties, or expectations, these SMRs exceeded the threshold by varying margins. Thus, the similarities Plaintiffs identify certainly did not have the effect of causing SMRs to fall below the threshold for outside sales activity as a group.

C.  ***Certification does not turn on whether differences among the opt-in plaintiffs are "entirely personal."***

In addition to focusing on irrelevant aspects of the factual record, Plaintiffs proffer a legal standard to govern the Court's certification determination that is unsupported by law or logic. Plaintiffs assert that "[o]nly if the plaintiffs' claims are based on circumstances that are entirely personal to the individual plaintiff may the court deny certification."  Opp. at 23.  Plaintiffs do not point to a single decision from this jurisdiction in support of their assertion.  Instead, they point to two decisions from other jurisdictions, neither of which impose an "entirely personal"

requirement.[2]  Neither this Court nor the Second Circuit has held that an FLSA case shall proceed to judgment on a collective basis unless the individual plaintiffs' claims are "entirely personal."  Rather, as the Second Circuit has held, the standard for the Court's certification determination is straightforward – collective litigation is appropriate only if the opt-ins are similarly situated with respect to the factors that determine whether an FLSA violation has occurred.  *Myers*, 624 F.3d at 555.

Indeed, if the standard for final certification of a collective action were as forgiving as Plaintiffs contend, then virtually any wage case brought on behalf of a group of employees in the same position would survive a motion for decertification.  However, courts have held plaintiffs to a much higher burden and have not hesitated to decertify wage cases where a strong showing of similarity among the opt-ins was lacking.  *See, e.g., Kuznyetsov v. W. Penn Allegheny Health Sys., Inc.*, 2011 WL 6372852, *8 (W. D. Pa. Dec. 20, 2011) ("[I]t would be inherently unfair to both sides to base one Plaintiff's situation on another's potentially dramatically different situation.  Representative evidence simply will not work under those facts.  Therefore, the result is a situation such that judicial economy will be hindered rather than promoted by certification."); *Espenscheid*, 2011 WL 2009967, *6 (decertifying collective action where liability determination would require examination of amount of time that each individual devoted to particular activities); *Prise*, 2011 WL 4101145, *23 (decertifying collective action based on "disparate factual and employment settings of individual plaintiffs," which raises "specter of

---

[2] The *Morgan* decision, which Plaintiffs cite in support of their assertion, does not say anything related to an "entirely personal" requirement.  The other decision Plaintiffs cite states that "[a] court may deny a plaintiff's right to proceed collectively only if the action arises from circumstances personal to the plaintiff, and not from any generally applicable rule, policy, or practice." *Escobedo v. Dynasty Insulation, Inc.*, 2009 WL 2382982, *6 (W.D. Tex. July 31, 2009).  Far from imposing an independent "entirely personal" requirement, this ruling is simply another way of stating the "similarly situated" standard for collective action certification that has been further refined and explicated by authorities cited in NVR's MOL and the present Reply.

unfairness . . . and supports a finding that plaintiffs are not similarly situated"); *Wong v. HSBC Mortg. Corp.*, 2010 WL 3833952 (N.D. Cal. Sept. 29, 2010) (decertifying FLSA collective action challenging application of outside sales exemption because only way to determine applicability of exemption was to examine circumstances of each individual's employment); *Oetinger v. First Residential Mortg. Network, Inc.*, 2009 WL 2162963 (W.D. Ky. July 16, 2009) (same).

> ### D.     *The extent of the opt-ins' outside sales activities depends on personal factors.*

Even if the certification determination did turn on the standard that Plaintiffs posit – i.e., whether differences among the opt-ins are "entirely personal" – the record supports such a finding in this case.  The opt-ins provided many examples illustrating that their personal approaches to the market and adaptations of NVR's sales process substantially affected the frequency and duration of their individual outside sales activities:

- One SMR testified that she only met with realtors outside of her model home twice during her entire career, and noted that she had less realtor contact than her peer-SMRs.  McKnight Dep. 186:24-187:10; McKnight Dep. 256:19-20 ("I worked the least amount . . . with a real estate agent than any other sales representative.").  In contrast, another SMR made a personal decision to visit six to eight realtors every time a spec home was available in her community, which occurred approximately once per quarter.  A. Wilcox Dep. 107:11-19, 110:6-112:25.

