UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

———————————————————

PATRICK TRACY, on behalf of himself and
all other employees similarly situated, et al.,

                      Plaintiffs,

             v.

NVR, INC.,

                  Defendant.

———————————————————

DECISION & ORDER and
REPORT & RECOMMENDATION

04-CV-6541L

## PRELIMINARY STATEMENT

Commenced nearly eight years ago, this protracted and often contentious

collective action has spawned dozens of discovery disputes.  The latest, and hopefully final,

disputes arise from allegations by both parties that the other has spoliated evidence.  (Docket

## 579, 624).  Because resolution of the motions turns in part upon the relevance of the alleged

spoliated material, I briefly summarize the factual and legal issues pertinent to plaintiffs' claims.

Plaintiff Patrick Tracy ("Tracy") commenced this action in 2004 against NVR,

Inc., a public corporation engaged in the home construction business, alleging that he and other

similarly-situated employees of NVR were unlawfully denied overtime pay under the Fair Labor

Standards Act ("FLSA") and the New York Labor Law.  (Docket ## 1, 394).  From 2000 until

2005, Tracy was employed by NVR as a Sales and Marketing Representative ("SMR").  (Docket

# 394 at 1).  In that position, Tracy met with potential customers interested in purchasing homes

in custom-built residential subdivisions, showed them model homes and attempted to negotiate

and finalize home purchases in the developments.  (*Id*.).  Tracy alleges that he and other SMRs

generally worked from inside a model home in one of NVR's developments.  (*Id*.).  His

complaint alleges that he and other SMRs regularly worked more than forty hours per week, but

were improperly classified by NVR as exempt employees under the FLSA and thus denied

statutorily-required overtime compensation.  (Docket ## 80, 394 at 1-2).  Discovery proceeded

initially only on Tracy's claims.  (Docket # 291).

On July 14, 2007, United States District Judge David G. Larimer conditionally

certified the collective action claims under the Fair Labor Standards Act.[1]  (Docket # 136).

Thereafter, NVR identified approximately 1,615 individuals as putative class members eligible to

join the litigation.  (Docket # 590 at ¶ 6).  By September 12, 2007, the end of the opt-in period,

155 current and former SMRs had opted to join the lawsuit as party plaintiffs.  (*Id*. at ¶ 7).  As a

result of the subsequent withdrawal or dismissal of claims by 22 of the plaintiffs, 133 plaintiffs

are currently participating in this litigation.  (Docket # 621 at 17).

In February 2009, Judge Larimer denied Tracy's motion for summary judgment

on his individual claims.  (Docket # 394).  In opposing Tracy's motion, NVR maintained that

SMRs had been properly compensated pursuant to FLSA regulations exempting from overtime

requirements any employee "customarily and regularly engaged away from his employer's place

of business" in sales activities.  (*Id*. at 3).  *See* 29 C.F.R. 541.500.  Specifically, NVR relied on

Department of Labor opinion letters concluding that "sales persons operating from model homes

are exempt as outside sales employees, where their duties require their frequent absence from the

model home or comparable sales office."  (Docket # 394 at 4).  Tracy, on the other hand, claimed

---

[1] In 2006, the parties settled the claims of a class of employees classified as Sales and Marketing
Associates.  (Docket # 345 at ¶¶ 10-11).

that he did not "customarily and regularly" perform work away from the model home and that he "never strayed from NVR's designated sales sites when making sales." (*Id*.).

Judge Larimer concluded that summary judgment was inappropriate considering the parties' "nearly diametrically opposed descriptions of . . . Tracy's sales activities in and away from the model homes to which he was assigned." (*Id*. at 8-9). Those disputed facts, Judge Larimer determined, are "central to the determination whether Tracy was 'customarily and regularly engaged' outside of NVR's place of business, and present a material question of fact as to whether the 'outside sales' exception applies to him, and to those similarly situated." (*Id*. at 9).

Following Judge Larimer's decision, the parties conducted discovery relating to eight plaintiffs selected by defendant. (*See* Docket # 400). Following numerous disputes between the parties, the discovery period concluded in June 2010, except for certain follow-up discovery approved by the Court. (Docket # 490 at 85).

In plaintiffs' pending motion, they seek an order compelling NVR to produce its litigation hold notices, accompanied by a list of employees who received the notices. To justify their request for production of documents generally protected by the attorney-client privilege, plaintiffs maintain that they have made a preliminary showing of spoliation. (Docket # 579). In NVR's motion, it seeks an order imposing sanctions as a result of the loss or destruction by plaintiff Megan Fox Donahue of her calendars spanning the period August 2000 through December 2003 and an expense report she prepared for the month August 2000. (Docket # 624).

3

## **DISCUSSION**

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999). *See also Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 685 F. Supp. 2d 456, 465 (S.D.N.Y. 2010). "The right to impose sanctions for spoliation arises from a court's inherent power to control the judicial process and litigation, but the power is limited to that necessary to redress conduct 'which abuses the judicial process.'" *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 685 F. Supp. 2d at 465; *see also Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 106-07 (2d Cir. 2002) (citing *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 135-36 (2d Cir. 1998)); *Reilly v. NatWest Mkts. Grp., Inc.*, 181 F.3d 253, 267 (2d Cir. 1999) ("[w]hether exercising its inherent power or acting pursuant to Rule 37, a district court has wide discretion in sanctioning a party for discovery abuses"), *cert. denied*, 528 U.S. 1119 (2000).

A party moving for spoliation sanctions must demonstrate that: (1) the party charged with destroying the evidence had an obligation to preserve it; (2) the records were destroyed with a "culpable state of mind"; and (3) the destroyed evidence was relevant to the party's claim or defense. *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d at 107 (citing *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 107- 08 (2d Cir. 2001)). *See also Pension Comm.*, 685 F. Supp. 2d at 467; *Arista Records LLC v. Usenet.com, Inc.*, 608 F. Supp. 2d 409, 430 (S.D.N.Y. 2009); *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 220 (S.D.N.Y. 2003).