- Some SMRs regularly undertook – of their own initiative – to show completed, occupied homes to prospects.  McKnight Dep. 157:13-158:6; Dabulewicz Dep. 349:24-350:10.  In contrast, another SMR decided not to show completed, occupied homes to prospects because he thought it was an invasion of the homeowner's privacy.  Tripler Dep. 153:12-155:15.

- One SMR made a personal decision to demonstrate homesites to any customers who prequalified for financing.  A. Wilcox Dep. 277:5-19.   In contrast, another SMR made her own decisions about whether to demonstrate homesites to customers based on the level of traffic in her model home at a given time.  Donahue Dep. 257:24-258:23.

- One SMR made a personal decision not to show homes under construction to anyone because he thought it was dangerous and that homes under construction did not fairly represent the Company's product.  Tracy Dep. 85:6-15.  In contrast, another SMR would show homes under construction or, if she was busy with another customer at the time, send the prospect to the home unaccompanied.  Donahue Dep. 290:5-291:8.

- Some SMRs decided to "shop the competition" by leaving their sales centers and visiting other communities only on a regular quarterly basis.  Savarino Dep. 171:11-172:19; 233:19-234:24; Tripler Dep. 225:10-227:20.  Some SMRs did so far more often than the minimum requirement, entirely of their own volition.  A. Wilcox Dep. ("I hold myself to a higher standard than other people.").

- Some SMRs decided to travel away from their sales centers to tape off homesites in order to facilitate demonstrations.  Grey Dep. 101:15-17; Tripler Dep. 164:14-165:8; A. Wilcox Dep. 245:16-246:9.  In contrast, other SMRs asked construction workers to do the task so that the SMRs did not have to leave their sales centers.  Donahue Dep. 269:5-17, 270:16-271:18.

- One SMR decided to make it a personal practice to attend every preconstruction meeting with her customers.  Grey Dep. 119:7-14.  In contrast, others were more selective in the preconstruction meetings that they decided to attend.   A. Wilcox Dep. 291:14-292:11.

These examples, which are drawn entirely from the small sample of eight opt-in plaintiffs who participated in discovery among the 133-person collective, show that a determination of liability

in this matter genuinely would require an analysis of each SMRs "entirely personal" approach to selling homes.  Indeed, it is the aggregation of these "entirely personal" decisions made by each SMR that will determine the extent of each opt-in plaintiff's outside sales activities, including how frequently the SMR demonstrated homesites and homes under construction, how often the SMR visited realtors, the SMR's chosen method for shopping the competition, and a wide variety of other outside activities in which SMRs had the latitude to engage.  Such a fundamentally individualized inquiry is antithetical to the purposes of collective litigation.

## II.   PLAINTIFFS MISSTATE THE RECORD EVIDENCE PERTAINING TO THEIR OUTSIDE SALES ACTIVITIES.

Throughout their Opposition, Plaintiffs misstate the record in an effort to downplay the extent and the significance of their outside sales activities as SMRs.  While the volume of the briefing at this stage is not amenable to a point-by-point refutation, the following are but examples of Plaintiffs' many mischaracterizations of the record evidence:

- Plaintiffs contend that SMRs shop the competition "no more than four times per year."  Opp. at 21.  However, shopping the competition four times per year was a minimum requirement. McKnight Dep. 185:25-186:3.  Plaintiffs testified that they shopped the competition <u>much more frequently</u>, and the extent to which they exceeded the minimum depended on several factors.  One SMR, for example, shopped the competition once per month when she was not reaching her sales objectives.  Dabulewicz Dep. 162:15-163:11.  Another SMR would regularly visit as many as six or seven different competitors in a single month.  A. Wilcox Dep. 122:21-124:18.

- Plaintiffs state that SMRs "all employed the same competitive shopping techniques" (Opp. at 12) and that "opt-ins shopped the competition by calling neighboring communities for information of their traffic and sales" (Opp. at 21).  However, the record shows that SMRs

employed a variety of competitive shopping techniques, including activities outside of the model home.  For example, two opt-ins testified that they regularly shopped the competition by visiting their competitors' models, observing available amenities, and obtaining sales brochures.  Savarino Dep. 171:11-172:19; 233:19-234:24; Tripler Dep. 225:10-227:20.

- In an attempt to imply that SMRs sell new homes without leaving their assigned model homes, Plaintiffs assert that SMRs are stationed in fully built-out and decorated model homes.  Opp. at 5.  However, several SMRs testified that, instead of decorated model homes, they were stationed in RVs or trailers, which left them no choice but to leave the sales center regularly to show an actual home and homesite to prospects.  Grey Dep. 28:15-29:2; Tripler Dep. 105:22-108:2.  Another SMR decided – of his own volition – to station himself in an RV at an undeveloped community each weekend to pursue sales.  Tracy Dep. 149:22-151:4.