## I. **Plaintiffs' Motion to Compel Production of Litigation Hold Notices**

I turn first to plaintiffs' motion to compel production of NVR's litigation hold notices, which NVR has asserted are protected from discovery under the attorney-client privilege. Plaintiffs do not dispute that the communications are privileged, but contend that they have made a preliminary showing of spoliation of evidence sufficient to justify their production.

### A. **Facts**

#### 1. **Document Retention Practices of Certain NVR Managers**

In support of their motion, plaintiffs rely on deposition testimony from six NVR managers – Paul Mock, Doug Partington, Mark D'Urso, Michael Barrett, David Wilcox and Michelle Sobieski.  Plaintiffs contend that their testimony establishes that (1) NVR failed to instruct them to preserve all relevant documents or (2) despite those instructions, preservation did not occur.  As a result, plaintiffs contend, information and documents were destroyed, including electronically-stored information, that shed light on the central question of how SMRs customarily spent their time.  The particular documents that plaintiffs contend the managers failed to preserve are "traffic reports," quarterly marketing reports, customer surveys and "secret shopper" reports.  (Docket ## 580 at 4, 9; 621 at 7-8).  Neither party has explained, nor do the deposition excerpts submitted describe, the particular information contained on any of these reports other than the traffic reports, which are described below.[2]

a. **Paul Mock:**  Since 1998, Paul Mock has worked as a Division Manager for NVR's Washington West division.  (Docket # 588 at ¶ 1).  In that position, he

---

[2] Wilcox testified that quarterly marketing reports were prepared by SMRs to record, "What are [they] going to do for [their] community . . . outside of the corporate efforts."  (Docket # 596, Ex. E at 70).  He did not explain the format or content of the information in the report.

supervised Sales Managers who, in turn, supervised SMRs, but he did not directly supervise any SMRs. (*Id.*). Mock testified that in 2007 he received an instruction to preserve documents, although he did not recall searching for any documents after he received that notice. (Docket # 581, Ex. A at 29, 32, 33-35). On January 29, 2010, pursuant to Fed. R. Civ. P. 26(a)(1)(A)(i), NVR designated Mock, along with nearly 200 others, as an individual likely to have information that NVR may use in support of its defenses. (Docket # 581, Ex. G).

Among the documents and reports that Mock regularly reviewed were "traffic reports." Mock testified that each division compiled a weekly report that summarized information about "traffic" in each development (referred to by NVR as a "community") within the division, such as the number of customers who visited the community, the number of appointments set, the number of contracts written and the number of sales made. (Docket # 581, Ex. A at 223-24). Mock testified that only one SMR generally worked in each community, and an administrative employee for the division would prepare the traffic report from information provided by each community and distribute the report throughout the division, as well as to the Regional Manager in charge of the division and the President in charge of the region. (*Id.* at 224-25, 227). Mock testified that he typically retained his copies of the traffic reports for one year in order to make annual comparisons of traffic data. (*Id.* at 226). According to Mock, his division did not create or maintain any records reflecting the schedules or daily activities of SMRs who worked in the division. (*Id.* at 219).

In addition, Mock testified that SMRs were required to submit quarterly marketing plans to their Sales Managers. Mock did not regularly receive copies of such reports, and when he did, he did not save them. (*Id.* at 221-22). Similarly, when he did receive copies of

6

completed customer surveys, which were sent by NVR's headquarters to customers who had

bought houses in NVR communities, he did not save them.  (*Id*. at 338-40).  Finally, he also

shredded copies of any "secret shop" reports he received.  (*Id*. at 289-90).

Six of the opt-in plaintiffs worked in the Washington West division, although

none were still employed by NVR at the time they joined this litigation.  (Docket # 588 at

¶¶ 3-4).  Four of the six terminated their employment within the year preceding the filing of their

opt-in notices.  (*Id*. at ¶ 4).

**b. <u>Doug Partington</u>:**  Doug Partington was promoted from Sales

Manager to Regional Sales and Marketing Manager in January 2003.  (Docket # 589 at ¶ 5).

Before he was promoted, Partington directly supervised two of the opt-in plaintiffs, but did not

directly supervise any SMRs thereafter.  (*Id*. at ¶ 4).  Partington testified that he was not familiar

with a litigation hold notice.  (Docket # 581, Ex. B at 41-42).  He further testified that he

regularly deleted email and disposed of customer surveys, and discarded traffic reports at the end

of every year.  (*Id*. at 45, 49; Docket # 590, Ex. E at 149-50).

**c. <u>Mark D'Urso</u>:**  Before he left NVR in 2007, Mark D'Urso was

employed as a Regional Manager for the southwest Ohio region.  (Docket # 590, Ex. G at 13).

As a Regional Manager, Division Managers reported to him.  (Docket # 581, Ex. C at 83).

D'Urso testified that he was not familiar with a litigation hold notice and was unaware whether

any documents were collected in connection with this litigation.  (*Id*. at 84, 88-89).  He testified

that he deleted emails.  (*Id*. at 93-94).

**d. <u>Michael Barrett</u>:**  Before he resigned from NVR in approximately

September 2006, he was employed as a Sales Manager and had supervised SMRs, including three

opt-in plaintiffs who left employment with NVR approximately one year before they joined the

litigation.  (Docket ## 581, Ex. D at 30; 589 at ¶¶ 6-7).  Barrett testified that he was unfamiliar

with a litigation hold notice and threw away "customer surveys" after receiving them.  (Docket

# 581, Ex. D at 32, 136).  According to Barrett, when he resigned, he returned his work computer

to NVR without deleting any information.  (*Id*. at 128-29).  In 2009, Barrett returned to work at

NVR as an SMR.  (*Id*. at 128).

> **e.  David Wilcox:**  David Wilcox was a Sales Manager for NVR and

supervised three opt-in plaintiffs, each of whom had ceased employment before they joined the

litigation.  (Docket # 589 at ¶ 8).  Wilcox testified that he was not familiar with a litigation hold

notice.  (Docket # 581, Ex. E at 30-31).  He testified that he received and kept traffic reports.  (*Id*.

at 72).