- Plaintiffs assert that all SMRs "demonstrated the homesite in the same manner."  Opp. at 10.  The record contradicts this assertion.  In their own testimony, SMRs described various differences in the way they demonstrated homesites.  For example, some SMRs testified that they would take the extra time to set out tape measures and cones to help customers visualize their lot (Grey Dep. 101:15-17; Tripler Dep. 164:14-165:8; A. Wilcox Dep. 245:16-246:9), whereas another SMR testified that she would not "tape off" the property (Donahue Dep. 269:5-17, 270:16-271:18).  Some SMRs demonstrated homesites in a thorough manner to "paint the picture" of where the house and the yard boundaries would be, a process that for some SMRs averaged thirty minutes per demonstration and could take as long as two hours.  Aberi Dep. 120:13-23; 245:18-23; Marsinek Dec. ¶¶10-11.  Other SMRs testified to demonstrating homesites in more of a drive-by style that would take as few as five minutes.  Donahue Dep. 271:19-273:23.

12

- Plaintiffs contend that "[a]ll opt-ins received the same training." Opp. at 6. However, as various SMRs testified, a significant portion of training consisted of individualized instruction and coaching tailored to the peculiarities of an SMR's particular community.[3] Donahue Dep. 165:9-166:13; Tracy Dep. 62:13-24. The core introductory training program that most SMRs attend, which is known as "HIT," is only the beginning of their overall training. After SMRs complete that program, they receive individualized, field-based training from their Sales Managers and/or SMR mentors over a period of months or even years. Mock Dep. 99:24-100:11; Delaney Dep. 32:10-20. Thus, while it is true that each SMR received training that began from the same foundation at HIT, each SMR's overall training experience was unique.

Plaintiffs' mischaracterizations are significant not only because there are so many but because they relate to the issue at the core of the Court's certification determination – whether the SMRs are similarly situated in regard to their outside sales activities. Plaintiffs repeatedly attempt to twist the factual record to both minimize and homogenize the duration and frequency of their outside sales activities when, in fact, the record shows that the duration and frequency of outside sales activities varies greatly among SMRs (including the opt-ins), depending on a multitude of factors. Because of those variations, collective resolution of Plaintiffs' claims would be unworkable.

---

[3] Plaintiffs similarly attempt to manufacture similarity among SMRs with the observation that SMRs were not permitted to complete their training until they each passed the "same 'demo day' evaluation." Opp. at 20. While nearly all SMRs complete a demo day before assuming responsibility for a community, the record establishes that each demo day evaluation is unique and depends on a host of factors, including the community in which it occurs and the personalities of the manager and the SMR. D. Wilcox Dep. 100:23-101:10; Sobieski Dep. 91:5-7. In this regard, demo days illustrates the individualized aspects of NVR's training program that occur after the basic HIT training on which Plaintiffs seek to place exclusive emphasis.

**III.   IN MOVING TO STRIKE TESTIMONY FROM INDIVIDUALS WHO DID NOT DIRECTLY WITNESS THEIR ACTIVITIES, PLAINTIFFS ACKNOWLEDGE WHY COLLECTIVE LITIGATION OF THIS MATTER IS INAPPROPRIATE.**

In response to NVR's Motion to Decertify, Plaintiffs have offered a separate filing in which they contend that neither managers nor other SMRs can testify as to the outside sales activities of the various opt-in plaintiffs because those managers and other SMRs "clearly have no personal knowledge of the opt-ins' job performance as they did not observe the opt-ins perform their actual activities."  Pl. Motion to Strike (Dkt. 655) at 8.  In other words, Plaintiffs contend that managers and peer-SMRs cannot testify as to the actual outside sales activities of any SMR with whom they did not have line-of-sight contact.  In making that assertion, Plaintiffs acknowledge that the actual outside sales activities of the opt-in SMRs vary significantly by person and that there is no amount of outside sales activity that is common to the SMRs or the opt-ins.  *See id.* at 8 ("[D]efendant erroneously focuses on all SMRs generally, and not on the actual performance of the 133 opt-in plaintiffs.").  At the same time, Plaintiffs identify no connection between the 133 individuals who filed consents to join this action that would give rise to some common level of outside sales efforts among those particular individuals.  In this regard, Plaintiffs have not only conceded the argument that is the fundamental basis of NVR's Motion to Decertify, they have affirmatively adopted that argument as their own position.