> **f.  Michelle Sobieski:**  Since April 1, 2006, Michelle Sobieski worked as

Vice President of Sales and Marketing for NVR's Delaware Valley region.  (Docket # 589 at

¶ 9).  Sobieski did not directly supervise any of the opt-in plaintiffs.  (Docket # 590 at 71-73).

Sobieski testified that she was not instructed to preserve documents or email related to this case.

(Docket # 581, Ex. F at 59-60).  Sobieski testified that when she was employed as Regional Sales

Manager during the period 2000 through 2006, she regularly received traffic reports and "mystery

shopper" reports, which she saved for approximately one year.  (*Id*. at 138-40, 145).

## 2.  **Destruction of Documents Relating to MTV Office**

Plaintiff Jessica McKnight worked as an SMR in NVR's "MTV"[3] office between 2001 and 2005, and as a Sales Manager between 2005 and 2008.  (Docket ## 595 at 8; 596 at ¶ 45).  McKnight joined this lawsuit on August 8, 2007.  (Docket # 201).  Five months later, NVR closed the MTV office.  In response to an interrogatory seeking information about NVR's destruction of certain types of documents, NVR stated that "some documents related to Ms. McKnight's employment may have been discarded or displaced upon the closure of the MTV division office in or about January 2008."  (Docket # 530 at ¶ 44, Ex. J at 5).  The record contains no information, however, identifying what documents had been maintained in the MTV office when the litigation commenced, McKnight joined the lawsuit or the office was closed.

### B.  **Discussion**

#### 1.  **Applicable Legal Principles**

"Identifying the boundaries of the duty to preserve involves two related inquiries: *when* does the duty to preserve attach, and *what* evidence must be preserved?"  *Zubulake v. UBS Warburg LLC*, 220 F.R.D. at 216 (emphasis in original).  A party is obligated to preserve evidence when it has "notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation."  *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 436 (2d Cir.), *cert. denied*, 534 U.S. 891 (2001); *Creative Res. Grp. of New Jersey, Inc. v. Creative Res. Grp., Inc.*, 212 F.R.D. 94, 105 (E.D.N.Y. 2002).  Once the duty to preserve has attached, a party should institute a litigation hold and "suspend its routine document

---

[3]  The record on this motion does not disclose the full name of the "MTV" office.

and retention/destruction policy." *Toussie v. Cnty. of Suffolk*, 2007 WL 4565160, *7 (E.D.N.Y. 2007) (quoting *Zubulake*, 220 F.R.D. at 218).

A party must preserve "what it knows, or reasonably should know, is relevant to the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably likely to be requested during discovery and/or is the subject of a pending discovery request." *Zubulake*, 220 F.R.D. at 217 (quoting *Turner v. Hudson Transit Lines, Inc.*, 142 F.R.D. 68, 72 (S.D.N.Y. 1991)).  The scope of the duty does not include, however, "every shred of paper, every e-mail or electronic document" because such a rule would be crippling to large corporations, which are often involved in litigation.  *Zubulake*, 220 F.R.D. at 217 (citing *Concord Boat Corp. v. Brunswick Corp.*, 1997 WL 33352759, *4 (E.D. Ark. 1997)).  Thus, the duty "extend[s] to any documents or tangible things (as defined by Rule 34(a)) made by individuals 'likely to have discoverable information that the disclosing party may use to support its claims or defenses'" – in other words, documents created or maintained by the "key players" in the case.  *Id.* at 217-18 (quoting Fed. R. Civ. P. 26(a)(1)(A)).  According to *Zubulake*, the key players in the litigation include individuals identified in a party's initial disclosure as persons likely to have relevant information that the party may use to support its claims or defenses.  *Zubulake*, 229 F.R.D. at 433-34.

In this case, plaintiffs do not seek a finding that defendant has spoliated evidence or the imposition of sanctions.  Rather, they request an order requiring defendant to produce its litigation hold notices, presumably as part of its assessment whether a full-blown spoliation motion is justified.  In seeking disclosure of NVR's litigation hold notice and a list of its recipients, plaintiffs rely primarily on *Major Tours, Inc. v. Colorel*, 2009 WL 2413631 (D.N.J.

10

2009).  In *Major Tours*, the court held that litigation hold letters are generally protected from discovery as privileged or attorney-work product unless a preliminary showing of spoliation is made.  2009 WL 2413631 at *2.  The court further held that a party need not prevail on a separate spoliation motion in order to compel production of litigation hold letters.  *Id*. at *2. Rather, a party need only make a preliminary showing of spoliation, which may be established by deposition testimony demonstrating the destruction of documents or the absence of a preservation order.  *Id*.

The Second Circuit has not addressed whether a lesser standard of proof applies when a party seeks discovery of litigation hold communications rather than spoliation sanctions. The court's conclusion in *Major Tours* that it does is reasonable, and NVR does not explicitly contend otherwise.  *See id*. at * 5 ("most applicable authority from around the country provides that litigation hold letters should be produced if there has been a preliminary showing of spoliation").  I need not resolve that question, however, because I find that even under the more relaxed "preliminary showing of spoliation" standard, plaintiffs' motion should be denied.

## 2.  <u>The Scope of the Duty to Preserve in this Case</u>

The usual point of departure in analyzing any spoliation issue is to determine the date on which any duty to preserve arose.  Here, no dispute exists that NVR had a duty to preserve documents when the lawsuit was filed in 2004.  At that time, NVR was obligated to preserve documents related to Tracy's claims that he was unlawfully denied overtime compensation when he worked as an SMR.  Those documents necessarily included records pertaining to the hours he worked, the activities he performed and where he performed them.

11

The records also included those reflecting NVR's compensation policies for SMRs, including its decision to classify SMRs as exempt employees.