Plaintiffs' recognition of the need for testimony from witnesses with line-of-sight observations of each SMR and the substantial variations in outside sales activities among SMRs is fatal to their attempt to pursue their claims on a collective action basis.  In their Opposition, Plaintiffs point to the substantial resources that would be consumed if each individual opt-in plaintiff's claim were to be tried separately.  They note that "[i]f defendant's position was adopted, and assuming conservatively that each opt-in's trial would last for only two weeks, that would total 266 weeks of federal trials."  Opp. at 32.  However, cobbling the opt-ins'

14

fundamentally distinct claims together into one proceeding, as Plaintiffs propose, would not improve this scenario – it would make the scenario much worse.  In a collective proceeding, a single panel of jurors would not only have to hear testimony from 133 different SMRs and a similar number of supervisors explaining the outside sales activities of each opt-in plaintiff, the jurors would be called on to keep track of this overwhelming volume of testimony and other evidence to engage in an SMR-by-SMR deliberation at the conclusion of the trial to determine which of the opt-ins spent the requisite amount of time engaged in outside sales activities to meet the pertinent exemption.  Such a welter of individualized inquiries renders collective action inappropriate.  *See, e.g.*, *Wong*, 2010 WL 3833952 (decertifying FLSA collective action challenging application of outside sales exemption because the only way to determine applicability of exemption was to examine the circumstances of each individual's employment).

## IV.    NVR'S INTERNAL CLASSIFICATION OF THE SMRs IS NO GROUNDS FOR COLLECTIVE RESOLUTION OF PLAINTIFFS' CLAIMS.

Perhaps recognizing that the record reflects that the opt-ins' working experiences are too heterogeneous to allow for a collective trial, Plaintiffs suggest that the Court circumvent an analysis of the record and allow this action to proceed to a collective trial because NVR's uniform classification of its SMRs as exempt establishes that they are "similarly situated."  Opp. at 16-18.  Plaintiffs assert that "[f]or this reason alone defendant's motion should be denied."  Opp. at 16.  That argument is contrary to the governing case law and lacking in persuasive force.

In support of their argument, Plaintiffs point to four cases from other jurisdictions.  *See* Opp. at 16-18.  However, none of those cases held that uniform internal classification is sufficient grounds to deny a decertification motion.  In each case, all of which involved the FLSA's administrative or executive exemptions, the Court found that in addition to the uniform classification, the plaintiffs' actual job duties were, in fact, similar.  *See Morgan*, 551 F.3d at

15

1262-63; *Ahle v. Veracity Research Co.*, 738 F. Supp. 2d 896, 922 (D. Minn. 2010); *Nerland v. Caribou Coffee Co.*, 564 F. Supp. 2d 1010, 1018-24 (D. Minn. 2007); *Pendlebury v. Starbucks Coffee Co.*, 518 F. Supp. 2d 1345, 1359-62 (S.D. Fla. 2007).  In other words, notwithstanding uniform classification, the courts still examined whether the opt-ins truly were similarly situated in the areas of their jobs relevant to the FLSA misclassification inquiry.[4]

More importantly, the Second Circuit's recent ruling in *Myers v. Hertz Corp.*, which Plaintiffs failed to mention, eviscerates Plaintiffs' argument.  In *Myers*, a group of managers, who were seeking to recover overtime under the FLSA through collective litigation, argued that certification was appropriate because the company classified all managers as exempt without an examination of each individual's duties.  *See* 624 F.3d at 549.  However, the Second Circuit found that the company's blanket policy of *classifying* managers as exempt did not provide a basis for a collective resolution of whether those employees were *actually* entitled to overtime. In fact, the Second Circuit found that a collective resolution was inappropriate because regardless of the employer's blanket classification of the employees at issue, resolution of the plaintiffs' legal claims would depend on individualized inquiries:

> [T]he fact of common exemption does not establish whether all plaintiffs were *actually* entitled to overtime pay or whether they were covered by the applicable administrative regulations defining FLSA's exemptions. . . . Again, the question of entitlement to overtime pay is answered by examining the employee's actual duties.