Rather, this dispute pertains to discovery relating to certain of the opt-in plaintiffs who were supervised by some of the managers or worked in a division for which the managers had responsibility.  Plaintiffs maintain that NVR had a duty to preserve relevant documents pertaining to all SMRs, not just Tracy, in 2004 when Tracy filed the putative class action complaint.  In plaintiffs' view, the act of filing the lawsuit as a putative collective and class action was sufficient to trigger an obligation on NVR's part to preserve all relevant documents relating to all former and current SMRs employed by NVR across the country.  NVR contends that such a construction of its preservation duties sweeps far too broadly and ignores both the possibility that the court may not have certified a collective action and the fact that Tracy did not even move for certification until 2007.  NVR argues that the actual opt-in rate in this case of less than 10% (155 of a possible 1,615) illustrates the excessive, and ultimately unnecessary, burden that it would have shouldered had it been required to preserve all potentially relevant documents relating to all putative class members for the nearly three years before conditional certification was requested and granted.

This Court's search, however, has yielded sparse authority addressing the scope of the duty to preserve in a putative collective class action filed under the FLSA.[4]  *See, e.g., Pippins*

_____

[4]  Courts in non-FLSA cases have also found that a duty to preserve arises at the time the putative class action is filed, but have not addressed whether the duty to preserve extended to documents relating to putative class members only.  *See, e.g., Casale v. Kelly*, 710 F. Supp. 2d 347 (S.D.N.Y. 2010) (city's obligation to preserve summonses arose when class action was filed challenging enforcement of the loitering statute that had been ruled unconstitutional prior to the issuance of the summonses); *Bensel v. Allied Pilots Assoc.*, 263 F.R.D. 150, 152 (D.N.J. 2009) (although general duty to preserve arose when the class action was filed, specific duty to preserve particular witness's documents did not arise until pleadings were amended to include allegations related to that witness); *In re NTL, Inc. Sec. Litig.*, 244 F.R.D. 179, 193 (S.D.N.Y. 2007) (duty to preserve documents relevant to the litigation

*v. KPMG, LLP*, 2012 WL 370321 (S.D.N.Y. 2012); *Otsuka v. Polo Ralph Lauren Corp.*, 2010 WL 366653, *4 (N.D. Cal. 2010); *O'Brien v. Ed Donnelly Enterprises*, 2006 WL 2583327, *5 (S.D. Ohio 2006) (without analyzing when duty to preserve arose, court declined to award sanctions for the defendants' failure to produce one time record created after the lawsuit was filed but before the plaintiff opted in). *Pippins v. KPMG, LLP*, is instructive, however. In that case, the plaintiff filed a putative collective and class action under the FLSA alleging that the defendant, a national auditing firm, had improperly classified a group of thousands of employees as exempt and had unlawfully denied them overtime wages. *Pippins v. KPMG, LLP*, 2012 WL 370321 (S.D.N.Y. 2012). The plaintiffs properly moved for conditional certification, and the court stayed discovery pending its decision. *Id*. at *3.

During the stay, the parties and the magistrate judge attempted to resolve a dispute over preservation of all of the computer hard drives belonging to the thousands of putative class members. *Id*. at *4. The efforts were unsuccessful, and the defendant moved for a protective order. The magistrate judge determined that the defendant was obligated to preserve all of the hard drives, finding that they likely contained relevant information regarding the employees' job responsibilities and the hours they worked. *Id*. at *6. The magistrate judge also found that the duty to preserve arose at the time the putative class action was filed because "at that point it became foreseeable that each and every Audit Associate could be a potential plaintiff." *Id*. at *7.

---

arose at time the securities fraud class action was filed; defendant company was obligated to preserve documents related to company's financial condition where plaintiffs alleged that company had falsely reported that the company's financial condition was healthy); *Keir v. Unumprovident Corp*., 2003 WL 21997747, *1 (S.D.N.Y. 2003) (observing without discussion that defendant's obligation to preserve backup tapes containing email arose on the date that the ERISA class action was filed).

13

After the class was conditionally certified, the district court affirmed the magistrate judge's decision in *Pippins*. *Id*. The district court held that the defendant was obligated to preserve each of the hard drives until either (1) the parties agreed to a sampling methodology or (2) the defendant abandoned its argument that "even if Audit Associates generally are found to be non-exempt employees . . . individual Audit Associates perform work that renders them exempt from the FLSA." *Id*. at *10. In reaching its determination, the district court found that, for the purpose of determining the duty to preserve, all parties are "key players" and the defendant should "'reasonably anticipate' that every Audit Associate who will be receiving opt-in notice is a potential plaintiff in this action." *Id*. at *12. The court acknowledged that at the conclusion of the opt-in period, the defendant was free to destroy hard drives of any noticed employee who had not opted-in.[5] *Id*. at *10. Thus, as the district court noted, because the plaintiffs had moved for conditional certification promptly after filing suit, the practical effect of the magistrate judge's decision was "no[thing] more than preserv[ation] [of] the status quo" pending decision on the certification motion. *Id*. at *9.

In this case, the question before the Court is not whether NVR had any duty to preserve documents in 2004; clearly, it did. Nor is the question whether that duty encompassed documents and information relating to the named plaintiff and his claims, including the defendant's determination that the entire class of employees of which he is a member is exempt under the FLSA. Clearly, it did. Rather, the narrower question is whether NVR's duty in 2004 extended to documents and information relating to potential opt-in plaintiffs. NVR contends that

---

[5] The court noted one exception: the defendant was still obligated to preserve hard drives for New York employees who did not opt in because they might become part of "the putative (and as yet uncertified) New York Labor Law class." (*Id*. at *12).

14

it did not, emphasizing that the named-plaintiff did not move for conditional certification for over two years after filing suit.  I agree with NVR that Tracy's decision to wait over two years before moving materially distinguishes this case from *Pippins*.