*Id.* at 549-50 (emphasis in original).  Several other courts have rejected the argument that Plaintiffs offer here for similar reasons.  *See, e.g., In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d 953, 959 (9th Cir. 2009) (employer's uniform internal classification policy does

---

[4] Plaintiffs' argument that uniform internal classification is grounds for a collective resolution of an FLSA claim also defies common sense.  The overwhelming majority of employers make classification decisions regarding employees' FLSA status by position, rather than on an employee-by-employee basis.  If that were enough to permit collective resolution of an overtime claim, there would be no need for the rigorous "similarly situated" analysis in the second step of the two-stage FLSA collective action inquiry.

not eliminate need for individualized inquiries to determine liability); *Hernandez v. United Auto Credit Corp.*, 2010 WL 1337702, *5 (N.D. Cal. Apr. 2, 2010) (in analyzing certification of FLSA collective action, court should not rely on uniform internal classification policy).

## V.   THE SUPREME COURT'S HOLDING IN *DUKES* MUST GUIDE THE COURT'S CERTIFICATION DETERMINATION.

The Supreme Court's landmark *Dukes* decision applies to the Court's certification determination in this case.  In *Dukes*, the Supreme Court held that in determining whether cases may proceed in a representative capacity, courts must undertake a "rigorous analysis" to determine whether there is a common contention, the truth or falsity of which can resolve the claims of all class members in one stroke.  Plaintiffs attempt to evade the impact of *Dukes*, in part by pointing to six decisions that they contend to hold that *Dukes* is not applicable to FLSA cases.  Notably, five of those decisions were made at the conditional certification stage, where the court's inquiry is more limited and the plaintiff's burden is much more lenient than at the decertification stage.  *See Creely v. HCR ManorCare, Inc*., 2011 WL 3794142 (N.D. Ohio July 1, 2011)[5]; *Spellman v. Am. Eagle Express, Inc*., 2011 WL 4014351, *1 n.1 (E.D. Pa. July 21, 2011); *Eddings v. Health Net, Inc.*, 2011 WL 4526675 (C.D. Cal. July 27, 2011); *Faust v. Comcast Cable Commc'n Mgmt*., 2011 WL 5244421, *1 (D. Md. Nov. 1, 2011); *Ware v. T-Mobile USA*, 2011 WL 5244396, *2 (M.D. Tenn. Nov. 2, 2011).  Indeed, two of those decisions expressly limit their rulings to the conditional certification stage for this reason.  *See Spellman*, 2011 WL 4014351, *1 n.1; *Ware,* 2011 WL 5244396, *7 n.10.  These courts have simply opined that *Dukes* does not govern the preliminary inquiry in an FLSA collective action, which merely determines whether and to whom notice of the pendency of the case will issue.  In the remaining

---

[5] While the *Creely* decision that Plaintiffs cite does not recite the procedural posture of the case, the docket reflects that the opinion was entered in response to the parties' request for a ruling regarding the impact of *Dukes* on the court's conditional certification order, which entered a few days before *Dukes* was published.  *See* S.D. Ohio docket no. 3:09-cv-02879-JZ, entries 100-110.

case that Plaintiffs cite, the court recognized that other district courts had applied *Dukes* to FLSA collective actions and concluded that the concerns expressed in *Dukes* were not determinative in that particular action. *Troy v. Kehe Food Distrib., Inc.*, 2011 WL 4480172, *8 (W.D. Wash. Sept. 26, 2011) ("[Where] district courts relied on *Dukes* to deny collective action certification, the individualized, discretionary decisions of individual supervisors were at issue . . . . Here, no such inquiry into individual supervisors' discretionary decisions is required."). Thus, none of the decisions Plaintiffs cite hold that the Supreme Court's guidance as to when an action may proceed to judgment based on representative proof is inapplicable to the second stage inquiry in an FLSA case, where the standard to be applied is very similar to the Rule 23 certification standard that the Supreme Court elucidated in *Dukes*. It is no surprise, therefore, that other courts have found that *Dukes* is applicable to FLSA certifications where individualized inquiries are necessary. *See Ruiz v. Serco, Inc.*, 2011 U.S. Dist. LEXIS 91215, at *18 (W.D. Wis. Aug. 5, 2011); *MacGregor v. Farmers Ins. Exch.*, 2011 WL 2981466, *4 (D.S.C. July 22, 2011).