Another significant distinction between this case and *Pippins* is the nature of the potential evidence at issue.  *Pippins* involved direct evidence maintained by the putative opt-in plaintiffs regarding their work hours and duties.  By contrast, the potential evidence involved in this case – traffic reports, quarterly marketing reports, secret shopper reports and customer surveys – provides only indirect information, at best, about the kinds of activities engaged in by SMRs.  None of the records apparently provide evidence of the hours worked by any SMR in any particular activity or the particular location where such activity occurred (specifically, whether the activity was inside or outside the model home).  Review of the Complaint reveals that those two issues are central to the exemption dispute.

Despite years of discovery, plaintiffs have not explained the contents of the reports, other than the traffic reports; nor are sample reports part of the record on this motion.  The absence of this information prevents this Court from assessing whether relevant evidence reasonably could have been plumbed from the records.[6]  With respect to traffic reports, one of the managers testified that the reports provided information about customer activity in each community within a division, including the total number of customers visits, appointments, signed contracts and sales.  Because most communities employed only one SMR, plaintiffs

---

[6] For a similar reason, the destruction of documents relating to one of the opt-in plaintiffs in connection with the closure of NVR's MTV office does not provide a basis for making a preliminary finding that NVR spoliated evidence.  Although NVR admitted in an interrogatory response that some documents "may have been" destroyed relating to her employment, plaintiffs have not shown what documents were created or maintained in that office that related to her employment, let alone that they would have been relevant to the issues in this case.  In other words, this Court simply cannot make any finding in the absence of information about what records existed.

contend that information about a particular SMR's weekly activities may be extrapolated from the traffic reports.[7]  Again, the central dispute raised by the Complaint is not what type of activities SMRs generally engaged in, but *where* they occurred and the *duration* that each involved.  Plaintiffs have not shown how reliable evidence about either subject may be derived from the traffic reports.[8]  Certainly, more direct evidence exists and has been produced concerning the opt-in plaintiffs' general duties.[9]

To be clear, NVR was not entitled to deviate from its customary document retention policies and "run to the shredder" to destroy documents related to potential opt-in plaintiffs as soon as the action was filed.  (*See* Docket # 595 at 5).  This case presents no evidence that NVR engaged in any such conduct.  *Cf. Capellupo v. FMC Corp.*, 126 F.R.D. 545, 551 (D. Minn. 1989) (imposing sanctions where defendant's "senior officials," upon receiving notice that employee intended to file a class action lawsuit alleging gender discrimination, instituted widespread program of destruction of affirmative action plans, discrimination claims and investigation and personnel files; "[d]efendant's purge was *intentionally* tailored to make forever unavailable records and documents which defendant knew or should have known would be pertinent to this gender discrimination lawsuit") (emphasis added).

---

[7]  For example, counsel explained at oral argument that the amount of time an SMR spent signing contracts inside the model home could potentially be determined from the information recorded in the traffic report because sales contracts are "oftentimes" signed inside a model home.  (Docket # 621 at 6).

[8]  Of course, Tracy was free to move for an order directing NVR to preserve this or any other evidence at the time he filed suit.  *See, e.g.*, *Lawson v. Life of the S. Ins. Co.*, 738 F. Supp. 2d 1376, 1378 (M.D. Ga. 2010) (plaintiff moved for order preserving documents pertaining to putative class members during pendency of interlocutory appeal); *Walker v. Cash Flow Consultants, Inc.*, 200 F.R.D. 613, 617 (N.D. Ill. 2001) (granting plaintiff's motion for an order requiring defendant to preserve documents related to putative class members).

[9]  To the extent that plaintiffs argue that NVR was obligated to preserve these documents as relevant to the questions of commonality and typically under Rule 23, plaintiffs have provided no authority, and this Court has found none, supporting that argument.

As in any case raising issues of spoliation, the court's determination of the scope of the duty to preserve is a highly fact-bound inquiry that involves considerations of proportionality and reasonableness.  *See, e.g.*, *Pippins*, 2012 WL 370321 at *11 ("proportionality is necessarily a factor in determining a party's preservation obligations"); *Orbit One Commc'ns, Inc. v. Numerex Corp.*, 271 F.R.D. 429, 436 n.10 (S.D.N.Y. 2010) (discussing concept of reasonableness and proportionality as "good guiding principles . . . [when] evaluating the sufficiency of a party's efforts at preservation after the fact"); *Pension Comm.*, 685 F. Supp. 2d at 466 (determining the scope of a party's duty to preserve "depends heavily on the facts and circumstances of each case and cannot be reduced to a generalized checklist of what is acceptable or unacceptable").  These considerations lead me to conclude that even if NVR had a duty to preserve documents relating to potential opt-in plaintiffs at the time the suit was filed (a question I need not and do not reach), plaintiffs have not established – preliminarily or otherwise – that documents that should have been preserved by NVR were lost or destroyed.  *See Otsuka v. Polo Ralph Lauren Corp.*, 2010 WL 366653 at *4 (defendant's obligation to preserve store video footage did not arise until two years after putative class action was filed where defendant was unaware of relevance of footage to plaintiffs' claims for overtime compensation until plaintiffs specifically requested it).  Accordingly, I deny plaintiffs' motion for an order compelling production of NVR's litigation hold notices or a list of recipients of such notice.

## II.   Defendant's Motion for Spoliation Sanctions against Plaintiff

I turn next to defendant's motion for sanctions against plaintiff Megan Fox Donahue ("Donahue") for spoliation of evidence.  Specifically, NVR requests that this Court find

17

that her destruction of certain original documents warrants the imposition of an adverse inference that Donahue was customarily and regularly engaged in outside sales activities and an order precluding her from testifying about her activities as an SMR during the period August 2000 through December 2003.  (Docket # 624-1 at 1).  Donahue counters that her conduct does not justify the imposition of any sanctions, let alone such severe sanctions as those sought by NVR. (Docket # 627 at 21-25).