Plaintiffs also attempt to distinguish *Dukes* on its facts – particularly the immense size of the class and the fact that the liability determination in *Dukes* would have required an examination of the subjective intent of each decision maker. Opp. at 34. However, nothing in Plaintiffs' Opposition or the Supreme Court's decision provides any reason why the *Dukes* holding should be limited to immense classes or claims that turn on subjective intent. Indeed, other courts have not found the holding of *Dukes* to be so narrow as Plaintiffs would like to believe. *See, e.g.*, *Cruz v. Dollar Tree Stores, Inc.*, 2011 WL 2682967 (N.D. Cal. July 8, 2011) (applying *Dukes* to FLSA case involving 718 class members). While the number of opt-ins here is smaller than the number of class members in *Dukes*, the individualized nature of Plaintiffs' claims creates the same types of manageability problems that the Supreme Court recognized in

*Dukes*.  Similarly, while the individualized inquiry presented by this case is a matter of each individual SMR's approach to the outside sales aspects of the position, rather than a question of how particular supervisors exercised discretion in making promotional decisions, the result is the same.  The Court is not in a position to resolve the claims of the group of individuals at issue in this litigation without examining the circumstances of a large number of individuals *seriatim*.  Under those circumstances, the case may not proceed to trial on a representative basis.

## VI.   PLAINTIFFS HAVE NOT ADDRESSED THE EVIDENTIARY ISSUES CAUSED BY THEIR SPOLIATION THAT FURTHER RENDER THEIR CLAIMS UNSUITABLE FOR COLLECTIVE LITIGATION.

As NVR pointed out in its Motion to Decertify, a collective trial in this case would be rendered even more unworkable by Plaintiffs' failure to preserve evidence relating to their claims in this matter, because their destruction of evidence would require the Court to engage in yet another set of individualized inquiries regarding each opt-in's preservation efforts.  Def. MOL at 38-40.  Plaintiffs do not address that point, but rather contend that "decertification is not an appropriate spoliation sanction."  Opp. at 39.  This observation misses the point, as NVR has never sought decertification as a sanction.  Rather, NVR has observed that the record reflects that Plaintiffs' counsel failed to give any meaningful document preservation instructions to any of the opt-ins, including the sampling of individuals who participated in discovery.[6]  Def. MOL at 39.  As a result, it is undisputed that probative evidence has been destroyed.  Donahue Dep. 567:12-22.  The extent to which each individual opt-in has spoliated evidence will depend on his or her own idiosyncratic recordkeeping practices.  Similarly, Plaintiffs' spoliation will call for examination of what information each individual possessed, what he or she destroyed, whether

---

[6] While the motion practice surrounding Plaintiffs' failure to preserve documents has, up to this point, focused on one of the eight opt-ins who participated in discovery, Plaintiffs' counsel has repeatedly attested that the inadequate preservation instructions that they gave to that SMR is consistent with their firm's "standard practices."  *See* Def. MOL at 39.

his or her destruction of any evidence was unreasonable under the circumstances, and the appropriate remedy for each act of spoliation.

Plaintiffs do not substantively contest any of these points; instead they attempt to deflect the spoliation issue by noting that it is not ripe for adjudication as to the class as a whole.  Opp. at 39.  This glib attitude toward the individualized issues presented in this case is symptomatic of Plaintiffs' larger effort to forestall a serious consideration of what a collective trial of this action would involve.  After four years of active discovery and more than 650 docket entries, this case is more than sufficiently developed for the Court to determine whether a collective resolution of Plaintiffs' claims is appropriate.  The record provides every indication that the case involves more differences than similarities with respect to the issues to be resolved at trial, and the need to remedy – on an individualized basis – Plaintiffs' failure to preserve probative evidence is but one poignant example of the unworkability of a collective resolution of this case.

## CONCLUSION

For the foregoing reasons and the reasons set forth in Defendant's Memorandum of Law in Support of Its Motion to Decertify Collective Action, the Court should decertify the FLSA collective action in this matter and dismiss the claims of the opt-in plaintiffs without prejudice.

Dated: January 13, 2012                  Respectfully submitted,

                                    /s/ Barry J. Miller          _

|              SEYFARTH SHAW LLP              |  | WOODS OVIATT GILMAN LLP |
|---|---|---|
| Richard L. Alfred | Lorie E. Almon | William G. Bauer |
| Barry J. Miller | 620 Eighth Avenue | 700 Crossroads Bldg., 2 State St. |
| James M. Hlawek | New York, NY 10018 | Rochester, NY 14614 |
| 2 Seaport Lane, Suite 300 | (212) 218-5500 | (585) 987-2800 |
| Boston, MA 02210 | lalmon@seyfarth.com | wbauer@woodsoviatt.com |
| (617) 946-4800 |  |  |
| bmiller@seyfarth.com |  |  |

*Attorneys for Defendant NVR, Inc.*

14041927v.5