**A.  Facts**

**1.  Overview**

The facts giving rise to this particular motion have been the subject of several previous disputes and motions.  Relevant to this sanctions motion are the following facts.  During discovery, in response to NVR's document requests, plaintiffs produced (1) copies of calendars (referred to as "day runners") for the period August 2000 through December 2003 that Donahue maintained while employed by NVR and (2) a copy of a monthly expense report for August 2000 that she prepared.

Donahue's day runners were originally produced to defendant's counsel in redacted form, but were later produced in unredacted form.  Both sets – the redacted and the unredacted – contain two versions of her monthly calendars for the periods August 2000 through June 2001 and August 2002 through January 2003 that differ from each other in substantial and peculiar ways, as described below.  The expense report produced bears a "redacted" notation that her counsel added to reflect that the "original" report received from Donahue had some white-out in the middle of the report.

After copies of the day runners and expense report had been produced, the originals were returned to Donahue, and she either destroyed or lost them.  She testified that she shredded the expense report (Docket # 628, Ex. B at 567-68, 574) and did not retain and likely shredded the day runners (Docket # 624, Ex. A at 462-63, 465).

### 2.  The Calendars

a.  **Donahue's Testimony and Description of Day Runners:**  Donahue testified that she could not explain the origin of the two versions of her calendars.  She stated that she did not remember keeping two calendars, nor could she think of any reason that she would have done so.  (*Id*. at 467, 554).  Donahue also testified that she kept another calendar in her office that reflected her daily work appointments, which was more accurate than the day runners.  (Docket # 628, Ex. A at 121).  According to Donahue, she left that other calendar at NVR when she stopped working there in 2003.  (*Id*. at 127-28).  No evidence has been adduced about what happened to it.

The entries on the day runners pertain to what Donahue did, or was planning to do, for each day of the month.  For example, they record meetings, training sessions, appointments with customers, personal and work-related lunches and dinners, medical and other personal appointments, parties and days "off."  The entries also include abbreviations on many days such as, "WP," "CH," "SE" and "BC," which apparently denote the names of particular NVR communities.  (Docket # 624, Ex. A at 527, 534).

19

b. **Comparison of the Two Versions**:  This Court has reviewed and

compared the two versions of the day runners in their entirety.[10]  To say that they are replete with

differences would risk understatement.[11]  The fact that certain entries are identical on both, in

terms of content and handwriting, leads to the inescapable conclusion that at some point one

original existed, which was copied and then changed to create a second version.  Whether all

seventeen months for which there are two versions were copied at one time or at different times,

such as at the end of each month, cannot be discerned from examining the copies produced.

Despite some identical entries on both versions, one reflects substantially more

entries than the other.  Indeed, every one of the seventeen months for which there are two

versions contains multiple additional entries – over thirty for some months – all of which depict

Donahue's daily activities, including in many instances, the nature, purpose, duration and

location of the work activities, in addition to leisure activities.  For example, one version of the

August 2000 calendar contains the notation on August 21, 2000, "drive to Bethesda @ 7 pm,"

and the notation "Training Bethesda" spanning the period August 15-17.  The other version

contains none of this information, and Donahue could not explain why.  (Docket # 624, Ex. A at

545).  Similarly, one version of the April 2001 calendar contains handwritten entries on April 9,

2001 stating, "9:30 mtg," "prestart 1pm – lot 123," and "WP 1-7".[12]  None of this information is

---

[10] The Court has copies of the entire calendars because they were submitted for *in camera* review before they were produced to NVR.

[11] Plaintiffs appear to suggest that the differences are limited to the examples cited by NVR in its motion papers and fall outside the applicable statute of limitations.  Both suggestions are wrong.  (Docket # 627 at 5-6).  All seventeen months for which there are two versions have multiple differences; six months (August 2002 through January 2003) fall within the limitations period.

[12] "WP" refers to an NVR community.  (Docket # 624-1 at 2).  Donahue testified that a notation such as "CH 10-6" indicated that she was scheduled to or did work at that location from 10:00 a.m. until 6:00 p.m.  (Docket # 624, Ex. A at 534).

present on the other version.  Donahue testified that "prestart 1pm – lot 123" meant that a

pre-construction meeting regarding lot 123 was scheduled for 1:00 p.m. that day and that the

meeting most likely took place at the WP NVR community, not at lot 123.  (*Id*. at 527).  Many of

the additional entries take a similar form – "WP 12-7," "CH 2-7" – and apparently reflect the

hours she worked, or was scheduled to work, at a particular NVR community.  All told, the two

versions reflect hundreds of differences.

Side-by-side comparison of the two versions strongly suggests that after the

original was copied, entries were *added* to the copy.  The other possible explanation is that the

original version had some entries that were "whited-out" on the copy.  Although I believe that

explanation is implausible,[13] loss of the original makes it impossible to determine conclusively

whether the changes resulted from additions or deletions.

Assuming entries were added rather than deleted, the loss of the originals has also

deprived NVR of potentially probative evidence as to when the additions were made.  For

example, additions written in the same ink on a particular monthly calendar may suggest that

they were made at the same time, while additions written in different ink may suggest that they

were made at different times.  If all of the additions on all the monthly calendars are in the same

ink, such evidence may suggest that they were all made at the same time and after January 2003,

the last month for which two versions exist.  The timing of the additions is, of course, germane to

their reliability – the more contemporaneous they are with the event they purport to record, the

more reliable they are likely to be.

---

[13]  That the printed calendar lines are still visible under entries that appear on one version and not on the other suggests that the entry was added to the copy, rather than deleted from the original.

One possible explanation for the additions is that they were intended as annotations for Donahue's counsel.  Counsel initially resisted disclosure of Donahue's day runners on the grounds that they were protected under the attorney-client privilege, explaining that she had made notes to her counsel on the calendar that were so intertwined with the original entries that they could not be redacted.  After addressing the issue with this Court, the day runners were produced, first in redacted form and eventually in unredacted form.  Comparison of the redacted and unredacted sets reveals that, with one exception, all of the information that was redacted were handwritten notes contained in the margins of the calendars.[14]  Had the day runners been preserved, they could have been inspected to determine whether the additional entries in the body of the calendar were made in the same ink as the margin notes to counsel.  If they were, such evidence may suggest that Donahue made them around or after the time she decided to join the litigation – an inference that would be relevant not only to the issue of reliability, but also to whether her annotations constituted spoliation.

Finally, I note that there are several instances in which different entries appear in exactly the same place on the two versions.  For example, one version of the December 2000 calendar contains the notation "2 pm - Mtg for Life Sale - WP" on December 15; the other version contains the entry "6:30 Meig-en" in exactly the same place.  Donahue testified that she could not explain the discrepancy.  (*Id*. at 555-56).  One version of her calendar for April 19, 2001 reflects the notation "7:30 - 2 pm"; the other reflects the notation "7-12" in exactly the same place.  The only conceivable explanation for these discrepancies is that Donahue replaced

---

[14]  The one exception is the notation "3Q Quota" that appears under the column "To Be Done" in her November 2002 calendar.

the original entry on one of the copies with a new entry.  Inspection of the originals would show whether white-out or tape appears under one of the conflicting entries, thus facilitating the differentiation between the original entry and the later addition.

### 3.  **The Expense Report**

With respect to the August 2000 expense report, Donahue testified that she had applied white-out to a portion of the report before she produced it to her counsel, although she could not remember when she did so and, specifically, whether it was before or after she joined the lawsuit.  (Docket # 628, Ex. A at 567-68, 574).  Based on the evident "white-out," Donahue's counsel's office stamped the expense report "redacted" and returned the original to Donahue, who then shredded it.  (*Id*.).

### 4.  **Notice to Donahue of Her Preservation Obligations**

Donahue has made conflicting statements about whether she was instructed to preserve documents.  At her deposition, she testified that she did not recall receiving such an instruction.  (Docket # 624, Ex. A at 485-86).  In her interrogatory responses, however, she affirmed that she had received a "Welcome Letter" from counsel in January 2007, although she could not recall its substance, and had had two telephone conversations with representatives from her attorneys' firm in 2009 advising her to preserve all documents.  (Docket # 624, Ex. F).  Neither Donahue nor her counsel has produced a copy of the "Welcome Letter" sent to Donahue, despite this Court's urging.  (Docket # 621 at 41-55).  In a letter dated August 26, 2011, plaintiffs' counsel represented that "after a thorough search of all paper and electronic files, plaintiffs have concluded that indirect evidence of the firm's practices exists, but that counsel

does not possess any direct evidence of the substance of the preservation language that was included" in the letter sent to Donahue.  (Docket # 628, Ex. F).

### B.  Discussion

Donahue's duty to preserve arose no later than February 8, 2007 when she filed her opt-in notice.  (Docket # 39).  The duty encompassed retention of her day runners and expense reports because both provide salient information about the nature, location and duration of Donahue's daily work activities.  No dispute exists that Donahue destroyed or lost the "original" day runners and expense report after they were copied by her attorney and returned to her.  She was also obligated to retain them because they were responsive to NVR's discovery requests and the copies of them did not capture all of the information available on the originals – such as ink color and white-outs.  On these facts, I find that Donahue spoliated evidence that should have been preserved.[15]

### 1.  Culpability

In considering sanctions, I must assess the level of culpability with which Donahue destroyed the original documents.  "[A] finding of bad faith or intentional misconduct is not a *sine qua non* to sanctioning a spoliator."  *Reilly v. NatWest Mkts. Grp., Inc.*, 181 F.3d at 268.  Rather, a finding of gross negligence or knowing or negligent destruction of evidence will satisfy the "culpable state of mind" requirement.  *Id.*; *Residential Funding Corp.*, 306 F.3d at 108 ("[t]he sanction of an adverse inference may be appropriate in some cases involving the negligent

---

[15]  Although NVR contends that "the discrepancies [in the day runners] appear to reflect a deliberate attempt to alter the day runners by removing or altering references to outside sales activities" (Docket # 624-1 at 3), NVR's motion papers do not press the argument that the alterations constitute spoliation (*see id.* at 6).  In any event, the record does not enable me to make any findings about when the day runners were copied and annotated or when the white-out was applied to the expense report.

destruction of evidence because each party should bear the risk of its own negligence");
*Zubulake*, 220 F.R.D. at 220 ("a 'culpable state of mind' for purposes of a spoliation inference
includes ordinary negligence").

        The record in this case does not support a conclusion that the documents were
destroyed willfully or in bad faith.  Specifically, no evidence has been adduced that Donahue
intentionally destroyed the originals in order to conceal them from NVR.  *Compare Arista
Records LLC v. Usenet.com, Inc.*, 608 F. Supp. 2d at 438-39 (finding bad faith where defendants
"took affirmative steps" to make data unavailable and provided misleading information to the
court) *with De Espana v. Am. Bureau of Shipping*, 2007 WL 1686327, *3-4 (S.D.N.Y. 2007) (no
bad faith even though defendant failed to issue a timely litigation hold and inaccurately
represented to the court that production was complete, but also produced a "massive record of
evidence").  *But see Zubulake*, 229 F.R.D. at 436 (documents were willfully destroyed where
employees deleted emails after counsel's instructions to retain documents).  In fact, when the
documents were returned to her, Donahue presumably knew that copies of them had been made
by her attorneys and turned over to NVR's counsel.

        I find, however, that Donahue's destruction amounted to gross negligence.  The
record plainly establishes that she destroyed or lost important records containing information not
only relevant, but central, to the issue of how and where she spent her time each day while
employed as an SMR.  Although copies of the records have been produced, any cursory review of
them would reveal substantial and curious discrepancies between the two versions.  Donahue –
more than anyone else – should have been aware of the discrepancies in her calendars.  Both she
and her counsel should have anticipated that NVR's counsel would want to inspect the originals

in an effort to explore the discrepant entries.  Where, as here, a party fails to preserve for

inspection and further use original documents that (1) provide evidence central to the party's

claims, (2) respond to the opposing party's discovery requests, and (3) contain vast numbers of

conflicting handwritten entries, such conduct constitutes more than mere negligence.

### 2. **Appropriate Remedy**

Finally, I must determine the sanction that is most appropriate under the

circumstances.  *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d at 436 ("[t]he determination of an

appropriate sanction for spoliation, if any, is confined to the sound discretion of the trial judge,

and is assessed on a case-by-case basis") (internal citation omitted).  As the Second Circuit has

observed:

> [T]he applicable sanction should be molded to serve the
> prophylactic, punitive, and remedial rationales underlying the
> doctrine.  The sanction should be designed to: (1) deter parties
> from engaging in spoliation; (2) place the risk of an erroneous
> judgment on the party who wrongfully created the risk; and
> (3) restore the prejudiced party to the same position he would have
> been in absent the wrongful destruction of evidence by the
> opposing party.

*West v. Goodyear Tire & Rubber Co.*, 167 F.3d at 779 (citing *Kronisch v. United States*, 150

F.3d 112, 126 (2d Cir. 1998), *overruled on other grounds by Roteller v. Wood*, 528 U.S. 549

(2000)) (internal quotation and citation omitted).

Here, NVR seeks "an adverse inference that Ms. Donahue was customarily and

regularly engaged in outside sales activities."  (Docket # 624-1).  The adverse inference that

NVR has requested – a jury instruction that certain facts are deemed admitted and must be

accepted as true – represents an adverse inference "[i]n its most harsh form."  *Pension Comm.*,

685 F. Supp. 2d at 470.  Such an instruction would likely result in the dismissal of Donahue's claims because the question whether SMRs, like Donahue, were lawfully exempt from overtime pay requirements under the FLSA turns on whether they were engaged in outside sales activity. *See In re: NTL, Inc. Sec. Litig.*, 244 F.R.D. at 192 ("[a]n adverse inference instruction is a severe sanction that often has the effect of ending litigation because it is too difficult a hurdle for the spoliator to overcome") (internal quotations omitted).  *See also Jones v. Niagara Frontier Trans. Auth. (NFTA)*, 836 F.2d 731, 734 (2d Cir. 1987), *cert. denied*, 488 U.S. 825 (1988) (dismissal or an entry of judgment against a party is "an extreme sanction, to be imposed only in extreme circumstances").  A sanction of dismissal should not be imposed absent a finding of willfulness or bad faith, *Valentine v. Museum of Modern Art*, 29 F.3d 47, 49 (2d Cir. 1994), or where lesser sanctions would be effective, *Shcherbakovskiy v. Da Capo Al Fine, Ltd.*, 490 F.3d 130, 140 (2d Cir. 2007).  Because Donahue's conduct did not involve bad faith, an adverse instruction would be too harsh a sanction.

NVR also urges the Court to issue an order prohibiting Donahue from testifying about her sales activities during the time period covered by the day runners – August 2000 through December 2003.  (Docket # 624-1 at 11-12).  Although a preclusion order is also a severe sanction, *see, e.g.*, *Daval Steel Prods., a Div. of Francosteel Corp. v. M/V Fakredine*, 951 F.2d 1357, 1367 (2d Cir. 1991) (citing *Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639, 643 (1976) (*per curiam*)) ("[a]lthough an order . . . precluding a party from presenting evidence . . . is strong medicine, such orders are necessary on appropriate occasions to enforce compliance with the discovery rules and maintain a credible deterrent to potential violators"); *Update Art, Inc. v. Modiin Pub., Ltd.*, 843 F.2d 67, 71 (2d Cir. 1988); *Outley v. City of New*

27

*York*, 837 F.2d 587, 590 (2d Cir. 1988); *Brick v. CSX Transp., Inc.*, 2007 WL 2580483, *3

(W.D.N.Y. 2007), it is the most appropriate sanction for Donahue's conduct.  To permit Donahue

to testify about her activities as an SMR between 2000 and 2003, particularly where that

testimony refers to or is refreshed by entries from her daily calendars for that period, without

affording NVR's counsel the ability to cross-examine her with the original calendars would

permit Donahue to profit unfairly from her destruction of important evidence.  No lesser sanction

would avoid such an unfair and prejudicial result.  *See Brown v. Coleman*, 2009 WL 2877602, *3

(S.D.N.Y. 2009) (witness was precluded from testifying about facts that could have been gleaned

from destroyed documents).  Accordingly, I recommend that Donahue not be permitted to offer

evidence regarding her daily work activities during the period August 2000 through December

2003.


## <u>CONCLUSION</u>

For the reasons discussed below, plaintiffs' motion to compel production of

NVR's litigation hold notice and a list of its recipients **(Docket # 579)** is **DENIED**.  I

recommend that the district court grant in part and deny in part defendant's motion for spoliation

sanctions against plaintiff Megan Fox Donahue.  (Docket # 624).  Specifically, I recommend that

Donahue be precluded from offering evidence regarding her daily work activities during the period August 2000 through December 2003.

**IT IS SO ORDERED.**


                                                    _s/Marian W. Payson_
                                                    MARIAN W. PAYSON
                                                    United States Magistrate Judge

Dated:  Rochester, New York
         March __26__, 2012

29

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute, Fed. R. Civ. P. 72(b), 6(a) and 6(e) and Local Rule 72.3(a)(3).

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance.  *See e.g. Paterson-Leitch Co., Inc. v. Massachusetts Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.**  *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 72.3(a)(3) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority."  **Failure to comply with the provisions of Rule 72.3(a)(3), or with the similar provisions of Rule 72.3(a)(2) (concerning objections to a Magistrate Judge's Decision and Order), may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the Plaintiff and the Defendant.

**IT IS SO ORDERED.**

                                                        *s/Marian W. Payson*
                                                        MARIAN W. PAYSON
                                                        United States Magistrate Judge

Dated: Rochester, New York
          March ___26___, 2012